Thomas Clyde BOWLING,
Jr., Petitioner,

v.

Phillip PARKER, Warden, Respondent.

No. Civ.A. 99–236.

United States District Court,
E.D. Kentucky,
Lexington.

March 29, 2001.

Randall L. Wheeler, Elizabeth R. Stovall, Public Advocate's Office, Frankfort, KY, for Thomas Clyde Bowling, Jr., petitioner.

Connie V. Malone, David A. Smith, Ian G. Sonego, Dana Maria Todd, Attorney General's Office, Frankfort, KY, Joseph T. Bouvier, Commonwealth Attorney's Office, Lexington, KY, for Phillip Parker, respondent.

## MEMORANDUM OPINION AND ORDER

FORESTER, Chief Judge.

This matter is before the Court on the petition of Thomas Clyde Bowling, Jr., by counsel, for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The respondent, by counsel, has filed an answer [Record No. 25], to which the petitioner has, with the permission of the Court, filed a traverse [Record No. 66].

### FACTUAL BACKGROUND

At approximately 7:00 a.m., on Monday, April 9, 1990, in the parking lot in front of the Earley Bird Cleaners, in Lexington, Fayette County, Kentucky, Tina and Eddie Earley, a couple in their twenties, and their two-year-old son, Chris, were shot as they arrived to open the family dry cleaning business. Eddie was found lying on the pavement between the open passenger door of his car and the door to the business; he was bleeding from four bullet wounds. Tina, who was still sitting in the car, had been shot and wounded three times; and Chris, found on the car floor under his mother, had a wound to his foot. The son would recover, but his parents were pronounced dead at the hospital minutes later that morning.

Police arriving at the scene found damage to the driver's side of the Earleys' car; collected bullets from outside and inside the vehicle; and recovered debris consistent with a collision, including paint and broken pieces of headlight from another car. The gunshots had alerted a few witnesses, whose observations varied when they gave descriptions of the shooter to the police. In the early stages of the investigation, it was determined that the debris came from a light blue 1981 Chevrolet Malibu and a 1981 Malibu was registered in Fayette County to Thomas Clyde Bowling, Jr. The police pursued a broad search for the suspect's car and considered several theories of what could have occasioned the young couple's murder.

On the following day, April, 10, 1990, police received a telephone call from the petitioner's sister, Pat Gentry. She stated that she and her mother, Iva Lee Bowling, were worried because his mother had not seen their son/brother, "T.C." Bowling, since he left the mother's Lexington home at approximately 6:00 a.m. the preceding day; she and her mother had just discovered his damaged car on family property in rural Powell County, Kentucky; the car met the description of the vehicle they had heard was being sought in the Earley shootings; and they feared that these facts, together with Bowling's recent de-

pressed and unstable mental state, had caused him to take his life. Later in the day, the sister telephoned her Knoxville home and discovered that the petitioner had come to her home and was asleep on her couch.

Lexington and Knoxville police departments immediately coordinated a SWAT team of officers who arrested the petitioner at the Gentry home without incident and took him to jail. There his clothing was taken and examined and no blood residue found. Meanwhile, at approximately midnight, the police recovered the petitioner's car on the family's Powell County property and towed it to Lexington. The broken pieces of headlight and other debris recovered from the crime scene and paint smears on the Earleys' vehicle were later matched to the petitioner's car. A search of the car interior yielded only an empty thermos bottle; there were no traces of blood.

The following day, April 11, 1990, the police returned to Powell County. There they found a partially buried .357 magnum revolver and other items belonging to the petitioner which had been stashed in various places on the property. Police later found a man who reported that he had sold a .357 magnum to Mr. Bowling a few days prior to the shootings.

According to the instant 197–page petition, signed by counsel, the petitioner has no memory of the day of the crime. While being held in the Lexington jail, he was interviewed by mental health experts, whom he told he had no recollection of that day; he also told them he had no previous history of blackouts.[1]

## THE TRIAL

On June 20, 1990, Bowling was indicted in Fayette Circuit Court on two counts of intentional murder and one count of assault. Although initially represented by a member of the Kentucky Department of Public Advocacy, at the time of his arraignment in the Fayette Circuit Court, Sixth Division, on June 22, he was represented by three retained counsel: Russell Baldani, William Summers, and Tucker Richardson. From the beginning, the Commonwealth announced that it would provide "open file" discovery to the defense and would seek the death penalty. After a number of pretrial motions by defense counsel and several pretrial conferences, the original trial date of October 15, 1990 was changed to December 10, 1990; Bowling underwent a neurological examination; his counsel obtained a court-ordered psychological evaluation; and the defense was granted extra peremptory challenges.

On Monday, December 10, 1990, jury selection commenced. Jurors had filled out a special jury questionnaire, designed by agreement of counsel, as well as the standard one; and they were voir dired first generally as a group and then, with

---

1. Also according to the petition, although there is no evidence in the state record, the petitioner told other interviewing officials that he knew nothing about the crime and had not even heard of the Earleys until he read the newspaper articles about their deaths. Bowling's family contends that T.C. had periods of memory loss throughout his life and a history of several significant head injuries. His father drank heavily and was violent toward the mother when he did so, his focus on the petitioner being either to ignore him or to tell him how stupid or scrawny he was. As a young man, the petitioner also became a heavy drinker, and friends have reportedly witnessed him changing instantly from good natured to enraged. He is purportedly extremely paranoid and distrustful, and his second ex-wife, Loretta, believes he has a split personality. The marriage eventually ended because of his drinking. His third and last marriage, after eight years, was on the brink of dissolution in the months prior to the shootings.

regard to the death penalty, individually in chambers. The court's stated goal was to qualify from the 99–person jury pool 44 jurors, which would allow the defendant 18 peremptory challenges, the Commonwealth 12 peremptories, 12 people remaining to be jurors and 2 alternates. Two days later, stating that it was concerned that the original qualified juror pool would be too small, the court continued down the jury pool list and ended up qualifying 48 jurors. Just before trial, however, after striking a juror for cause, thus leaving 47 qualified, the court overruled the defense motion to grant it additional peremptories and, instead, struck the three extra jurors, numbers 45, 46, and 47.

On the third day, December 12, the jury was seated, and the guilt phase of the trial commenced.[2] After opening arguments, the Commonwealth began its presentation of evidence. A total of 25 witnesses was presented, including the testimony of three individuals who heard the shots and became the only eye witnesses. The first, Larry Turner, thought he heard backfires while he was walking to work approximately a block away; upon his approach to the scene, he saw the two bodies, heard the child crying, and continued on to work to call 911. Another man, David Boyd, testified that from where he sat in the driver's seat of his car at the nearest stoplight, he looked back over his shoulder to see two cars on the cleaners' parking lot and a man standing beside the dark car. He was holding a gun with both hands and shooting into the car. Record No. 57 at 1272. The shooter then moved as if to get into the other vehicle, but did not do so; he went back around to look at the scene before coming around again and driving off. Boyd described the assailant's car as a light blue 1979 or 1980 Malibu and described the assailant as a white male, about six feet tall, medium build, wearing a black jacket and brimmed hat. The third eyewitness, Norman Pullins, who had seen events from the window of a nursing home across the street from the cleaners, could not be located by either the Commonwealth or by the defense. By agreement of the parties, the police officer who interviewed Pullins the morning of the shootings introduced the audiotape of that interview, which was played for the jury. *Id.* at 1286–92.

Police testimony concerned the securing of the crime scene, immediate care of the victims, and the beginning of an investigation. The Commonwealth introduced numerous photographs of the scene, including the view from the K–Mart parking lot through a slatted fence to the Earley Bird Cleaners, close-up photographs of the evidence collected, and a videotape of the entire area. Record No. 57 at 1340, et seq. One detective described his towing the Earleys' car later that day and going to the Bowlings' Powell County property the next day to tow Bowling's car; both were secured as evidence. *Id.* Officer Mark Merriman, of the Kentucky State Police, related his locating the Powell County property late on April 10. He found there the petitioner's damaged Malibu, in the thickets; a shed containing an orange jacket, an orange Little Caesar's t-shirt, and a black Rangers hat; and an unused outhouse into which had been thrown a "little beer case," a four-pack of wine coolers, an empty wine cooler bottle, and the Malibu's license plate. Record No. 58 at 1498–1510. Jim O'Brien, one of police officers searching the Powell County property, testified to his discovery of the

---

2. Kentucky has a bifurcated system, providing a trial first for a determination as to guilt phase and then reconvening for a separate penalty phase to recommend the sentence. Kentucky Revised Statute (KRS) 532.025.

.357 magnum, which was found under an upside down metal pan; the gun was wrapped in clothing and partially buried under leaves. Record No. 58 at 1494. Another officer stated that the gun was fully loaded and had been secured by him for evidence. Detective William Henderson, who was in charge of the investigation, related the events surrounding Bowling's arrest in Knoxville; told of retrieving Bowling's personal effects at that time: a black jacket, umbrella, and backpack containing an atlas, blanket, personal papers, and a homemade sign with "K–N–O–X" written on it; and described locating and interviewing several witnesses, including two who could place Bowling on the road in front of the Powell County lot on the evening of the murders, April 9. Record No. 59 at 1513.

In addition to the officials involved in the investigation, the Commonwealth called experts from state agencies. Dr. John C. Hunsaker, III, forensic pathologist and the state medical examiner, testified that Eddie had four gunshot wounds and Tina three; both had been shot from behind; the wounds were to major organs such that neither victim had a chance of surviving them; and the cause of death of both was blood loss and shock. Record No. 58 at 1368–1406. An auto theft police expert told of matching the glass, plastic and chrome debris from the scene to the damage on Bowling's car (Record No. 59 at 1546), and the State Police Crime Laboratory's professional in Trace Evidence matched not only those pieces but also paint from Bowling's vehicle to the Earleys' and paint from the Earleys' car which was left on Bowling's (*Id.* at 1563). When the prosecutor asked, "[C]an you say that in fact Mr. Bowling's vehicle is the one which rammed into the Earley vehicle?" she responded, "Yes, sir, in my opinion." *Id.* at 1575. A state ballistics expert identified the recovered gun as a Smith and

Wesson .357 and stated that bullets shot from it and those recovered from the victims and crime scene both ended up marked with five grooves of the same width, with a right twist and similar scratch marks; however, he could not positively swear that those used at the crime scene were shot by that particular gun. *Id.* at 1577–99. He also testified that gunpowder residue was found in the right front pocket of the petitioner's black jacket. *Id.*

Lay witnesses for the Commonwealth included Clay Brackett, an eighty-year-old man who traded in firearms at flea markets and who testified that the recovered gun looked like the one he sold to Mr. Bowling a few days before the killings. He identified the defendant as being the man to whom he sold it. Record No. 58 at 1481. Two witnesses testified to Bowling's presence in Powell County on the evening of April 9. Jack Mullins had seen Bowling driving on the road along which his and the Bowlings' property is located; had noticed the car abandoned in the bushes there later that night; and gave an in-court identification of the defendant as the man he saw. Jack Strange, another resident of the same road, testified that he had spoken to a man in a black jacket with umbrella and bag who was out for a walk on that road that evening. Additionally, he identified the man he saw on the road as Bowling when he saw his picture in the paper at the time of Bowling's arrest, when he viewed a police photo line-up during the week before trial, and when he testified at trial, indicating the defendant in the courtroom.

The Commonwealth also called some of the defendant's family members. The first was his sister, Pat Gentry, who was visiting at her mother's home, where the defendant had recently been living, during the weekend before the Monday shootings.

She testified that Thursday or Friday was the last day he worked his usual job driving for Little Caesar's Pizza deliveries; on Friday night he showed the family a gun he had bought; and he showed signs of depression all weekend. After she left on Sunday evening, their mother called her on Tuesday morning, the day after the shootings, very worried because "T.C." had not returned to her home Monday evening; she didn't know where he was; a news article about the shootings described his car; and during a drive with her on Sunday afternoon, he had talked about where he wanted to be buried and what to do with his possessions. Record No. 58 at 1413–20. Mrs. Gentry drove to Lexington and the two women drove to Powell County, where they found Bowling's car but not Bowling. Upon their return to Lexington, they called the police and told them what they had found and why they were worried. The sister confirmed that her brother had several brimmed hats and at least one short black jacket. Record No. 58 at 1428. Also called was Bowling's mother, Iva Lee Bowling, who further described her son's activities that preceding weekend, including a three hour Sunday afternoon drive, when he purportedly continued the theme of death, telling her that his time had run out and if he was missing for three or four days to look for him on the Powell County property. Record No. 58 at 1436. The afternoon included their stopping for approximately thirty minutes in a K–Mart parking lot which was behind the nursing home property across from the Earley Bird cleaners; Bowling first parked behind a side yard fence with a slat missing, and then he moved to be directly behind the nursing home. On being recalled, Bowling's sister, Pat Gentry, reported that her mother had relayed to her

Bowling's parting words before he left the house early that Monday morning: "Today is the day." Record No. 58 at 1449.

The defense presented no witnesses. After the prosecution rested, one of Bowling's counsel asked for time to "again" tell his client of his right to testify. Afterwards, they announced that the defendant would not testify[3] and that the defense would rest. Defense counsel relied on their cross-examinations of witnesses and their arguments, which emphasized the lack of any eyewitness identification of their client as the shooter and the fact that the prosecution's case was based on circumstantial evidence. Through both the state's direct and defense counsel's cross-examination of family members, they had brought out the defendant's background, particularly his behavior during the weekend preceding the shootings. Clyde Brackett had been questioned about his trading in handguns without keeping records; also his memory and eyesight were admitted to be poor. Counsel had elicited from eyewitness David Boyd, who had described a white male matching Bowling's description, admissions that he did not remember hair color or that he had told a police detective at the time that the attacker had long brown hair, dark complexion, and possibly a mustache, none of which describe Bowling. The two witnesses from Powell County, however, proved unshakable in their identifications of Bowling. In the cross-examination of the ballistics expert, defense counsel gained the admission that the .357 magnum was one of perhaps millions of weapons that could have fired the fatal shots. Record No. 59 at 1609. Through other of the Commonwealth's witnesses, it was established that none of the

---

**3.** The court questioned the defendant on the record about his decision not to testify. Rec-

ord No. 59 at 1640.

defendant's possessions, including his clothing, car, and other items recovered from him at his arrest or from the Powell property, had any blood evidence; no fingerprints of the defendant's were found on the gun or at the scene; and the only lead residue which was found on any of Bowling's belongings was inside a left pocket of his jacket and could have been from a gun or from bullets. Record No. 58 at 1536.

Both sides argued for jury instructions which the court refused, the prosecution seeking one on transferred intent and the defense being unsuccessful in their requests for instructions on, *inter alia,* extreme emotional disturbance, manslaughter I and II, reckless homicide, and circumstantial evidence. Record No. 60 at 1654–1700. After the court's jury instructions were read, at approximately 9:00 a.m. on Friday, December 14, 1990, counsel gave closing arguments and the case was submitted to the jury for a decision on guilt.

The jury found the petitioner guilty of the two adult Earleys' intentional murders and of fourth degree assault on the son. Record No. 60 at 1787. Because it was late in the day and the penalty phase of the trial would not commence until the following Monday morning, the defense moved to sequester the jury over the weekend, a request which was overruled. *Id.* at 1788.

On Monday morning, December 17, 1990, at 8:30 a.m., Bowling, his defense counsel, and the prosecution were in chambers on the defendant's *pro se* request to discharge his attorneys. *Id.* at 1799. Upon questioning from the court, Bowling contended that he wanted to discharge his attorneys, have a mistrial declared, and have new counsel appointed prior to the sentencing phase of the trial. As grounds, he stated that his attorneys did not spend enough time with him, even an hour total;

he had no opportunity to tell them of witnesses; that at least one of his attorneys was short with him when he tried to talk; none discussed a defense with him; and he was unhappy with them because they failed to put on any defense at all. After the court questioned Bowling's feelings, offered its opinion that the defense attorneys' performance was "above average" and their strategy "was a good defense," and considered alternatives to Bowling's requests, the court overruled his motions. *Id.* at 1805–1831.

The penalty phase of the trial began. The Commonwealth declined to give an opening statement. The defense spoke briefly and then presented six witnesses. These included three non-family members: a Little Caesar's co-worker whom Bowling had befriended and helped over the last several years; a Fayette County jail employee who called the petitioner's conduct since entry there seven months before "exemplary"; and a supervisor from the jail who reported no problems with Bowling at all. Mrs. Bowling was recalled to relate details of the defendant's background, including her son's childhood and being slow to walk and talk; his having only a ninth grade education and taking jobs that didn't involve any thinking; his three marriages, the last breaking up just weeks before the shootings; their having mental illness run in the family; and details of her son's increasingly strange behavior before the shootings, particularly the weekend preceding the April 9 shootings. Record No. 61 at 1857–85. She also quoted him on a visit at the jail as saying, "I pray for the Earleys every night, Mom, but I didn't know those people." *Id.* at 1894. His sister Pat was also recalled. She traced her brother's mental/emotional deterioration further back, beginning in February with his being distressed over the failure of his last marriage, for which he had

sought her and her mother's support, help and/or intervention several times, the sister once having driven to Lexington in the middle of the night because of his call. Pat Gentry also detailed his drinking, inability to keep food down, depression, and strange behaviors during the weekend before the shootings. *Id.* at 1939. Finally, the defense called Jason Bowling, the defendant's thirteen-year-old son by his second wife. He testified that the defendant was a good father and he pled with the jury not to hurt him. *Id.* at 1940–42.

Again the defendant did not testify and was questioned about that decision by the court on the record. *Id.* at 1944–49. Again the court denied his counsel's drafted jury instructions, including one listing for the jury the specific mitigating circumstances of mental illness, extreme emotional distress, intoxication, and model jail conduct. After the giving of the court's instructions and counsel's closing arguments, the jury was out until late in the evening. When the jurors returned, they had found one statutory aggravating factor, that of multiple intentional deaths, and they recommended two death sentences. *Id.* at 2022.

Sentencing was postponed once for Bowling to decide whether he wished the court to consider a psychological evaluation of him which the court had ordered before the trial, in case an insanity defense was introduced. Record No. 46. After he informed the court that he wished it considered, the sentencing hearing was held on January 4, 1991. Record No. 62. Again the defendant chose to make no statement, and it was his trial counsel who pled for his life. In accordance with the recommendations of the jury, the trial court sentenced the petitioner to death for each of the two murders and twelve months in jail for the child's assault. His execution was set for January 6, 1992.

## PROCEDURAL HISTORY AFTER TRIAL

Bowling's convictions and sentences underwent mandatory review by the highest court in the state, pursuant to Kentucky Revised Statute (KRS) 532.075, with court-appointed attorneys from the Kentucky Department of Public Advocacy (DPA), as now, representing him.[4] The Supreme Court of Kentucky addressed 22 legal issues and affirmed the convictions and sentences on September 30, 1993, two justices vigorously dissenting.[5] *Bowling v. Commonwealth*, 873 S.W.2d 175 (1993), is the opinion, as modified on denial of rehearing, March 24, 1994 [hereinafter, this Court will refer to the state court's final adjudication of Bowling's claims on direct appeal as *Bowling I*]. On October 3, 1994, the Supreme Court of the United States de-

4. Except for retained counsel for the trial and sentencing, the Kentucky Department of Public Advocacy has represented the petitioner at every stage of the proceedings, although a different set of attorneys from the department takes over at each new phase. The series of DPA attorneys representing the petitioner is listed in his form Petition [Record No. 17] at page 7. On direct appeal, the petitioner's DPA attorneys were Barbara M. Holthaus and Timothy T. Riddell.

5. One dissenting justice wrote that reversal and retrial were appropriate on three grounds: (1) the jury should have been in-

structed on extreme emotional disturbance and manslaughter I in the guilt phase; (2) the jury should have been instructed on the statutory mitigating circumstances of extreme emotional disturbance, mental disease or defect, and intoxication in the penalty phase; and (3) these errors were compounded by improperly permitting the prosecutor to give his personal opinion in argument. *Bowling I*, 873 S.W.2d at 183–84 (Liebson, Justice, dissenting). Another justice agreed with (2) and (3) as reasons to reverse and remand. *Id.* at 185 (Burke, Special Judge, dissenting).

nied Bowling's petition for writ of certiorari. *Bowling v. Kentucky,* 513 U.S. 862, 115 S.Ct. 176, 130 L.Ed.2d 112 (1994).

Under Kentucky's Rules of Criminal Procedure (RCr), the next step in the state courts is a post-conviction collateral attack, which is instituted with an RCr 11.42 motion to vacate, set aside or correct sentence, filed in the trial court. In the instant case, by this time, a different judge, Lewis G. Paisley, was presiding in Fayette Circuit Court's Sixth Division. On February 28, 1995, with yet another Assistant Public Advocate representing him,[6] the petitioner filed (1) a notice of intent to file an RCr 11.42 motion; (2) a motion for appointment of new counsel because Bowling was unhappy with appellate counsel Riddell's representation; and (3) a motion for a status conference for scheduling matters related to an ineffective assistance of counsel claim. Trial Record [hereinafter "TR" followed by the Volume, "Vol.", and then the page number] Vol. 4 at 486–91. Except for an April 24, 1995 status conference on the issue of appointing the petitioner new counsel,[7] no further action was taken until January 3, 1996, when the Governor of Kentucky set the petitioner's execution for February 1, 1996. Two weeks later, on January 18, 1996, Bowling's counsel moved for stay of execution in the trial court, but the motion was denied. The trial court ruled that because no RCr 11.42 motion had been filed, only an intent to file the motion, the court lacked jurisdiction to grant a stay. Upon the DPA's January 26 emergency motion to the Supreme Court of Kentucky, temporary stays were issued to petitioner and three other prisoners, while the highest state court decided whether their filing of a notice of intent to file an RCr 11.42 motion may serve as a jurisdictional basis for the circuit court to issue a stay of execution.

In *Bowling v. Commonwealth,* 926 S.W.2d 667 (1996), the Supreme Court of Kentucky held that filing a notice of intent to file an 11.42 motion is insufficient to serve as a basis for issuance of a stay; until the RCr 11.42 motion itself is filed in the circuit court, there is no procedure by which the court can issue a stay of the execution. *Id.* at 669. The court also held that once the 11.42 motion is filed, however, amendments thereto "shall be freely given when justice so requires." *Id.* at 670 (quoting Kentucky's Civil Rule 15.01, identical to the language in Fed.R.Civ.P. 15(a)).

Accordingly, on January 26, 1996, counsel Keys and another DPA attorney[8] filed Bowling's formal RCr 11.42 motion [TR Vol. 5 at 612], together with a request for additional time in which to either file an amended or supplemental motion. By order of February 8, 1996, the circuit court granted the request for more time, giving petitioner 120 days from the January 26 filing date in which to supplement the motion. On May 28, 1996, a supplemental RCr 11.42 motion was filed, but it was not verified, as required by the rule. On June 6, 1996, eight days later and clearly after the running of the 120-day deadline, the petitioner filed another supplemental motion, identical to that of May 28 but a verified version.

On October 1, 1996, the circuit court ordered both versions of the supplemental motion stricken. After finding that Bowling "has engaged in a willful and systematic attempt to delay the proceedings in this case," the court struck the May 28 supplemental motion on the ground that it was

---

6. Linda K. West

7. DPA attorneys Karl R. Keys and Donna L. Boyce began representing Bowling.

8. Current counsel Thomas M. Ransdell co-signed the motion.

not signed and verified and struck the second, the June 6 version, because amendment or supplementation of an 11.42 motion requires leave of court and when the 120 days expired, his right to amend or supplement expired.[9] TR Vol. 5 at 763–64. "While the Court is cognizant of its duty to freely allow amendment where justice so requires pursuant to CR 15.01, the Court finds that the Movant's conduct and the lack of merit in the claims raised in the Supplemental 11.42 warrant a different conclusion." *Id.* at 764. Additionally, the court denied discovery which the petitioner's counsel had requested and denied all relief, both on state law grounds and also because it found that, of all the "allegations of error raised by the Movant ... [n]one merit discussion." TR Vol. 5 at 765. Bowling moved the court for reconsideration, a motion which was denied on April 29, 1997, and, with new DPA counsel,[10] he then appealed the state court's ruling.

On October 15, 1998, the actions of the trial court were unanimously affirmed. In *Bowling v. Commonwealth*, 981 S.W.2d 545 (1998) [hereinafter *Bowling II*], the Supreme Court of Kentucky quoted from the trial court's opinion and found no error under Kentucky law in the trial court's striking the supplemental RCr 11.42 motions, striking the other unauthorized pleadings, or its refusal to grant an evidentiary hearing. *Id.* at 549. The court then examined the claims in Bowling's original RCr 11.42 motion and those additional claims presented in the stricken supplemental motion. Finding no merit in all of the claims, Kentucky's highest court again affirmed the petitioner's convictions and sentences. *Id.* at 553. After his motion

for a rehearing was denied, Bowling filed another petition for writ of certiorari to the Supreme Court of the United States; it was denied on June 21, 1999. *Bowling v. Commonwealth*, 527 U.S. 1026, 119 S.Ct. 2375, 144 L.Ed.2d 778 (1999).

On the following day, June 22, 1999, the petitioner, by current DPA counsel, filed in this Court motions seeking to proceed herein *in forma pauperis* and to have themselves appointed as Bowling's counsel to prepare a federal habeas corpus petition in his behalf. These motions were granted on June 28, 1999, with a deadline set for the filing of the petition [Record No. 3]. The instant petition [Record No. 17] was timely filed on August 12, 1999. The Court also granted the petitioner's subsequent motions for a stay of execution and for preparation of a written transcript of the trial court record [Record Nos. 11, 15].

The respondent filed his answer [Record No. 25] to the petition on September 30, 1999, together with a memorandum of law [Record No. 26]. Thereafter, the Court ordered the continuation of the stay of execution [Record No. 27]; granted the petitioner's motion for preservation of evidence [Record No. 32]; and granted his motion to permit the petitioner to file a traverse to the response and/or amendments to the original petition within thirty days after the filing of the state court transcripts in the record [Record No. 33]. On January 7, 2000, the state court transcript was filed herein [Record Nos. 43–62]; and on February 7, 2000, the petitioner filed his traverse [Record No. 66].

## STANDARD OF REVIEW

Petitioner's filing of his application for a writ of habeas corpus on August 12, 1999

---

9. The trial court also ordered two other of Bowling's pleadings, a "Notice" and a "Traverse," to be struck as being unauthorized. TR Vol. 5 at 764.

10. Oleh Tustaniwsky and Richard Hoffman

was more than three years after the April 24, 1996 effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Therefore, and the parties do not dispute the issue, the AEDPA amendments to habeas corpus law apply to the instant case. *See Lindh v. Murphy*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *Williams v. Coyle*, 167 F.3d 1036 (6th Cir.1999).

The AEDPA, *inter alia*, altered the standard of review that a federal court must employ when deciding whether to grant a writ of habeas corpus. It is revised § 2254(d) and (e) which govern the inquiry as to whether or not habeas corpus relief is appropriate in this case.

### 1. Claim Adjudicated in State Court

The appropriate standard of review depends on whether a claim was decided on the merits in state court. If a claim was decided in state proceedings, 28 U.S.C. § 2254(d) (1997), as amended, now provides the applicable standard, as follows:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evi-

dence presented in the State court proceeding.

28 U.S.C. § 2254(d) (1997).

Under the clear language of the statute, if a claim was decided on its merits by the state courts, a petitioner will be entitled to federal habeas relief only if he can establish that the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).

The Supreme Court of the United States has assisted the courts by clarifying the language of § 2254(d)(1) in *[Terry] Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Justice O'Connor, writing for the majority, acknowledged that in the AEDPA, with its new § 2254 language,[11] Congress has "placed a new restriction on the power of federal courts to grant writs of habeas corpus to state prisoners." *Id.* at 399, 120 S.Ct. 1495. In Section II, she examined § 2254(d)(1) in detail and found that it defines two separate categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court. Agreeing with the Fourth Circuit as to these two categories, the high court first described what "contrary to ... clearly established Federal law" means. The Court stated that in order for the writ to issue, a state court decision must be "contrary to" Supreme Court precedent in the sense that

---

**11.** Federal courts had recognized since 1996 that, under the AEDPA, they must give greater deference to the determinations made by state courts than they were required to do under the previous law. *See, e.g., Nevers v.*

*Killinger*, 990 F.Supp. 844, 849–50 (E.D.Mich. 1997), *aff'd* 169 F.3d 352 (6th Cir.), *cert. denied*, 527 U.S. 1004, 119 S.Ct. 2340, 144 L.Ed.2d 237 (1999).

the state court arrive[d] at a conclusion opposite to that reached by this Court on a question of law ... [or] the state court confront[ed] facts that are materially indistinguishable from a relevant Supreme Court precedent and arrive[d] at a opposite to ours.

*Id.* at 405, 120 S.Ct. 1495.

As to the second alternative in subsection (d)(1), a state court decision rests on an "unreasonable application of" clearly established federal law if "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413, 120 S.Ct. 1495. If the federal habeas court finds such an "unreasonable application," it may grant the writ.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411, 120 S.Ct. 1495. The Court emphasized that reasonableness of the state court's opinion is judged by an objective standard, rather than a subjective one. "Stated simply, a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409, 120 S.Ct. 1495. The Court noted that the term "unreasonable" is "no doubt difficult to define," and did not try to define it, stating only that "it is a common term in the legal world, and, accordingly, federal judges are familiar with its meaning." *Id.* at 410, 120 S.Ct. 1495.

The Sixth Circuit has applied *Williams,* "interpreting it to mean that even if this

court 'believe[s] that a state court incorrectly applied federal law, [it] must refuse to issue the writ of habeas corpus if [it] finds that the state court's decision was a reasonable one.' *Machacek v. Hofbauer,* 213 F.3d 947, 953 (6th Cir.2000) ...." *Simpson v. Jones,* 238 F.3d 399 (6th Cir. 2000).

Under the AEDPA, Congress has also limited the legal authority on which this Court may rely when addressing a habeas petition; the Court must look exclusively to Supreme Court case law. 28 U.S.C. § 2254(d)(1); *Williams,* 529 U.S. at 412, 120 S.Ct. 1495. *See Harris v. Stovall,* 212 F.3d 940, 944 (6th Cir.2000) (citing *Herbert v. Billy,* 160 F.3d 1131, 1135 (6th Cir. 1998)). If the issue is a mixed question of fact and law, then § 2254(d)(1) will apply. *Harpster v. Ohio,* 128 F.3d 322, 326–27 (6th Cir.1997), *cert. denied,* 522 U.S. 1112, 118 S.Ct. 1044, 140 L.Ed.2d 109 (1998). Therefore, for every claim adjudicated on the merits in state court, this Court must determine whether the state court's decision was "contrary to, or involved an unreasonable application of," Supreme Court jurisprudence. 28 U.S.C. § 2254(d)(1); *see Coe v. Bell,* 209 F.3d 815, 822–23 (6th Cir.), *cert. denied,* 529 U.S. 1084, 120 S.Ct. 1716, 146 L.Ed.2d 516 (2000).

When a federal habeas petitioner challenges the findings of fact made by a state court, the standard is set forth in § 2254(d)(2). A federal court cannot issue a writ unless a petitioner establishes that the state's adjudication on the merits "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* Additionally, for questions of fact, the petitioner faces § 2254(e)(1),[12] which provides that the

---

12. The applicable subsection now reads as follows:

state court's determination is entitled to the presumption of correctness and that the habeas applicant has the burden of rebutting that presumption by clear and convincing evidence. Deference to factual determinations applies whether those determinations are made by a state trial court or a state appellate court. *See Sumner v. Mata*, 449 U.S. 539, 546, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981).

■ Thus, for claims adjudicated in state court, this Court may grant the writ only if the petitioner can establish that the state court decision involving a question of law or a mixed question of law and fact (1) was "contrary to" federal law as determined by the Supreme Court, *i.e.*, arrived at a conclusion opposite to that reached by the Supreme Court on a question of law or decided the case differently than the Supreme Court has on a set of materially indistinguishable facts or (2) involved an unreasonable application of federal law as determined by the Supreme Court, *i.e.*, unreasonably applied the governing legal principle from Supreme Court precedent to the facts of the prisoner's case (28 U.S.C. § 2254(d)(1)); or, for a question of fact, the state decision (3) was based on "an unreasonable determination of the facts" in light of the evidence before it (28 U.S.C. § 2254(d)). *See Williams v. Taylor*, 529 U.S. at 402–13, 120 S.Ct. 1495.

Stated differently, this Court must uphold the state's decision unless this Court finds that the state decision is contrary to federal law as determined by the Supreme Court; or is an unreasonable application of federal law as determined by the Supreme Court; or is based on an unreasonable

determination of the facts in light of the evidence presented.

### 2. Claims Not Adjudicated in State Court

When a state court has not adjudicated a habeas petitioner's constitutional claims on the merits, the AEDPA severely restricts the capacity of a federal habeas court to conduct a hearing to develop the evidence relating to the claim. Since 1996, 28 U.S.C. § 2254(e)(2) has provided as follows:

(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—

(A) the claim relies on—

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e). Thus, after the AEDPA, the command is that the Court will not hold an evidentiary hearing on a claim which was not developed in the state court proceedings unless one of two exceptions applies to the claim: the claim relies on a new, previously unavailable rule of

---

(e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be

presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254.

constitutional law made retroactive to cases on collateral review by the Supreme Court ((2)(A)(i)); or it relies on facts that could not have previously been discovered ((2)(A)(ii)). If one of the two exceptions under subsection (A) applies, then an additional requirement in order to obtain an evidentiary hearing is that the claimant show that the facts underlying the claim are sufficient to establish by clear and convincing evidence that, but for the constitutional error, no reasonable factfinder could have found the applicant guilty ((2)(B)). The latter requirement has been described as "the actual innocence" standard. *See United States ex rel. Assenato v. Nelson,* 1998 WL 704327 (N.D.Ill.1998).

The first clause of the statute triggers these stringent requirements. They are called into play only "[i]f the applicant failed to develop the factual basis of a claim in State court proceedings." § 2254(e)(2). This statutory language has been scrutinized by the Supreme Court in another recent case of the same name, *Williams v. Taylor,* this petitioner being Michael Williams and the citation being 529 U.S. 420, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000). A unanimous Court held that "failure to develop" a claim does not mean simply that the applicant "did not develop" the claim. *Id.* at 431, 120 S.Ct. 1479. "Under the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Id.* at 432, 120 S.Ct. 1479. The Court noted the impact:

> [I]n requiring that prisoners who have not been diligent satisfy § 2254(e)(2)'s provisions rather than show cause and prejudice, and in eliminating a freestanding "miscarriage of justice" exception, Congress raised the bar Keeney imposed on prisoners who were not diligent in state-court proceedings....

> ...[T]he opening clause of § 2254(e)(2) codifies Keeney's threshold standard of diligence, so that prisoners who would have had to satisfy Keeney's test for excusing the deficiency in the state-court record prior to AEDPA are now controlled by § 2254(e)(2).

*Id.* at 434, 120 S.Ct. 1479 (citing *Keeney v. Tamayo–Reyes,* 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992)).

The Court instructed, "The question is not whether the facts could have been discovered but instead whether the prisoner was diligent in his efforts." *Id.,* 529 U.S. at 435, 120 S.Ct. 1479. Diligence for purposes of the opening clause depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend upon whether those efforts could have been successful. *Id.* Applying this inquiry, the Court found that petitioner Michael Williams' failure to develop two of his issues, those of juror bias and prosecutor misconduct, was not due to a lack of diligence. Therefore, he was not barred from an evidentiary hearing on these issues by § 2254(e)(2), and the Court remanded the case for further proceedings to examine only these claims. "Our analysis should suffice to establish cause for any procedural default.... Questions regarding the standard for determining the prejudice the petitioner must establish to obtain relief on these claims can be addressed by the Court of Appeals or the District Court in the course of further proceedings." *Id.* at 444, 120 S.Ct. 1479.

### 3. Claim Raised and Rejected but State Court Does Not Articulate Reasoning

The Supreme Court has not addressed how to apply § 2254(d) when a claim is

raised and denied but there is no state court decision articulating its reasons. However, several circuit courts have reasoned, "We owe deference to the state court's result, even if its reasoning is not expressly stated." *Aycox v. Lytle,* 196 F.3d 1174,1177 (10th Cir.1999). Under this rationale, where the state court has not articulated its reasoning, federal courts are obligated to conduct an independent review of the record and applicable law to determine whether the state court decision is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented. *Id.* at 1177–78 ("we must uphold the state court's summary decision unless our independent review of the record and pertinent federal law persuades us that its result contravenes or unreasonably applies clearly established federal law, or is based on an unreasonable determination of the facts in light of the evidence presented"); *Schaff v. Snyder,* 190 F.3d 513, 523 (7th Cir.1999); *Delgado v. Lewis,* 181 F.3d 1087, 1091 n. 3 (9th Cir.1999), *vacated on other grounds,* 528 U.S. 1133, 120 S.Ct. 1002, —— L.Ed.2d —— (2000).

■ One of these circuits is the Sixth, which examined the above-cited cases of other circuits and followed their lead in *Harris v. Stovall,* 212 F.3d 940, 943 (6th Cir.2000). The court held that where a state court, although deciding a claim, does not offer some explanation of its decision, a federal court must conduct an independent review of the state court's decision. *Id.* at 943. This independent review requires the federal court to "review the record and applicable law to determine whether the state court decision is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented." *Id.* The Sixth Cir-

cuit noted that the independent review, however, is not a full, *de novo* review of the claims, but remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. That court directed that where a state court decides a constitutional issue by form order or without extended discussion, a habeas court should then focus on the result of the state court's decision, applying the standards articulated above. *Id.*

Applying the standards of the AEDPA, as defined in *Williams,* the appellate court in *Harris* noted that the district court first had to determine what was the "clearly established federal law as determined by the Supreme Court of the United States" [§ 2254(d)(1) ] at "the time of the relevant state court decision" [*Williams,* 529 U.S. at 412, 120 S.Ct. 1495]. Because the Supreme Court precedent existing when the petitioner raised the claim therein did not dictate or compel a different result, the state court's affirmance of the conviction was not an unreasonable application of clearly established federal law as determined by the Supreme Court at that time. *Id.* at 944–45. Therefore, the dismissal of the § 2254 petition was affirmed by the Sixth Circuit.

With these standards in mind, the Court begins its examination of Bowling's petition for writ of habeas corpus.

### PRELIMINARY MATTERS

A state petitioner for a federal writ of habeas corpus may obtain relief if he can demonstrate that he is in custody pursuant to the judgment of a state court in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254.

### Prerequisites for Federal Habeas Corpus Review

■ Before addressing the merits of any claim in a proceeding pursuant to 28

U.S.C. § 2254, the Court must find that certain prerequisites for granting relief are present. Specifically, the Court must find that: (1) petitioner is in "custody"; (2) petitioner has exhausted the remedies available to him in state court; and (3) petitioner did not waive or forfeit the right to present a particular issue by failing to follow state court rules to ensure that the state courts would review that issue on appeal. The first of these is satisfied because the petitioner is in custody at the Kentucky State Penitentiary, under a sentence of death. The next two prerequisites call for some discussion.

■ Federal review is barred if the petitioner either failed to exhaust his state remedies (*see* 28 U.S.C. § 2254(b)(1)(A)) or his conviction rests on an independent and adequate state procedural ground (*see Coleman v. Thompson*, 501 U.S. 722, 729–32, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)). Principles of comity and federalism underlie both the Court's long-standing exhaustion doctrine (*see* 28 U.S.C. § 2254(b) for its codification; *Murray v. Carrier*, 477 U.S. 478, 489, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)) and the doctrine of procedural default, with its cause and prejudice standard (*Coleman v. Thompson*, 501 U.S. at 730, 111 S.Ct. 2546). The Supreme Court has recognized the inseparability of the exhaustion rule and the procedural default doctrine in *Coleman*, 501 U.S. at 732, 111 S.Ct. 2546 (the independent and adequate state ground doctrine ensures that the state's interest in correcting their own mistakes is respected in federal habeas cases), and *O'Sullivan v. Boerckel*, 526 U.S. 838,

848, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999) (concluding that the procedural default doctrine was necessary to protect the integrity of the federal exhaustion rule). The requirement of giving state courts the first opportunity to cure a constitutional claim stems from the understanding that state courts are obliged to follow federal law and from the desire for comity between the state and federal court systems. *Id.* at 844–45, 119 S.Ct. 1728.

### Exhaustion

28 U.S.C. § 2254(b)(1) specifically bars habeas relief "unless it appears that … the applicant has exhausted the remedies available in the courts of the State.…" *Id.* That subsection of the statute contains a few limited exceptions to the exhaustion requirement.[13] Moreover, the state may expressly waive the exhaustion requirement. 28 U.S.C. § 2254(b)(3). Additionally, the habeas statute now provides for denial of an application for a writ of habeas corpus on the merits, "notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2).

■ If a state court would find unexhausted claims procedurally barred from state review, they are deemed exhausted. *See Harris v. Reed*, 489 U.S. 255, 263 n. 9, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) ("[A] federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state would hold the claim procedurally barred."); *Coleman v. Thompson*, 501 U.S. at 735 n. 1, 111

13. The statute provides, in pertinent part, as follows:

(b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—
(A) the applicant has exhausted the remedies available in the courts of the State; or

(B)(i) there is an absence of available State corrective process; or
(ii) circumstances exist that render such process ineffective to protect the rights of the applicant.
28 U.S.C. § 2254(b)(1).

S.Ct. 2546 (If the petitioner failed to exhaust and the state court would find the claims procedurally barred, "there is a procedural default for purposes of federal habeas review.").

In the instant case, under Kentucky law, Bowling has pursued both his direct appeal and one 11.42 collateral attack to the state Supreme Court. Under Kentucky's Rule of Criminal Procedure ("RCr") 11.42, the prisoner may file a motion to vacate, set aside, or correct a conviction or sentence, with the requirement that the "motion shall state all grounds for holding the sentence invalid of which the movant has knowledge. Final disposition of the motion shall conclude all issues that could reasonably have been presented in the same proceeding." RCr 11.42(3). The movant cannot raise issues which were raised and decided on direct appeal. *Stanford v. Commonwealth*, 854 S.W.2d 742 (Ky.1993), *cert. denied*, 510 U.S. 1049, 114 S.Ct. 703, 126 L.Ed.2d 669 (1994). Nor is a prisoner permitted a successive 11.42 motion to raise issues which were or could have been raised in a first motion. *McQueen v. Commonwealth*, 949 S.W.2d 70, 71 (Ky.1997).

■ All claims not brought on the direct appeal or in that collateral challenge are generally defaulted. *See Gall v. Parker*, 231 F.3d 265, 316 (6th Cir.2000). Although there are exceptions for situations for an error which was not known or discoverable,[14] the instant petitioner has presented no claims which would fit under these exceptions. Therefore, Bowling has no further remedy "available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). In his

Answer to the petition, respondent has admitted Bowling's exhaustion of the issues herein "because of procedural default." Record No. 25 at 10.

### *Procedural Default*

The respondent has argued that several of the petitioner's claims are procedurally defaulted because Bowling failed to bring them in either the direct review or collateral proceedings. Therefore, under the doctrine of procedural default, these claims are precluded from review in this Court.

■ In *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), the Supreme Court held that when a habeas petitioner fails to obtain consideration of a claim by a state court because of his failure to comply with a state procedural rule, the claim is procedurally defaulted and may not be considered by the federal court on habeas review unless the petitioner shows cause for his failure and prejudice flowing therefrom. *Id.* at 80, 84–87, 97 S.Ct. 2497. The procedural default doctrine standard applies alike whether the default in question occurred at trial, on appeal, or on state collateral attack. *See, e.g., id.* (failure to object at trial); *Murray v. Carrier*, 477 U.S. 478, 490–492, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986) (failure to raise claim on appeal); and *see generally Harris v. Reed*, 489 U.S. 255, 262, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989).

Later, in *Coleman v. Thompson*, 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), the Court discussed *Sykes* and its progeny, recognized the importance of

---

**14.** Under RCr 60.02, a defendant can raise a challenge not brought in his RCr 11.42 motion if the errors involved were "unknown and could not have been known to the party by the exercise of reasonable diligence and in time to have been otherwise presented to the court." *Gross v. Commonwealth*, 648 S.W.2d 853, 856 (Ky.1983). Additionally, a new 11.42 motion can be filed "upon a ground which was not known, or reasonably discoverable at the time the first motion was made." *Gilliam v. Commonwealth*, 652 S.W.2d 856, 858 (Ky.1983).

honoring state procedural rules, and stated the doctrine of procedural default, as follows:

> We now make it explicit. In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default, and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Id.* at 750, 111 S.Ct. 2546. Again, reasons of comity and federalism underlie the doctrine. "Like a prisoner who fails to exhaust state remedies, a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance." *Id.* at 732, 111 S.Ct. 2546.

■ Therefore, federal courts "will not review questions of federal law decided by a state court if the decision of that court rests upon a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman,* 501 U.S. at 729, 111 S.Ct. 2546. If the state court judgment clearly and expressly states that the judgment was based on a state procedural rule, then the claim is procedurally defaulted. *See Harris v. Reed,* 489 U.S. at 263, 109 S.Ct. 1038 (1989).

■ Even if there is no clear expression of the basis of the state's decision, the Supreme Court in *Coleman* also provided a presumption to guide the Court's analysis:

> [Federal courts] will presume that there is no independent and adequate state ground for a state court decision when the decision "fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion."

*Id.* at 734–45, 111 S.Ct. 2546 (quoting *Michigan v. Long,* 463 U.S. 1032, 1040–41, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)). Accordingly, when the last state court decision appears to rest primarily on federal law or was interwoven with federal law and does not clearly and expressly rely on an independent and adequate state ground, a federal court may address the petition. *Coleman,* 501 U.S. at 735, 111 S.Ct. 2546.

■ However, if a state court reaches the merits of a federal claim, then "it removes any bar to federal court review that might otherwise have been available," and the claim is properly before the federal habeas court. *Wainwright v. Witt,* 469 U.S. 412, 431 n. 11, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). If the last state court from which the petitioner sought review affirmed the conviction both on the merits, and, alternatively, on a procedural ground, the procedural default bar is invoked and the petitioner must establish cause and prejudice in order for the federal court to review the petition. *See Rust v. Zent,* 17 F.3d 155, 161 (6th Cir.1994); *Simpson v. Jones,* 238 F.3d 399 (6th Cir.2000).

■ If the last state court judgment contains no reasoning, but simply affirms the conviction in a standard order, the federal habeas court must look to the last "reasoned state judgment" rejecting the federal claim and apply a presumption that later unexplained orders upholding the judgment or rejecting the same claim rested upon the same-ground. *Ylst v. Nunnemaker,* 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991).

Therefore, this Court begins any analysis of whether a claim is procedurally defaulted by looking to the last reasoned state court judgment on the petitioner's claim and then applying the *Coleman* presumption.

### Cause and Prejudice

■ Once a claim is determined to be defaulted procedurally, a habeas petitioner can overcome procedural default in two instances. The first is establishing "cause" and "prejudice." The analysis is whether a petitioner has demonstrated (1) cause for the default and actual prejudice arising from the error or (2) that failure to consider the claim will result in a fundamental miscarriage of justice. *See Coleman*, 501 U.S. at 750, 111 S.Ct. 2546. A showing of either is a burden which the petitioner must carry in order for the federal court to review the claim. *Id.*

■ Satisfying the "cause" standard requires that the petitioner show that "some objective factor external to the defense impeded counsel's efforts" to previously raise the claim in the state court. *McCleskey v. Zant*, 499 U.S. 467, 493, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991) (quoting *Murray v. Carrier*, 477 U.S. at 488, 106 S.Ct. 2639). When a petitioner fails to establish "cause" to excuse a procedural default, a court does not need to address the issue of prejudice. *See Smith v. Murray*, 477 U.S. 527, 533, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986).

■ If the petitioner has established cause, the Court must address whether he has established the prejudice prong of the inquiry. "Prejudice" requires a strong showing of actual harm. *See United States v. Frady*, 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). The petitioner shoulders "the burden of showing, not merely that the errors at his trial created a possibility of prejudice, but that

they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 170, 102 S.Ct. 1584. Accordingly, the prejudice component is not satisfied if there is strong evidence of petitioner's guilt and a lack of evidence to support his claim. *Id.* at 172, 102 S.Ct. 1584.

■ The only alternative to the cause and prejudice requirement is the prisoner's demonstrating that a "fundamental miscarriage of justice" will result from enforcing the procedural default; this exception is limited to those rare cases "where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *Coleman*, 501 U.S. at 750, 111 S.Ct. 2546. Such a claim must be supported by "new reliable evidence" that was not presented at trial. *Schlup v. Delo*, 513 U.S. 298, 324, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). Moreover, actual innocence means factual innocence, not mere legal insufficiency. *Bousley v. United States*, 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998).

With this approach in mind, the Court now examines each of Thomas Clyde Bowling's claims.

## I. INEFFECTIVE ASSISTANCE OF COUNSEL

### Applicable Standards

The petitioner asserts that his retained counsel, Summers, Baldani and Richardson, rendered ineffective assistance at his trial. The Sixth Amendment right to the assistance of counsel is made obligatory upon the state by the Due Process Clause of the Fourteenth Amendment. *Gideon v. Wainwright*, 372 U.S. 335, 342–44, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

■ In reviewing the petitioner's first habeas claim, the Court must initially ascertain whether the Supreme Court of the United States has announced "clearly established law" which sets forth the standard for determining claims of ineffective assistance of counsel. Last year, in *Williams v. Taylor*, 529 U.S. at 391, 120 S.Ct. 1495, the Supreme Court stated that the standard for habeas review of such claims was set out in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The Supreme Court in *Strickland* described two components which the claimant must establish to prevail on this claim:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687, 104 S.Ct. 2052. To establish the deficient performance prong, a "defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. 2052. In the Court's words, "[T]he proper standard for attorney performance is that of 'reasonably effective assistance.'" *Id.* at 687, 104 S.Ct. 2052. The claimant must identify acts that were "outside the wide range of professionally competent assistance." *Id.* at 689, 104 S.Ct. 2052.

■ The proper analysis of an attorney's performance includes a requirement of deference; "the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690, 104 S.Ct. 2052. Therefore, a defendant's challenge to counsel's decisions must overcome the presumption that the challenged action might be considered sound trial strategy. *Id.* at 689, 104 S.Ct. 2052. Additionally, conduct of counsel must be evaluated from counsel's perspective at the time the relevant decision was made and not with the benefit of hindsight. *Id.*

To establish the prejudice component, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052. The showing must be "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687, 104 S.Ct. 2052. In making this determination, the court must look to the totality of the evidence before the jury. *See id.* at 695, 104 S.Ct. 2052.

The Supreme Court later clarified the standard in *Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993), wherein the Court directed that the prejudice inquiry not focus solely on mere outcome determination. Rather, attention must be given to

> whether the result of the proceeding was fundamentally unfair or unreliable. Unfairness or unreliability does not result unless counsel's ineffectiveness deprives the defendant of a substantive or procedural right to which the law entitles him.

*Id.* at 369–70, 113 S.Ct. 838. The Sixth Circuit has framed the question as whether, "[o]n balance," counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.

*McQueen v. Scroggy,* 99 F.3d 1302, 1311–12 (1996) (quoting *Strickland,* 466 U.S. at 686, 104 S.Ct. 2052).

A court reviewing an ineffective assistance claim need not address both components of the inquiry if the petitioner fails to make a sufficient showing as to one. *See Strickland,* 466 U.S. at 697, 104 S.Ct. 2052. Indeed, in *Strickland,* the Court voiced an explicit preference for "disposing of an ineffectiveness claim on the ground of insufficient prejudice." *Id.* Additionally, this Court must keep in mind that both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact. *Id.* at 698, 104 S.Ct. 2052. Therefore, the instant petitioner is entitled to relief if the state court's decision rejecting his ineffective assistance of counsel claim was either "contrary to, or involved in unreasonable application of," the established law of *Strickland. Williams,* 529 U.S. at 391, 120 S.Ct. 1495.

### *Treatment in State Court*

The instant petitioner's complaints that his trial counsel rendered ineffective assistance of counsel ineffective were made and addressed at every level of the state court proceedings.

First, during the trial itself, between the guilt and penalty phases, Bowling sought to have his counsel removed. On the Monday morning that the penalty phase of the trial began, with both the prosecution and defense counsel being present but saying nothing, the judge questioned the petitioner as to his alleged dissatisfaction with current counsel, *in camera.* The colloquy between Bowling and the judge included the following:

> MR. BOWLING: I don't feel like [counsel] have represented me in any form or fashion. I don't feel like they have offered me any defense. I don't feel like they are in my corner whatsoever.

THE COURT: ... Have they failed to do anything that you requested?

. MR. BOWLING: I don't feel like they have prepared me for the case I don't feel like they have talked to me or seen me as they should have before the case. The many times that I have seen them and talked to them they didn't hold over so we could go into court. I don't feel like they have done anything, really.

THE COURT: Again, let me ask, have they failed to do anything you asked them to do? Have you told them what you defense is and ...

MR. BOWLING: That's my whole point, Your Honor. They—we have not talked about this at all. There was nothing prepared before the trial. We have not worked out anything, any form or fashion, for the case.

THE COURT: The basic responsibility is on the Defendant to inform his attorneys of the facts of the case. Have you done that?

MR. BOWLING: I've not had ample chance to see these people or talk to them. I've not spent an hour, total, with any of them from day one.

THE COURT: Well, even if you spent an hour—as little as an hour with them, would that not be ample time for you to tell them your defense ...

MR. BOWLING: No, sir.

THE COURT: Or, some part of it?

MR. BOWLING: Maybe a small part; the few times that we have talked, the times that I would mention certain factors; this, that or the other, it was like I was stupid on the subject we were on....

. . . . .

THE COURT: ... Have you given your attorneys the name of any witness that would testify as to what your defense is?

MR. BOWLING: There are numerous witnesses that could be called. I feel like there were a lot of witnesses that were called that was not cross-examined, that was not called about. There could have been a lot of light shined on this. Yes, there is a lot that could have been done. But, to be given an opportunity to say this to them before they rested, no, I wasn't given that opportunity and haven't been since.

THE COURT: Well, you understand that attorneys are trained and your attorneys in this case are not only well-trained, but experienced in their trial of cases. And, in the experience of the Court they presented the appearance of well-prepared competent attorneys. The failure to cross-examined is required more experience and skill than aimless cross-examination. Do you understand that?

MR. BOWLING: Yes.

THE COURT: Some of the witnesses, as near as I could tell in monitoring, they cross-examined those witnesses where there was some hope of obtaining helpful information. And, they declined to cross-examine those witnesses which no help information could be obtained. They made, so far as I could determine, competent trial strategy decisions. It may not have appeared to you so....

. . . . .

THE COURT: ... I fail to see where your attorneys have failed you. And, I have—the only thing you have said is that they have not spent enough time with you.

MR. BOWLING: Well, the mere fact, Your Honor, that they didn't call any witnesses whatsoever in my defense, that they didn't put any defense on at all should be enough. And, there is a lot of information and a lot that could be said about this trial from those that they did

not ask. The Court doesn't see how it is, because they don't know what it is, because it wasn't brought out. I know.

THE COURT: That is what I'm getting at. Did you give the information as to the name and whereabouts of witnesses who could bring out information that you think would be helpful to you?

MR. BOWLING: Some of these people that I am talking about, the burden was not on me to get this to them....

THE COURT: Well, you're saying to me, then, that you don't know of any witness . . .

MR. BOWLING: Yes, I do know

THE COURT: That—well, have you told the attorneys of these witnesses?

MR. BOWLING: Your Honor, I've had no opportunity to tell the attorneys of these witnesses or talk about this subject in depth or anything otherwise. I was lucky to get the time of day....

. . . . .

MR. BOWLING: ... I feel like I have had a very unfair, a very unjust trial. I don't how anybody could come to an unbias decision when they don't have—you explained and all of us did to the jurors, that they have all of the evidence and have heard all of the evidence before they can reach a decision. They haven't heard it. It has not been brought out. So, at this time, I would like to have a mistrial. I want a mistrial, because I haven't—haven't been represented....

THE COURT: Let me ask you; why have you—did you wait until the verdict before bringing these things to my attention?

MR. BOWLING: It come to my mind to bring it to your attention when my defense was the only ones standing there when this was done.... The defense

rested. I wanted to say something then. I didn't know what the procedure was.

. . . . .

THE COURT: Now, you understand that there is a legitimate trial strategy in not having you testify, and not putting on any defense?

MR. BOWLING: No, sir, I do not understand that. That was not told to me that way. It wasn't explained to me. That is one of the things I was telling you; I did not know how to address you or what to do. I don't know these things and it wasn't told to me how it would be—how it would affect good or bad. It was told to me that Mr. Larson would tear me up on the defense stand and stuff like that. But, it wasn't explained to me what the outcome would be ... That would be the end of it there....

THE COURT: Keeping in mind that we are now approaching the penalty phase, and if you assume that the Court would not grant a mistrial, would it not be better for your to appear with your attorney and accept the defense that they have prepared?

MR. BOWLING: I don't feel that way. I pray upon the Court for a mistrial. I pray upon the Court to release these attorneys. I am not qualified to represent myself. I pray upon the Court to appoint me an attorney....

THE COURT: The ultimate responsibility for a fair trial rests with the trial judge. And, to the best of my ability, I will attempt to do that within the parameters of what I consider to be the law. It is my judgment, at this time, that you have not shown adequate cause for discharging your attorneys.

MR. BOWLING: I have more.

THE COURT: Well, tell me more.

MR. BOWLING: I have already made reference to the fact that the one time that I called Mr. Summers to come over to the jail to talk to me, and ... he in fact told me that I was wasting his time, ... and stormed out, and left me there that day. I made reference that they didn't cross-examining several witnesses that I know—know has a lot to shine a light on this case. There are some that I agree with you that cross-examining wouldn't have shown any light on the case, or anything in my favor. So, I know some of them, yes, didn't need to be cross-examined, but there is a lot that did. I have talked about how they didn't spend any time with me. They haven't talked to me about this case. I don't think they spent an hour, total, between the three of them with me at any time before the trial to get a defense, and talk about a defense.... There was no defense for my side. No one was called. I don't think that leaves anything to be desired. I ask for a mistrial, because I never had a fair and impartial trial.... I object, Your Honor, to going on with the sentencing phase of the trial. I, again, tell you I am not qualified to represent myself. And, I ask to be appointed an attorney to help work some of these things out.

THE COURT: Mr. Bowling, I believe it is too late to either continue the sentencing phase or to appoint another attorney to represent you. Obviously, if the case must go to trial on the sentencing phase, today, there would not be time for that attorney to prepare any defense. And, you not being qualified to represent yourself, that could result, I think, in disaster for you. It is the opinion of the Court, in my best judgment, that you have not stated adequate cause for discharging your attorneys, nor have you convinced me that the defense that they have provided was not adequate, compe-

tent. You say that you have various witnesses that would testify to helpful things. But, you have not told your attorneys about them. And, you say you haven't had time. You haven't informed the Court of any conflict that you had with your attorneys prior to now. I—I have no basis upon which to say that your attorneys have not represented you well, because my observation of their conduct in court, my knowledge of their experience, Mr. Baldani and Mr. Summers in particular, is a vast experience—far more experience cases of this type than any other attorneys that I could appoint you at this time. I have no quarrel. I monitored the case. It is part of my duty to determine if indeed they are performing as a reasonably competent attorney should perform. And, I found their performance not only competent, but above average....

THE COURT: ... [L]ooking at it from the standpoint of professional competence, it is the opinion of this Court that the strategy employed by your attorneys had a better chance of winning than any other strategy I could think of. The—and, when I say 'winning', based upon the proof put on by the Commonwealth from which the jury found you guilty, that proof was so strong that the best you could have hoped for, it seems to me, was not intentional murder. And, the defense put on by your attorneys was designed to achieve wanton murder, rather than intentional, and save you from the death penalty or the potential death penalty, life without parole, and give you a lesser penalty. That was a good defense considering the facts of this case.

MR. BOWLING: I beg to differ.

THE COURT: Well, of course, you do, because—but, I'm just trying to explain to you, as best I can, the basis of my ruling. And, I have to judge it as I see it. It is my judgment, at this time, that it would be a disaster for you to appear in court without any attorney. And, it would be equally disastrous for you to appear with an attorney that had just been appointed this morning. Therefore, I have to say in the interest of a fair trial, I must ask your present counsel to continue and present the defense they had planned to present. Your objections are of record and will be reviewed by the Appellate Court, no matter what happens. I might mention that as part of the defense that your attorneys provided you, that you may not be aware of, was numerous motions, pretrial motions, including the motion to suppress the automobile.

MR. BOWLING: Uh-huh; none of them went through.

THE COURT: ... I can understand your disappointment at the verdict of the jury. But, I cannot find that the trial should be declared a mistrial, and I cannot find that it should be continued. And, therefore, I have to overrule your motions....

Record No. 60 at 1806–27.

On Bowling's direct appeal, he complained that the trial court committed error in violation of state and federal due process requirements by not conducting a hearing on the issue of his dissatisfaction with counsel. The Kentucky Supreme Court ruled as follows:

The trial judge acted within his sound discretion when he refused to declare a mistrial or appoint new counsel. Bowling did not complain of his trial counsel's performance until after the jury returned a guilty verdict. Bowling himself made neither timely nor specific objec-

tion to the defense provided by his three attorneys. No objection was made to the conduct of an immediate hearing by the trial judge which afforded the defendant an opportunity to express his dissatisfaction with the performance of his defense team. In addition, the trial judge permitted Bowling an opportunity to fully set forth the basis for his alleged dissatisfaction.

The trial judge properly ruled that Bowling failed to show any sufficient cause for discharging his attorneys. The trial judge determined that the trial strategies by Bowling's counsel had a better chance of success than any of which the trial judge could think in light of the strong evidence of guilt presented by the prosecution.

*Bowling I,* 873 S.W.2d at 179–180, VIII.

The third and most thorough treatment of the ineffective assistance of counsel claim was in the state post-conviction proceedings, Bowling's Motion to Vacate, Set Aside or Correct Sentence, filed in the trial court pursuant to RCr 11.42. Although given permission to file a supplement to his original motion, Bowling's later-filed supplemental motions were stricken for his failure to adhere to certain portions of the state rule. In ruling on the original motion, the trial court, now with a different judge presiding, wrote, in pertinent part as follows:

> While the Court has seriously reviewed and considered the voluminous pleadings filed in this case, as a result of the Movant's conduct, only the claims of the Movant's original 11.42 shall be addressed in this Opinion. The Court finds that the Movant has engaged in a willful and systematic attempt to delay the proceedings in this case.... None of these additional finding[s] alter the inexorable conclusion that the Movant re-

ceived a fair trial and stands properly convicted and sentenced.

> Despite the unequivocal warnings to movants to state with specificity the constitutional violations alleged and the factual basis for the same, the Movant has opted for the impermissible shotgun approach. RCr 11.42; *Stanford v. Commonwealth,* 854 S.W.2d 742 (1993); *Lucas v. Commonwealth,* 465 S.W.2d 267 (1971). The Movant and his counsel are operating under a delusion as to the nature of an 11.42 proceeding. The 11.42 of record is a blatant attempt to retry a case in which a jury of his peers unanimously found the Movant guilty. That verdict has withstood considerable appellate review. "[T]he presumption that a criminal judgment is final is at its strongest in collateral attacks on that judgment." *Strickland v. Washington,* 466 U.S. 668, 697, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

> The Court has spent considerable time reviewing the allegations of error raised by the Movant. The allegations range from those previously rejected on direct appeal to those which should have been raised on direct appeal to sanctionable allegations. None merit discussion. The movant's assertion that if he is executed a lingering doubt will remain as to the real killer is of no consequence legally. The standard is beyond a *reasonable doubt* not beyond a lingering doubt, even in death penalty cases.... Quite simply, the Movant has failed to meet his burden under RCr 11.42. Wherefore, it is hereby ORDERED that the Movant's Motion for Relief under RCr 11.42 be, and same hereby is OVERRULED.

TR Vol. 5 at 764, 766 (footnotes omitted). Bowling moved for reconsideration, a motion which was denied April 29, 1997, and then appealed the circuit court's ruling.

On October 15, 1998, the actions of the trial court were unanimously affirmed by the Supreme Court of Kentucky. In *Bowling v. Commonwealth*, 981 S.W.2d 545 (Ky.1998) [*Bowling II*], the court quoted from the trial court's opinion and Kentucky case law and found no error under Kentucky law in the trial court's striking of the supplemental RCr 11.42 motions or its refusal to grant an evidentiary hearing. *Id.* at 549. "Having laid that foundation," the court then examined each of Bowling's ten (10) ineffective assistance of counsel claims in his original motion on the merits, using the United States Supreme Court's *Strickland* standard.

After rejecting each claim, the court concluded, in pertinent part, as follows:

Having reviewed each allegation of ineffective assistance of trial counsel, we conclude that Appellant has failed to demonstrate any claims which are not refuted by an analysis and review of the trial record. Many of Appellant's claims are nothing more than bald assertions without any factual basis. Such does not justify an evidentiary hearing pursuant to RCr 11.42.

Similarly, none of Appellant's claims of ineffective assistance of counsel entitle him to relief under RCr 11.42. The standard for determining ineffective assistance of counsel [was] announced in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674.... *Strickland* requires a movant to show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland*, supra at 687, 104 S.Ct. 2052.... In addition, *Strickland* mandates that judicial scrutiny be highly deferential. A court making this evaluation "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable assistance." *Id.* at 689, 104 S.Ct. 2052....

A court in considering an ineffectiveness claim must "consider the totality of the evidence before the judge or jury" and "assess the counsel's overall performance throughout the case in order to determine whether the 'identified acts or omissions' overcome the presumption that counsel rendered reasonable professional assistance." *Id.; Kimmelman v. Morrison*, 477 U.S. 365, 386, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986).... Under *Strickland* it is not enough that counsel erred and Appellant's trial reached an unfavorable result. Instead, Appellant must determine that, absent counsel's errors, there exists a "reasonable probability" the jury would have reached a different verdict. *Id. Strickland*, supra, at 694, 104 S.Ct. 2052.... We do not believe that in light of all of the circumstances, counsel's performance was "outside of the wide range of professionally competent assistance." *Id.* at 690, 104 S.Ct. 2052.

*Bowling II*, 981 S.W.2d at 550–551.

Kentucky's highest court also went on to individually address the additional claims of ineffective assistance of counsel which had been presented in the stricken supplemental motion. "Notwithstanding that his supplemental motion was struck by the trial court, in the interest of judicial economy we will review the seven additional claims of ineffective assistance of counsel." *Id.* at 551. The court found that the additional claims, like those in the original motion, "have either been decided on direct appeal or constitute harmless error, and are consequently insufficient to invalidate Appellant's conviction." *Id.* at 552. Therefore, Bowling was not entitled to relief on any of his claims of ineffective assistance of counsel. *Id.*

After the Supreme Court of the United States denied his petition for writ of cer-

tiorari, the petitioner came to this Court with his arguments regarding counsel divided into four categories, listed A–D, below. This Court now considers each claim of ineffective assistance of counsel individually, asking whether the state court decisions were based on an unreasonable determination of the facts or are contrary to or involved an unreasonable application of the *Strickland* standards, under § 2254(d)(1) and (2).

## A. COUNSEL'S FAILURE TO INVESTIGATE AND PREPARE PRE-TRIAL

 Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986).

 The petitioner contends that when counsel fails to investigate his options and make a reasonable choice between them, his strategic decisions cannot be reasonable and cites this Court to *Glenn v. Tate*, 71 F.3d 1204, 1207 n. 1 (6th Cir.1995), *cert. denied*, 519 U.S. 910, 117 S.Ct. 273, 136 L.Ed.2d 196 (1996). Counsel's failures cannot be excused as reasoned strategy when he does not present evidence to the jury because he has never taken the time to develop it. *Id.* Petitioner urges that this Court measure Bowling's counsel's performance over all, citing both *Strickland v. Washington*, 466 U.S. at 688, 104 S.Ct. 2052, and *Buchanan v. Kentucky*, 483 U.S. 402, 424, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987).

### 1. Petitioner was denied effective assistance of counsel when trial counsel spent an aggregate of one hour with him pretrial and failed to discuss the case with him.

The petitioner contends that this aspect of trial counsel's pretrial conduct toward their client failed to conform to the standards of the profession in capital cases and was so ineffective as to deprive him of his Sixth Amendment right to meaningful consultation with counsel. In fact, he describes the situation as a complete breakdown of the counsel and client relationship. In response, the Commonwealth notes the aforequoted various findings the trial court made in chambers (Record No. 60 at 1821–27); argues that the findings are entitled to deference under § 2254(d)(1); and urges that the court's decision was reasonable.

When the petitioner made this specific challenge to defense counsel's pre-trial conduct in his RCr 11.42 motion, Kentucky's Supreme Court wrote that it considered the issue

> raised and rejected on direct appeal ... wherein we stated that 'the trial strategy used by Bowling's counsel had a better chance of success than any of which the trial judge could think of in light of the strong evidence of guilt presented by the prosecution.' ... Therefore, Appellant is precluded from relitigating the issue in his RCr 11.42 motion. Brown v. Commonwealth, Ky., 788 S.W.2d 500 (1990)

*Bowling II*, 981 S.W.2d at 549 (quoting from *Bowling I*, 873 S.W.2d at 180, VIII).

 Federal law, as determined by the United States Supreme Court, is clear. In *Strickland*, the Court set out not only the components of a Sixth Amendment claim but underscored that the purpose of the Sixth Amendment is to guarantee the defendant a fair trial. *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. Therefore, the focus of the Sixth Amendment's guarantee is "the adversarial process, not ... the accused's relationship with his lawyer...." *United States v. Cronic*, 466 U.S. 648, 657 n. 21, 104 S.Ct. 2039, 80 L.Ed.2d 657

(1984). In fact, the Court has cautioned that the Sixth Amendment does not guarantee a "meaningful attorney-client relationship," nor satisfaction with counsel's performance. *Morris v. Slappy*, 461 U.S. 1, 12–15, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983). A court need go no further than ensuring that a defendant has an "effective advocate." *Wheat v. United States*, 486 U.S. 153, 160, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988).

■■■ This claim demonstrates the importance of the trial court's position as factfinder and the importance of the deference due it by this Court. The trial court was in the best position to have witnessed both the petitioner's demeanor and his counsel's performance over the course of several months pretrial and in the week of the penalty phase of the trial; the trial court was, consequently, in the best position to adjudge the credibility of the petitioner making these allegations and the quality of counsel's performance. That court's findings, after questioning the petitioner in the record, were challenged on direct appeal and affirmed. They are now entitled to the presumption of correctness which *Strickland* and *Williams* dictate, and the petitioner has not rebutted that presumption.

Even if the Court assumes, *arguendo*, that such limited contact took place, that there was a breakdown in meaningful contact, and that this rendered counsel's performance deficient, still the petitioner has failed to show that trial counsel's strategy was unsound or that the alleged restricted contact prejudiced the outcome. He has not identified any witness or clearly exculpatory information which he would have offered had more contact occurred. Further, to date, he has made no showing that a different result would have been obtained had counsel spent more time with him or obtained names of more people to testify. This Court finds the state courts'

findings and conclusions are not unreasonable under the standards of 28 U.S.C. § 2254(d)(1) and (2).

**2. Petitioner was denied effective assistance of counsel by counsel's failure to investigate and present evidence about alternate suspects, which would have established reasonable doubt.**

This claim of the petitioner springs from police documents, which were supplied by the open file discovery pretrial and which reveal that, initially, there were potential alternate ·suspects. One person interviewed suggested that others may have had access to the petitioner's car and keys. Other police notes in the investigation focus on still others who may have had a motive to kill the Earleys, purportedly because Tina Earley had an extramarital affair; the Earleys were involved in drug use; Eddie Earley worked as an informant for the police regarding drug activity; and/or, according to a telephoned tip, the killings were a drug debt or a "roughing up" which had gone bad. Petitioner contends that counsel failed to pursue any of these avenues, and so they were unable to show the jury persons who may have had a motive to kill the Earleys, and, thus, establish Bowling's innocence or, at least, reasonable doubt as to his guilt.

Calling these claims speculative, the respondent contends that Bowling's trial counsel were aware of these rumors and assigned either an attorney or investigator to interview them. He bases this contention on a defense attorney's intra-office memoranda, attached to Bowling's RCr11.42 traverse, wherein several witnesses are listed to be interviewed pretrial. TR, Stricken Pleadings, Vol. 2, Number [hereinafter "No."] 161. Respondent contends that nothing by trial counsel or current counsel has been presented to show these alternate suspect claims were anything more than rumor or in any way

connected to the murders; without probative evidence linking any of the alternative suspects to the murders, counsel's actions were reasonable; and without such a link any evidence regarding speculative suspects would have been inadmissible at trial.

The Kentucky Supreme Court found that this argument was "based on vague rumors and unsupported claims. Regardless of counsel's actions in this particular area, we are of the opinion that the mere existence of other potential suspects could do nothing to diminish the impact of the Commonwealth's overwhelming proof...." *Bowling II*, 981 S.W.2d at 550.

 This Court finds no error in the state court's rejection of this claim. First, there is no indication that counsel failed to pursue the idea of other suspects. To the contrary, the only evidence offered, the attorney memorandum, indicates such investigation was part of their pre-trial preparation. The Court feels free to examine these offerings of the petitioner in the state record, since the Kentucky Supreme Court included the stricken supplemental 11.42 motion in considering the merits of his claims. Even if they did not follow up on every alternative, counsel's duty to investigate is not an absolute duty to investigate every possibility. *Strickland*, 466 U.S. at 690–91, 104 S.Ct. 2052. This Court agrees with the Kentucky Supreme Court's reasonable application of *Strickland*'s prejudice standard.

3. **Petitioner was denied effective assistance of counsel when the prosecution disclosed the existence of an unnamed witness to the car accident which preceded the shootings and trial counsel took no additional steps to locate this witness or use this information.**

As a result of open file discovery, defense counsel had a copy of an April 13,

1990 phone message from one police officer to another, stating as follows:

Officer Morrison called in this day to advise her girlfriend had told her that her (the girlfriend) boyfriend was a witness to the incident at Earley's Cleaners. According to the girlfriend, the incident occurred over a fender bender type accident. Morrison didn't have the boyfriend's name with her so I advised her to contact you on Saturday. She agreed to do so.

The petitioner contends that because counsel took no steps to identify this person, the sole eyewitness to the car accident preceding the shootings, he was deprived of evidence critical to rebut the prosecution's theory that the Earleys' car had been rammed intentionally and to further support the defense's request for an extreme emotional disturbance (hereinafter "EED") instruction. Respondent contends that counsel did all that was needed at argument. Moreover, even if found, the witness would not provide the evidence of circumstances the way Bowling believed them to be, which is the crucial missing evidence in this case. The respondent also argues that the Kentucky Supreme Court's conclusion that the *Strickland* test was not met is reasonable.

The Kentucky Supreme Court, on direct appeal, noted only that proving the collision beforehand was not helpful to the petitioner's case in order to justify an EED instruction, because there was no evidence of the effect that the collision had on Bowling. *Bowling I*, 873 S.W.2d at 179, VI. In the later 11.42 proceedings, the same court stated with regard to counsel's failure to take steps to locate this witness:

[D]efense counsel argued that the automobile accident presented sufficient evidence to support an EED instruction

based upon the unchallenged conclusion that the collision occurred prior to the shootings. It was not the lack of evidence pertaining to the collision, but rather the lack of evidence showing the effect the collision had upon Appellant that precluded the EED instruction.

*Bowling II,* 981 S.W.2d at 549.

[28] This Court agrees with the Kentucky Supreme Court's conclusion that the trial counsel's not identifying and calling this witness was within the range of permissible legal conduct under *Strickland* (466 U.S. at 689, 104 S.Ct. 2052), and this omission did not render Bowling's convictions unreliable. Again, the duty to investigate is not an absolute duty to investigate every possibility. *Id.* at 690–91, 104 S.Ct. 2052. Even if there were such a duty and counsel failed woefully in failing to pursue this witness, the petitioner has not pointed to prejudice. As with the preceding claim, the ultimate question is whether counsel's failure to present this witness at trial rendered the petitioner's convictions and sentences unreliable. The Kentucky Supreme Court's decision on this issue was a reasonable application of the law as stated by the United States Supreme Court in *Strickland.*

**4. Defense counsel was ineffective in failing to locate Norman Pullins, a witness to the shooting, who gave a description of the shooter that was markedly different from petitioner's appearance.**

Because Mr. Pullins' description of the shooter in his police interview was in some respects different from that of the only other eyewitness to the shootings, David Boyd, the petitioner argues that Pullins's testimony was exculpatory and could have created a reasonable doubt at trial or a residual doubt at sentencing. Besides complaining that counsel did not take steps

to locate Pullins, the petitioner also faults the trial court with contributing to counsel's ineffectiveness and denying him due process because the court denied a motion for a continuance in order to locate Pullins.

The respondent, however, points to the Kentucky Supreme Court's rejection of this claim and that court's conclusion that the petitioner was advantaged because Pullins' description was put before the jury without risking any in-court identification or unwanted information on direct or cross-examination. According to the respondent, "Bowling got the best of both worlds."

Kentucky's highest appellate court found that counsel did take steps, which the court described as "extraordinary efforts" to locate Pullins, including asking for a continuance and obtaining the agreement of the Commonwealth to allow the taped statement to be introduced and played for the jury. *Bowling II,* 981 S.W.2d at 550. In the words of the court, "Thus, Pullins' description of the gunman was provided to the jury without risking the possibility of an in-court identification or other potentially damaging testimony to the appellant." *Id.*

The trial record reveals that defense counsel submitted a written motion for a continuance with two supporting affidavits setting out the efforts of attorney Baldani and a hired investigator to locate Pullins. TR Vol. 2 at 266–76. At oral argument on the motion, there was a discussion between all counsel and the court regarding the inability of both the Commonwealth and the defense to locate Mr. Pullins. Record No. 50 at 158–69. Defense counsel told of his and two investigators' multiple efforts, within and outside the state, beginning in July, the month after counsel was retained and five months before trial. *Id.* Agreeing to admit the taped interview was alterna-

tive conduct which also did not prejudice the petitioner.

 With regard to locating Mr. Pullins, the conclusions of the Kentucky trial and appellate courts, finding no deficient performance on the part of defense counsel, are objectively reasonable, based on the record and on clearly established law.

## B. COUNSEL'S FAILURE TO PRESENT A DEFENSE AT TRIAL

### 1. Petitioner was denied due process of law and effective assistance of counsel when his lead counsel learned that he would be indicted on the first day proof was to be taken.

The petitioner first alleges that he was denied effective counsel when lead counsel William Summers was indicted at the time of his trial. He contends that Summers broke down; upset the other defense counsel; was distracted; and thereafter played a more limited role in the defense than was planned.

The respondent notes that no evidence is offered to support this contention, and Bowling himself did not mention it during the trial, even when given the opportunity in camera to express the reasons for his dissatisfaction with counsel. Also, the record shows that, to the contrary, on the first day of trial, attorney Summers made the opening statement and cross-examined three important witnesses. Moreover, Kentucky's Supreme Court had videotapes of the proceedings to judge Summers' demeanor and still found no evidence of ineffective counsel. In the traverse, the petitioner asks that he not be faulted for not raising this issue earlier; his failure to do so only points up the lack of communication he had with trial counsel at the time of trial.

Kentucky's Supreme Court commented on the lack of evidence in the record and went on to state, "With no evidence that counsel's indictment had any negative implications on Appellant's trial, we cannot conclude that Appellant was denied effective counsel in this respect." *Bowling II*, 981 S.W.2d at 550.

This Court notes that this claim appears for the first time in the petitioner's original January 26, 1996 motion for relief under RCr 11.42. TR at 622. However, it was not until the petitioner filed a motion (Record No. 79) for this Court to reconsider his request for discovery herein that the petitioner submitted anything but argument to support this allegation and claim. Attachment 5 thereto consists of several newspaper articles about attorney Summers' 1991 indictment and exoneration. None of these articles refer to the petitioner's trial in 1990 or any date relevant thereto. The petitioner has not submitted an affidavit or other evidence suggesting that (1) Summers actually received notice of the pending or actual indictment during the first day of petitioner's trial; and (2) Summers' alleged notice of the indictment affected his performance.

 A claim that an event produced adverse impact on a criminal defendant's trial is not made out by simply claiming such; it must be an impact that significantly worsens the client's representation. *See United States v. Mett*, 65 F.3d 1531, 1535–36 (9th Cir.1995). Thus, even if Summers were so informed and so upset, the petitioner's claim of ineffective counsel cannot succeed so long as the petitioner does not demonstrate deficient performance and a harm resulting therefrom. The instant record suggests neither. The instant record fairly supports the conclusion of the Kentucky Supreme Court. Accordingly, this claim must fail.

**2. Petitioner was denied effective assistance of counsel by counsel's failure to elicit proof that, while at least seven shots were fired, the gun recovered could only fire six shots.**

The petitioner faults counsel for failing to adequately challenge the evidence about the gun purportedly used in the killings. Because there was some evidence that seven shots were fired and no testimony as to the gunman's reloading, perhaps the .357 magnum recovered in Powell County was not the murder weapon. The petitioner complains that counsel did not elicit reloading information from witnesses or argue an inconsistency so as to suggest that the gun found on his property was not the murder weapon. The respondent contends that trial counsel did attempt to bring out the discrepancy during the cross-examination of Dr. Hunsaker, who explained that a bullet that had passed through Eddie Earley's thigh had also entered his abdomen.

Kentucky's Supreme Court addressed the issue twice. First, on appeal, the issue was framed in conjunction with the trial court's refusal to give a transferred intent instruction. The court pointed out that there was evidence at trial that one bullet could cause two wounds. *Bowling I*, 873 S.W.2d at 179, VII. When this claim was urged in the RCr 11.42 claim of counsel being ineffective for failing to establish seven shots from a gun which could shoot only six bullets, Kentucky's highest court stated that Bowling "fails to appreciate" other evidence which was introduced, including expert evidence that one bullet could have caused two wounds. *Bowling II*, 981 S.W.2d at 552. Moreover, Kentucky's Supreme Court concluded that a "the seven-shot theory was of such minimal value that counsel's decision not to pursue it was not prejudicial." *Id.*

▮ Again, this Court cannot conclude that the Kentucky court's conclusion involved an unreasonable application of the *Strickland* performance or prejudice standard.

**3. Trial defense counsel were ineffective for failing to request disclosure of exculpatory evidence.**

The petitioner argues this claim generally and specifically with regard to a photo line-up. As to the photo line-up, he admits that counsel was provided with one page of the line-up results, which had abbreviations such as "no" or "DNS" beside those individuals who could not identify Bowling. The petitioner claims to have discovered a second page explaining the abbreviations in a 1996 Open Records request during the 11.42 proceedings. TR Vol. 5 at 671. He faults trial counsel for failing to pursue what the abbreviations on the first page meant. If counsel had done so, the second page would have been useful for the exculpatory identifications on it. The respondent argues that the claim is defaulted, having been raised only in the stricken 11.42 supplemental motion; even if not defaulted, it is refuted by the record.

▮ This matter is not defaulted because it was addressed by the Kentucky Supreme Court despite the striking of the supplemental documents. The Kentucky court found that with regard to requests for exculpatory materials, the record reveals that there had clearly been an open discovery file and that, additionally, the defense had made an oral motion for exculpatory evidence anyway. *See Bowling II*, 981 S.W.2d at 551–552. With regard to counsel's failing to request exculpatory evidence relating to the photo line-up, the court repeated, "such claim is refuted by the record." *Id.* at 552.

The state record does show that as early as the arraignment, the Commonwealth

announced its intention to provide "open file discovery" to the retained defense team (Record No. 45) and in an Agreed Order entered on July 18, 1990, the prosecution promised that, "[t]he Commonwealth will give copies of all tapes and documents in its file to the Defendant," a promise that would be "a continuing obligation." TR Vol. 1 at 59. Nonetheless, in an abundance of care, at the last pretrial conference one of defense counsel made an oral motion for exculpatory evidence. Record No. 49 at 121.

 As to the particular claim that counsel failed to pursue abbreviations on the photo-pack so as to find more persons who could not identify Bowling, the petitioner has not shown how the Kentucky court's ruling is unreasonable. He has not explained how any other person's failure to identify the petitioner would have impacted the trial, rendered the result unreliable. Defense counsel did cross-examine the only testifying witness to the shootings. His inability to identify Bowling was explored. Others' failure to identify him was of questionable value.

This Court agrees with the Kentucky court's conclusions, which are supported by the record and not unreasonably determined in light of the evidence or the law of *Strickland.*

4. **Trial defense counsel were ineffective in not cross-examining witness David Boyd regarding whether his view of the scene limited his ability to observe the gunman.**

The petitioner claims that because Boyd was seated in his vehicle which was facing away from the scene; was turning and looking over his shoulder to make his observations; and could not make a positive identification that the petitioner was the gunman he saw that day, it was incumbent upon counsel to cross-examine him exten-sively over his limited view of the scene, and counsel's failure to do so deprived him of effective assistance of counsel. The petitioner cites the Court to *Jemison v. Foltz,* 672 F.Supp. 1002 (E.D.Mich.1987).

The respondent distinguishes *Jemison v. Foltz* and also argues that this claim is defaulted because it was not raised on appeal of the 11.42 proceedings. However, even if the claim is not considered defaulted, the respondent contends this claim is meritless because (1) Boyd actually was cross-examined regarding in consistencies; (2) to do more would be argumentative; and (3) the extent of cross-examination is a matter of trial strategy. In reply, the petitioner counters that there was no default; he specifically claimed in the appeal of the 11.42 denial that the Kentucky Supreme Court's 50–page brief limitation prevented his briefing this issue.

The record reveals that in his original 11.42 motion in the trial court, the petitioner set forth his diverse claims of error divided into "paragraphs" (some paragraphs having several sub-paragraphs within) numbered 1–35. TR Vol. 5 at 611–62. Paragraph 21 conceded that defense counsel was able to elicit from Boyd that he could not identify the defendant as the man he saw firing the gun, but goes on to complain that "counsel did not notice that at the crime scene a hedge row of approximately five feet in height separated the witness from the scene, as well as the one hundred or so feet separating the two, both of which may have further aided in the cross-examination of this witness." *Id.* at 626. In his brief appealing the denial of 11.42 relief, counsel wrote only:

Space limitations preclude addressing all issues raised in T.C.'s 11.42 motion. Had sufficient space been allowed, the issues captured by paragraphs 14, 17, 20, 21, 27, 30, 31, 32, and 33 would have been presented as well.

State Record, Bowling's brief on appeal of 11.42 motion at 49.

■■■ The Kentucky Supreme Court did not specifically address this claim in its opinion, which upheld the trial court's 11.42 decision and found no Sixth Amendment violation. This Court finds that the issue of whether the petitioner fairly presented his claim to the state court is a close question. For this reason and because this is a death penalty case, the Court will not consider this claim procedurally defaulted. However, on the merits, the petitioner's claim must fail. On direct examination of Boyd, the prosecution had used an aerial photograph of the site, which included the intersection and the Earley Bird Cleaners, and Boyd was able to point at his location in relation to the shooter. The prosecution, in fact, asked the witness how far he was from the shooter when he put the gun in his pocket, to which Boyd responded, "I'd say about a hundred feet." Record No. 57 at 1277. When cross-examined by attorney Summers, Boyd admitted (1) which way he was facing and focusing; (2) the fact that he could not identify the shooter; and (3) the fact that there were discrepancies between his current memory and his description of the shooter immediately after the shootings. *Id.* at 1270–1285. Since this witness's limited ability to see the scene was demonstrated, admitted and capitalized on, this Court finds no error in counsel's terminating cross-examination without reference to a hedge.

The Court perceives no reasonable probability that counsel's continued cross-examination of this witness would have produced a different result. The 30–minute, virtual non-adversarial trial of *Jamison v. Foltz* is clearly distinguishable from the facts reflected in the record of the instant case. Counsel's performance herein has not been shown to be deficient under *Strickland.* The Kentucky Supreme Court's conclusion that the instant petitioner received effective assistance of counsel is not contrary to *Strickland.* Therefore, Bowling is entitled to no relief on this ground.

5. **Trial defense counsel were ineffective in failing to cross-examine witness Clay Brackett to determine if he was aware that he could be charged with firearms violation and whether fear of prosecution was a factor in his willingness to testify against petitioner.**

This claim was originally raised in the supplemental 11.42 motion, wherein the petitioner charged that the Commonwealth had made but then not revealed a deal with Brackett. The petitioner argues that a fundamental part of a defendant's right of confrontation is cross-examination to reveal possible biases or motives for his testimony. He cites abundant Kentucky case law for the propositions that a jury must be in possession of facts calculated to exert an influence upon a witness; that the motive of a witness to testify is never immaterial; and that cross-examination can be thorough and considerable latitude permitted.

According to the respondent, this claim is defaulted in several ways. First, it was raised only in the supplemental 11.42 motion, which was struck. Also, his original motion presented this issue not as herein, an ineffective assistance of counsel claim, but as a *Brady* claim that the Commonwealth failed to divulge a deal with Mr. Brackett. On appeal of the denial of his RCr 11.42 motions, he again argued the undisclosed deal as a part of a *Brady* claim and not as a claim of ineffective assistance of counsel. Thus, procedural default bars this court's review under *O'Sullivan v.*

*Boerckel,* 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999).

According to the respondent, even were this issue not defaulted by not being used to make a claim of ineffective assistance of counsel, there was no good faith basis to believe that such a deal was struck. Therefore, under the rules of professional conduct and cited case law, it would have been improper to cross-examine Mr. Brackett about a deal, as the petitioner suggests. Again, the respondent charges that the petitioner has merely speculated and failed to establish facts sufficient to support discovery about the matter or alert the court to any merits in the claim.

▉ Kentucky's highest court stated with regard to this matter in Bowling's 11.42 motion,

> Appellant finally claims that the Commonwealth made a clandestine deal with a witness, Clay Brackett, in exchange for his testimony. Appellant has no basis for such an allegation, and we have no reason to speculate that such an arrangement existed.

*Bowling II,* 981 S.W.2d at 550. Before both the Kentucky courts and this Court, the petitioner has submitted no support for contending that such a deal existed, or that Brackett lied, or that cross examining him about a deal would result in the probability of a different outcome. The Kentucky Supreme Court's decision was and is not an unreasonable determination of the facts in light of the evidence.

**6. Trial defense counsel were ineffective in failing to cross-examine police officers regarding their offer of a "deal" to petitioner if he would reveal who actually killed the Earleys.**

The petitioner alleges that while he was in custody prior to indictment, representatives of the Commonwealth offered to make a deal with him if he would reveal the identity of the Earleys' killer. The petitioner argues that this was a clear indication that law enforcement officials believed someone else had committed the crime, and yet defense counsel took no steps to identify the officers so as to put before the jury evidence that the police themselves doubted that the movant had killed the Earleys.

The respondent argues that this claim, too, is procedurally defaulted because it was not raised as an ineffective assistance of counsel claim in the post-conviction proceedings. However, even if this claim were not defaulted, the respondent argues that this is another unsupported allegation and that the petitioner cites to no authority which would permit the opinions of such officers, if they existed, to be admissible.

The petitioner counters that there is no procedural default. As he has argued about other claims, the petitioner contends that this claim was not raised earlier because his post-conviction attorney was ineffective and because the appellate court imposed briefing page limitations on him. Additionally, the petitioner contends that there is a factual basis in the instant record, his signature on the instant petition at page (7), and he has been deprived of a hearing to present the facts of such a deal.

▉ This claim is procedurally defaulted. At this point, it is a mere allegation which has not been presented to the Kentucky Supreme Court. It was not even an issue which appellate counsel stated he would have briefed if he had not had the 50–page limit. Nothing in the record supports this claim. The petitioner's few references to ineffective post-conviction counsel and page limitations on briefing in the Kentucky Supreme Court are both inaccurate and insufficient for this Court to consider the matter properly presented to

that court. There being no showing of cause or prejudice to excuse his total default, habeas review of this claim is barred.

7. **Petitioner was denied effective assistance of counsel when trial counsel failed to investigate and present extreme emotional disturbance as a defense or as mitigation.**

8. **Counsel were ineffective in failing to retain and prepare a mental health expert to competently examine petitioner with regard to petitioner's mental state at the time of the offense.**

Claims regarding the petitioner's mental health have been argued extensively in both the state proceedings and herein. The petitioner here points to events which were purportedly indicative of his deteriorating mental state and then alleges that, knowing these facts, defense counsel were ineffective in their presentation of the petitioner's mental state, both in defense to or in mitigation of the crime with which he was charged. Petitioner's counsel purportedly did not elicit from family witnesses enough details of his deteriorating condition and present expert testimony as to the meaning of these details, so as to support an EED instruction. Although defense counsel retained an expert, Dr. Donald G. Beal, petitioner claims that they did not guide him as to what they wanted him to evaluate, *e.g.*, sanity, extreme emotional disturbance, etc., and they also did not call him, the only reason shown in the record being their reference, on the last day of the guilt phase of trial, to his not returning a telephone call one of them had made to him earlier. Therefore, with no reliable expert testimony, counsel were forced to rely on cross examining lay witnesses in the guilt phase and calling law witnesses in the penalty phase. Failure of

counsel to present a competent mental health defense has been held to be ineffective assistance, the petitioner citing to *Glenn v. Tate*, 71 F.3d 1204 (6th Cir.1995). Additionally, the petitioner argues that once the defense of EED had failed, the defense should have introduced Dr. Beal's report at the penalty stage.

The respondent argues (1) that the petitioner would probably have not agreed to an EED defense, because he was and is maintaining his innocence, and (2) that Kentucky's highest court also agreed the defendant would not have abandoned his innocence stance. *See Bowling II*, 981 S.W.2d at 549. Additionally, the respondent argues that counsel's performance with regard to their own expert was reasonable. Counsel hired an expert months before trial; arranged for him to spend nine (9) hours with their client; and obtained a detailed report on him. Respondent describes this as a "far cry" from the situation in *Glenn v. Tate*. According to the respondent, counsel did a "masterful" job at presenting mitigation evidence without opening the door to the entirety of the expert's report, which included negative information.

It is true that the Kentucky Supreme Court noted that the petitioner has been maintaining innocence while also complaining of his counsel's failure to investigate using an EED defense and to obtain expert evidence to support it as a defense. The court agreed with the Commonwealth that Bowling's purported

> 'wealth of evidence' regarding EED was before the Court at the end of the penalty phase and was not even sufficient to warrant an instruction on EED as a mitigating factor. Moreover, we are not inclined to embrace Appellant's theory that he would have abandoned his claim of innocence.

*Bowling II*, 981 S.W.2d at 549. Additionally, the court concluded that the

Commonwealth's expert profile aided the petitioner more than his own; that controverting the Commonwealth's profile would have damaged his case; and that counsel are not required to search for an expert until they find one in support of their theory. *Id.* at 550.

The state record contains, as attachments to the petitioner's stricken traverse, documents which refute the petitioner's contentions with regard to the defense's use of their mental health expert. TR Stricken Pleadings, Vol. 2, attachments to No. 161. As it did *supra* with regard to an attorney's pre-trial memorandum, this Court examines these stricken portions of the state record, since they were filed by the petitioner and considered by the Kentucky Supreme Court on appeal of his unsuccessful RCr 11.42 motion. According to these letters and memoranda, the defense expert, psychologist Dr. Beal, was hired in August; counsel supplied several packets of information about Bowling via mail thereafter; and counsel Baldani and Dr. Beal engaged in multiple telephone conversations. In Dr. Beal's resulting formal psychological evaluation, written after nine hours with the petitioner, he addressed a mental disease or defect defense, writing that there was no evidence that his mental disorders impaired his behavior "such that he lacked substantial capacity to appreciate the criminality of his conduct, or that he was unable to conform his conduct to the requirements of the law. In my opinion Mr. Bowling was *legally sane* at the time of the offenses. . . ." In another exhibit, a November 12 note to Bowling's file, Baldani described a telephone conversation he had that day with Beal, the attorney writing as follows:

> Dr. Beal discussed T.C. Bowling's consistent history of becoming enraged with women, and observed that the Comp care notes from ten years earlier were consistent with his behavior prior to the

murders. He said that T.C. Bowling was in a frame of enraged anger prior to the murders, and we discussed that this did not appear to be a heat of passion kind of thing, but rather something that had been developing several days earlier.

*Id.* On its face, this psychological profile was more damning than helpful for defense use. Thus, according to documents in the state record, offered by the petitioner himself in his 11.42 proceedings, defense counsel's conduct cannot be said to be deficient with regard to psychological evidence, but in keeping with legitimate trial strategy. Nor does *Glenn v. Tate* assist the instant petitioner. The attorneys therein "failed to make any significant preparations" for the sentencing phase. When that phase was upon them, they presented witnesses who either did not know the criminal defendant or knew him only when he was a small child; they did not call any member of his family; and they failed to present any neurological information which reflected the defendant's substantial organic brain problems.

 The Kentucky Supreme Court's conclusion in *Bowling II* that *Strickland* was not violated is supported by the instant record and is objectively reasonable.

**9. Trial defense counsel were ineffective for failing to retain an accident reconstruction expert who could have determined whether the Earleys' car was intentionally rammed or damaged as a result of an accidental collision.**

The petitioner claims that his trial counsel's failure to hire or request funds for an accident reconstructionist denied him his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. With such a report, the defense could have countered the prosecution's argument that the collision between the victims' and Bowling's cars was an intentional act. Additionally, with such

testimony in the record, the defense would have had added support for their request for an EED instruction based on the accident's being a triggering event.

The respondent maintains that this claim is procedurally defaulted because it was not squarely presented in the petitioner's RCr 11.42 appeal, merely mentioned with regard to counsel's failure to pursue the unnamed witness to the "fender bender." Respondent also characterizes this claim as speculative, the petitioner submitting nothing to indicate what an expert could determine at all; and conclusory allegations are insufficient to show ineffective assistance of counsel. In reply, the petitioner argues that this claim was not defaulted because it was argued to the Kentucky Supreme Court, although the Supreme Court chose not to address it in their opinion. The petitioner maintains that it is not speculative and, accordingly, he earlier moved this Court for permission to access his car and hire an accident reconstructionist.

 The instant petitioner's pleadings in the state court record and appellate opinions after direct appeal and Rule 11.42 proceedings reveal absolutely no mention of an accident reconstructionist. Therefore, clearly, the claim that counsel was ineffective for failing to hire such an expert was not presented to the Kentucky courts. Accordingly, it is defaulted and, with no showing of cause or actual innocence to excuse the default, it is not properly before this Court on habeas review.

**10. Petitioner was denied effective assistance of counsel when trial counsel failed to object to the Commonwealth's conjecture that petitioner stalked and lay in wait of the victims and therefore acted with premeditation.**

The petitioner complains of his counsel's failure to object to the speculative scenario that the petitioner had scouted the area over the preceding weekend; had lain in wait for the victims; and had intentionally rammed their car in a premeditated plan. He contends there was no evidence to support these conjectures by the prosecution. The petitioner's mother stated that T.C. had gone to K–Mart only because she had requested that he take her there on Saturday; he was at a possible vantage point to the cleaners only briefly; and the mere finding of a thermos in his auto cannot support a premeditated, lying-in-wait conjecture. The petitioner argues that while a prosecutor may urge a jury to draw inferences supported by facts, he may not argue inferences so tenuously connected to facts as to be fanciful conjecture; therefore, the failure of trial counsel to object to the Commonwealth's persistent conjecture denied the petitioner effective assistance of counsel.

The respondent argues that the prosecutor's statements were consistent with eyewitness testimony, expert testimony, photographs, and other evidence presented at trial. Therefore, there was no prosecutorial misconduct and, in fact, state law supported this argument based upon the holding in *McClellan v. Commonwealth,* 715 S.W.2d 464 (1986). Additionally, the respondent notes that this argument of the petitioner's was rejected by Kentucky's highest court, both when it was presented as a claim of prosecutorial misconduct on direct appeal, and again when it was raised as part of the ineffective assistance of counsel claim in the post-conviction proceedings. Since the arguments were found to be proper, trial counsel cannot be ineffective for failing to object, the respondent citing *West v. Seabold,* 73 F.3d 81 (6th Cir.), *cert. denied,* 518 U.S. 1027, 116 S.Ct. 2569, 135 L.Ed.2d 1086 (1996).

In the petitioner's direct appeal, the Kentucky court described the petitioner's

claim as "contend[ing] that the prosecution used conjecture and surmise to attribute the worst possible motives and inferences without any evidentiary basis in order to obtain a conviction." *Bowling I,* 873 S.W.2d at 178, V. The court ruled as follows:

> There is no error because the closing arguments by the prosecution were based on the evidence and the reasonable inferences from the evidence. Cf. *Sanders v. Commonwealth,* 801 S.W.2d 665 (1990). They were within the reasonable latitude permitted during closing argument. Cf. *Lynem v. Commonwealth,* 565 S.W.2d 141 (1978).

*Id.* at 178–79. Later, in reviewing the 11.42 proceedings, the Kentucky court was faced with the direct allegation that counsel was ineffective for failing to object to the closing statement of the prosecution. The court quoted from the above portion of its opinion on appeal and found, "No further review is appropriate." *Bowling II,* 981 S.W.2d at 550.

As is evident from the foregoing, this claim has been considered and rejected by the Kentucky Supreme Court first as one of prosecutorial misconduct on direct appeal and later as an ineffective assistance of counsel claim, in the 11.42 appeal. Both times relief was denied, the court suggesting the basis for the second decision was that it had already ruled that the conduct was not misconduct. In the remarkably similar *West v. Seabold,* 73 F.3d 81 (6th Cir.), *cert. denied,* 518 U.S. 1027, 116 S.Ct. 2569, 135 L.Ed.2d 1086 (1996), even when the Kentucky court found that the prosecutor's conduct was egregious misconduct, the state court's conclusion that counsel's failure to act, to move for a mistrial, was a matter of strategy, was held to be a finding entitled to the presumption of correctness by the federal habeas court. *Id.* at 85. Thus, even before the advent of the

AEDPA's standard of deference, the federal appellate court could not find that this strategy constituted ineffective assistance. Stating that it was not in any "position, on this record, to second-guess defense counsel's conduct as not being within the range of reasonable professional assistance," the Sixth Circuit reversed the district court's grant of the writ. *Id.*

█ On the instant record and considering the Kentucky Supreme Court's initial finding of no prosecutorial misconduct, this Court finds that the state court's resolution reflects a reasonable application of federal law, including the standards of *Strickland.* This Court agrees that because Bowling has not demonstrated that he was deprived of a fair trial, he is not entitled to relief.

11. **Petitioner was denied effective assistance of counsel when trial counsel failed to introduce evidence that the Earley Bird Cleaners was not clearly visible from the K–Mart parking lot, which controverted the Commonwealth's argument that the Earleys' deaths were premeditated in that petitioner staked out the Earley Bird Cleaners while parked at K–Mart.**

The petitioner claims that he could not have staked out the Earley Bird Cleaners from behind a slatted fence across the street at the edge of the K–Mart parking lot, but his counsel failed to examine the site; discover this fact; and introduce evidence thereof in order to controvert the prosecution's premeditation. According to the petitioner, a simple investigation of the site and presentation of this information would have rebutted the theory that the murders were premeditated and thus would have avoided his receiving the death penalty.

The respondent argues that this claim is procedurally defaulted because it was not argued on appeal of the denial of his RCr 11.42 motion. Further, the claim has no merit, as photography Exhibits 37 and 38 show the visibility of the cleaners from behind missing slat in the K–Mart parking lot.

 This claim is clearly defaulted, because it was never presented to the state courts. The petitioner's providing no exception to the application of the procedural default doctrine, federal review of this claim is barred.

## C. COUNSEL'S FAILURE TO CHALLENGE APPROPRIATENESS OF DEATH PENALTY

### 1. Trial counsel were ineffective by failing to investigate and introduce mitigating evidence at the penalty phase.

The petitioner claims that counsel "overlooked" significant evidence which could have been presented in mitigation, including his low I.Q., the fact that he had a growth removed from his head at age seven, several head injuries, a family history of mental illness and/or alcoholism, and his own history of alcohol abuse. The petitioner also faults the defendants with their failure to prepare their expert, Dr. Beal, to testify about such contributing factors; to present Bowling's documented tendency to react violently to minor incidents at this stage; and to draw out from those who did testify the fact that Bowling had had a growth removed from his head at an early age. Additionally, there were other members of the petitioner's work, family and social life who could have shed light on his symptoms of emotional disturbance or refuted the prosecution's theory that the petitioner was merely mean and manipulative. The petitioner relies on numerous legal citations and contends that cases "abound which hold that counsel's failure to investigate and present evidence is unquestionably ineffective under the Sixth Amendment." Petition [Record No. 17] at 60.

The respondent contends that these are not the same arguments Bowling presented to the Kentucky Supreme Court in his RCr 11.42 appeal and, thus, they are procedurally defaulted. There is no evidence in the state court record to support the above allegations about the petitioner's background or family history of mental illnesses or about his father. The petitioner did not testify at trial, and he has failed otherwise to present any facts in support of his claims have been properly presented to the state court for review. Moreover, the presentation of such evidence would have been contrary to Bowling's wishes, as he continued to maintain his innocence. Additionally, the state record reveals that counsel for the petitioner moved the court for permission to obtain a neurological examination of Bowling. The respondent contends it is reasonable to conclude that had the test produced any evidence beneficial to their client, it would have been presented. He asserts that counsel did present testimony about the petitioner's background to the jury, and the fact that they did not introduce certain additional evidence does not demonstrate ineffective assistance of counsel. Also, the Kentucky Supreme Court rejected this ineffectiveness claim in *Bowling II*.

Kentucky's Supreme Court dealt with the claim that counsel was ineffective for not investigating potential mitigating evidence as follows:

This argument is clearly refuted by the record. In the penalty phase, counsel introduced extensive evidence pertaining to the appellant's family history of mental illness, his childhood, his marital his-

tory, and his deteriorating mental condition in the period leading up to the murders. Counsel presented strong evidence upon which the jury could have reduced appellant's sentence, had it seen fit to do so. The jury simply weighed the evidence and chose not to reduce the sentence.

*Bowling II,* 981 S.W.2d at 550.

■ According to the trial record, defense counsel presented the testimony of six witnesses, three of whom were family members who presented their impressions of Bowling's family, past history, and recent behaviors and demeanors. Although Bowling now faults counsel for omitting additional information, such as a head injury and information on his father's drinking, he has failed to establish the significance of the additional mitigating evidence which he now asserts that counsel should have presented. This Court finds that the Kentucky Supreme Court's above-quoted decision is supported by the record, and the petitioner does not meet the requirements for habeas relief on this claim under 28 U.S.C. § 2254(d)(1) or (2).

**2. Trial counsel were ineffective by failing to controvert a psychological profile of petitioner which was submitted by the prosecution prior to sentencing.**

Trial counsel agreed with the Commonwealth's proposal to submit the court-ordered psychological profile of Dr. Harwell Smith to the trial judge prior to sentencing. The petitioner claims that, although he gave consent, it was not an informed consent; further, he complains that counsel agreed to that report with nothing prepared to refute Dr. Smith's claims therein, e.g., studies, added information about organic brain damage, or their own experts' reports. The petitioner claims that this failure to fully investigate, explain

or refute Dr. Smith's report is a violation of his rights as guaranteed by the First, Sixth, Eighth, and Fourteenth Amendments to the Constitution.

The respondent contends that the petitioner has not shown that counsel's performance was deficient or that he was prejudiced by Dr. Smith's report being submitted to the trial court. Its submission got the evidence of the various diagnoses before the judge without any likelihood of cross-examination which could be prejudicial. Therefore, counsel's performance was neither deficient nor prejudicial.

As this Court has previously noted, *supra,* Kentucky's Supreme Court found Dr. Smith's report helpful to the petitioner, as follows:

In all actuality, however, it was this profile which aided Appellant in his case more than his own psychologist's profile. To controvert it would have damaged his case. Nonetheless, an unfavorable report does not require counsel to search until an expert supporting the defense theory can be found.

*Bowling II,* 981 S.W.2d at 550.

■ As to the decision to use Dr. Smith's report and not use that of Dr. Beal, described *supra,* this Court finds there is evidence to support the state courts' conclusion that the defense counsel's decisions were sound strategy, not deficient performance. And the Kentucky courts' rejection of this claim about counsel is not contrary to or an unreasonable application of the dictates of *Strickland.*

**3. Trial counsel were ineffective by failing to object to the prosecution's unfounded cross-examination of petitioner's witnesses at the penalty phase.**

The prosecution cross-examined two key mitigation witnesses, Bowling's mother

and sister, on their view of whether the petitioner's mental problems were feigned and his bizarre actions used to manipulate his family. The petitioner contends that there was no evidence to provide a factual basis for such questioning; such improper cross-examination, urging unfounded inferences, constitutes prejudicial error in a capital case (citing to *McClellan v. Commonwealth*, Ky., 715 S.W.2d at 464, and *Stumbo v. Seabold*, 704 F.2d 910 (6th Cir. 1983)); and the injection of a false issue through cross-examination is highly inflammatory and constitutes reversible error (citing *Coates v. Commonwealth*, Ky., 469 S.W.2d 346 (1971)). Trial counsel's failure to object to the line of questioning and closing argument constitutes ineffective assistance of counsel, the petitioner citing *Crotts v. Smith*, 73 F.3d 861 (9th Cir.1996).

The respondent argues that this claim was rejected when presented as one of prosecutorial misconduct in *Bowling I;* the Kentucky high court refused to consider the claim again when it was presented in the form of an ineffective assistance of counsel claim in *Bowling II;* and the claim should be considered procedurally defaulted by this Court because it was raised only in the stricken supplemental RCr 11.42 motion.

Without specifically referring to the Commonwealth's cross-examination of the family members, Kentucky's highest court found the petitioner's "numerous examples of alleged prosecutorial conduct ... [have] no merit." *Bowling I*, 873 S.W.2d at 178–79, II. On appeal of his 11.42 motion, where petitioner did raise this issue as part of his claim of ineffective trial counsel for failing to object to this line of questioning, the court stated, "This was raised and disposed of on the direct appeal and cannot be relitigated herein." *Bowling II*, 981 S.W.2d at 552.

It is not inconsistent for the Kentucky Supreme Court to find no prosecutorial misconduct on the direct appeal and then to use this to reject an ineffective assistance of counsel claim because there was nothing to object to. Therefore, how can counsel's performance be deficient if nothing was objectionable? For the same reason that the instant petitioner's complaint, *supra*, that counsel should have objected to the Commonwealth's conjecture, failed, this claim must also fail. Since the Kentucky court found no prosecutorial error sufficient to meet the standard for the petitioner's constitutional due process rights by denying him a fair trial (*see Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)), then counsel's failure to object thereto was not error so serious as to deprive the defendant of a fair trial (*Strickland*, 466 U.S. at 687, 104 S.Ct. 2052). *See also West v. Seabold*, 73 F.3d at 85. This Court finds that the Kentucky Supreme Court's decision is not contrary to or an unreasonable application of clearly established federal law.

4. **The application of Kentucky's death penalty statute to petitioner—a defendant whose only alleged aggravating factor was that his acts resulted in multiple deaths—was arbitrary and capricious in violation of petitioner's rights to due process and equal protection and constituted cruel and unusual punishment in violation of the Eighth Amendment; moreover, trial defense counsel were ineffective for failing to move to exclude the death penalty on these grounds.**

The petitioner has argued that he is the first and only man sentenced to death in Kentucky on the basis of the single aggra-

vating factor that the killings were intentional and resulted in multiple deaths. He faults his counsel for not presenting this argument and/or moving to exclude the death penalty on the grounds that it would be unheard of and disproportionate. The petitioner also again states that he raised this issue in his 11.42, but could not address it on appeal of that motion because of the 50–page limit for appellate briefs under Kentucky rules.

Again, the respondent argues that because it was not presented to the Kentucky Supreme Court on appeal of the RCr 11.42 motion, this claim is defaulted, the respondent again relying on *O'Sullivan v. Boerckel,* 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). The respondent also argues that if the claim is considered on the merits, nonetheless, it should fail. Factually, in 1990, Bowling became the first of three individuals in Kentucky who are now under a sentence of death based upon the single aggravating factor of multiple intentional deaths, there being two victims. Moreover, the respondent contends that under Bowling's theory that his penalty is disproportionate because no one else received death on a finding of this one aggravating factor, no single statutory aggravator could ever support a death penalty the first time it was used. Finally, the respondent relies upon well-known law, supporting the death penalty upon the finding of multiple murders as the sole aggravating factor, including the Supreme Court's *Lowenfield v. Phelps,* 484 U.S. at 241–46, 108 S.Ct. 546.

 The record reveals that appellate counsel wrote in paragraph 30 that Bowling's counsel was "constitutionally inadequate for not aggressively attacking the availability of the death penalty in this case in light of the Supreme Court's holding in *Enmund* [*v. Florida,* 458 U.S. 782, 794, 102 S.Ct. 3368, 73 L.Ed.2d 1140

(1982) ]." Counsel went on to designate paragraph 30 as one he would not brief because of the 50–page limitation. State record, Bowling's Brief on Appeal of 11.42 Motion at 23, 49. To the extent that this claim is not procedurally defaulted, it is meritless because the defense team vigorously sought to exclude the death penalty. Counsel presented "Motion to Exclude the Death Penalty Because Electrocution is Cruel and Unusual Punishment" (TR Vol. 1 at 103); a "Motion to Exclude the Death Penalty Based on Arbitrary and Discriminatory Application of the Death Penalty in Kentucky and Motion for Funds to Complete a Statistical Study and for an Evidentiary Hearing" (*Id.* at 108); a "Motion/Memorandum to Allow the Introduction of Evidence Concerning the Nature and Effect of the Death Penalty at the Presentence Hearing" (*Id.* at 87); and a "Motion to Exclude Death Penalty Due to Insufficient Statutory Guidance for Imposition of Death Penalty" (*Id.* at 94). This claim, accordingly, does not warrant habeas relief.

5. **Trial defense counsel were ineffective for failing to attack petitioner's death sentence on the grounds that the race of the victims played an impermissible role in both the Commonwealth's decision to seek the death penalty and in the jury's sentencing decision where the sole aggravating factor was that the acts of killing resulted in multiple deaths.**

It is the petitioner's contention that because the Earleys were white, the state rushed to judgment in the arrest, prosecution, and decision to seek the death penalty. The petitioner submits that if the victims in this case had been two African Americans, he would not have been sentenced to death, and yet his attorneys

failed to argue that the seeking of death in his case was a violation of the petitioner's rights to due process and equal protection. Therefore, they also rendered ineffective assistance as to this matter. As to the state court record on this claim, the petitioner contends that this was one of the issues his appellate counsel identified he could not address because of the appeal brief page limitation.

The respondent argues default, based upon the petitioner's failure to raise this with the Supreme Court of Kentucky in his RCr 11.42 appeal. Additionally, the respondent contends that this claim is refuted in the record. Counsel moved to exclude the death penalty; for funds to complete a statistical study; and for a hearing. He argued then that pursuing his death penalty was discriminatory based on the race of the victims and also the sex of one of the victims. TR at 108.

The record reveals that trial counsel did, indeed, address the issue of race as a determiner in a pretrial motion and new counsel addressed it in the post-conviction proceedings in paragraph 31 of his 11.42 motion to the trial court. Again, on appeal, paragraph 31 was on the list of issues about which Bowling's counsel stated he "would have presented" if he had not had the 50–page brief limitation. State Record, Bowling's Brief on Appeal of 11.42 Motion at 49. Appellate counsel chose to brief other issues to the Supreme Court of Kentucky.

■ Thus, to the extent the petitioner defaulted his race-based claim, he has tried to establish cause therefor in the Kentucky Supreme Court's 50–page limitation on briefs; he does not even attempt to establish prejudice. Nor has he demonstrated that failure to review this claim will result in a fundamental miscarriage of justice. *See Smallwood v. Gibson,* 191 F.3d 1257, 1269 (10th Cir.), *cert. denied,* —— U.S. ——, 121 S.Ct. 88, 148

L.Ed.2d 49 (2000). Moreover, even if viewed as not having been defaulted because the claim was mentioned, though not briefed, on the merits, this argument would fail for the same reasons it has failed in other cases by other white people. *See, e.g., McQueen v. Scroggy,* 99 F.3d 1302, 1333 (6th Cir.1996).

### Conclusion Regarding Trial Counsel

Each of the petitioner's claims of ineffective assistance of trial counsel is without merit. The state record, including the pretrial proceedings, the trial transcripts, and the judge's post-conviction report, supports the state courts' finding that trial counsel's performance was not deficient. Even were this Court to disagree with the Kentucky court and find a specific instance of counsel's representation to be deficient, "it cannot be said that [Bowling's] convictions or death sentences resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. This Court finds no conflict between federal law as stated by the United States Supreme Court in *Strickland* and its reasonable application by the Kentucky Supreme Court in Bowling's case. Therefore, Bowling cannot prevail on this claim. Finding that the Kentucky courts' decisions about counsel are not unreasonably determined or contrary to *Strickland,* this Court may not grant habeas relief based on ineffective assistance of trial counsel.

### D. COUNSEL ON DIRECT APPEAL FAILED TO RAISE A MERITORIOUS ISSUE

**Counsel on petitioner's direct appeal to the Kentucky Supreme Court were ineffective by failing to raise a Fourth Amendment claim related to the search and recovery of physical evidence.**

The petitioner claims that he wanted to pursue a Fourth Amendment claim based

upon the seizure of his vehicle and other property from the Powell County property without a warrant; and that he wished this issue to be the backbone of his defense and his appeal. He contends that appellate counsel, however, declined to brief this issue because it conflicted with the defense of extreme emotional disturbance. Counsel's failure to pursue the Fourth Amendment claim on appeal thus denied Bowling effective assistance of appellate counsel. Pointing to the holdings of the Supreme Court in *Jones v. Barnes*, 463 U.S. 745, 746, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), and *Evitts v. Lucey*, 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985), the petitioner urges this Court to apply the two-prong test of *Strickland* and determine that the petitioner had ineffective assistance of counsel on appeal.

The respondent argues that appellate counsel is not required to raise every conceivable constitutional issue, even in a death penalty case, citing *Murray v. Carrier*, 477 U.S. 478, 486, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). Moreover, he asserts that *Stone v. Powell*, 428 U.S. 465, 481–82, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), forecloses Fourth Amendment claims from review on a petition for writ of habeas corpus. Also in support of his position, the respondent argues that the trial court found that police had valid consent from the third party owner to search the property (TR at 191–195); certain exceptions to the warrant requirement were involved; and counsel's decision to omit the "loser" Fourth Amendment claim from his appeal was within the range of constitutionally effective appellate counsel.

In his traverse, the petitioner complains that the respondent has mischaracterized this as a Fourth Amendment claim, when it is actually one of ineffective counsel. Therefore, although Fourth Amendment claims themselves are foreclosed from review in a habeas petition, the attorney's ineffectiveness for not raising the issue on appeal is a legitimate question for this Court, citing *Kimmelman v. Morrison*, 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986).

The claim that appellate counsel was ineffective for not raising the Fourth Amendment challenge was presented in the petitioner's original RCr 11.42 motion. TR Vol. 5 at 631–31. However, on his appeal of the denial of that motion to the Kentucky Supreme Court, the claim regarding appellate counsel had become "IV. Bowling was Substantially Prejudiced ... By the Denial of Effective Assistance of Post–Conviction Counsel." Brief at 47–48. He argued therein that post-conviction counsel making his RCr 11.42 motion were ineffective because they filed supplemental motions which warranted summary dismissal and because the trial court found that they had failed to meet their burden under the state rule. Appellate counsel went on to argue that Bowling was "entitled to effective assistance of post-conviction [sic] regarding his claims of **ineffective trial and appellate counsel....**" *Id.* at 48 (emphasis in the original).

█ Unsurprisingly, the Kentucky Supreme Court did not address the issue of the performance of appellate counsel but only the issue of whether post-conviction counsel rendered ineffective assistance.[15]

---

15. With regard to this claim, the Supreme Court of Kentucky first noted that Bowling admitted that this issue was not preserved. The court went on to discuss the issue, nonetheless, as follows:

Notwithstanding the procedural deficiency, Appellant's argument is without merit. In *Coleman v. Thompson*, 501 U.S. 722, 752, 111 S.Ct. 2546, 115 L.Ed.2d 640 ... (1991), the United States Supreme Court held that "[t]here is no constitutional right to an at-

Thus, the state record shows that after presenting the claim of ineffective appellate counsel to the trial court in his 11.42 motion, the petitioner's counsel essentially dropped the claim on appeal, thereby failing to present the issue to Kentucky's highest court. For the purposes of federal habeas review, the petitioner's current counsel has now attempted to retrieve the argument that appellate counsel was ineffective for failing to raise the Fourth Amendment claim. However, this Court is of the opinion that the petitioner did not "fairly present" this claim to the Kentucky Supreme Court and so it never had a fair opportunity to rule on the claim of ineffective appellate counsel. Therefore, this Court is barred from considering it unless the petitioner establishes that his case meets one of the exceptions to procedural default.

■ Bowling cannot meet the cause and prejudice standard. The Supreme Court has held that attorney error may constitute cause to excuse procedural default only if his or her performance meets the standard for being constitutionally ineffective under *Strickland*. *Murray v. Carrier*, 477 U.S. at 488, 106 S.Ct. 2639. The application of the Carrier rule is dispositive of this claim in the instant case, as it was in *Coleman*. There is no constitutional right to an attorney in state post-conviction proceedings; and, therefore, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings. *Coleman*, 501 U.S. at 752, 111 S.Ct. 2546 (*citing, inter alia, Murray v. Carrier*, 477 U.S. at 488, 106 S.Ct. 2639, and *Murray v. Giarratano*, 492 U.S. 1, 109 S.Ct. 2765, 106 L.Ed.2d 1 (1989)). Without cause, the question whether the petitioner

would be prejudiced by his inability to raise the claim need not be considered. *See Carrier*, 477 U.S. at 494, 106 S.Ct. 2639. Moreover, Bowling presents no case for there being a fundamental miscarriage of justice requiring the Court to forgive his default. Consequently, this Court is without jurisdiction to review the merits of the petitioner's argument about appellate counsel.

Alternatively, if the reducing of his claim to part of a sentence in his RCr 11.42 appeal is not considered a default but a fair presentment which the Kentucky Supreme Court rejected without comment, then this court may reach it. As with all claims of constitutionally ineffective counsel, including appellate counsel, in order to succeed on the merits, a petitioner must show errors so serious that counsel was scarcely functioning as counsel at all and that those errors undermine the reliability of the defendant's convictions, under the standards of *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. "Not just any deficiency in counsel's performance" is sufficient to excuse procedural default; "the assistance must have been so ineffective as to violate the Federal Constitution." *Edwards v. Carpenter*, 529 U.S. 446, 120 S.Ct. 1587, 1591, 146 L.Ed.2d 518 (2000).

■ Scrutinizing the merits of petitioner's the Fourth Amendment claim in order to evaluate the performance of his counsel, this Court concludes that the claim was not a strong one. Petitioner's appellate counsel may well have felt that, in light of the trial court's ruling, the duly signed consent to search the Powell County Property (Trial Exhibit 1), and his research on the issue, the Fourth Amendment claim was a "loser," or was inconsistent with

torney in state post-conviction proceedings. Consequently, a petition cannot claim constitutionally ineffective assistance of counsel in such proceedings." (citations omitted);

*see also Murray v. Giarratano*, 492 U.S. 1, 109 S.Ct. 2765, 106 L.Ed.2d 1 ... (1989). *Bowling II*, 981 S.W.2d at 552.

Bowling's continuing innocence stance, or was simply weaker than other arguments. Appellate counsel "need not advance every argument, regardless of merit, urged by petitioner." *Evitts v. Lucey,* 469 U.S. at 394, 105 S.Ct. 830. The petitioner fails to show that dropping the claim falls outside the wide realm of professionally competent assistance. *See Kimmelman v. Morrison,* 477 U.S. at 365, 106 S.Ct. 2574. The very function of appellate counsel is to weed out the weak arguments and emphasize the strong arguments. *See Jones v. Barnes,* 463 U.S. at 751–52, 103 S.Ct. 3308. Strategic choices by counsel, including the jettisoning of some claims, while not necessarily those a federal judge in hindsight might make, do not rise to the level of a Sixth Amendment violation. *See McMeans v. Brigano,* 228 F.3d 674, 682 (6th Cir.2000) (citing *Jones,* 463 U.S. at 750–54, 103 S.Ct. 3308).

While a different lawyer might have done otherwise, the decision of the petitioner's appellate counsel not to assert a Fourth Amendment claim was not unreasonable and affords no basis for the Court to conclude that he was not functioning as "counsel" in the Sixth Amendment sense. *Id.* Again, as with all of the preceding claims of ineffective assistance of counsel, this Court agrees with the Kentucky Supreme Court's reasonable application of clear federal law, under which the petitioner has failed to meet the two *Strickland* requirements for demonstrating that the assistance of his counsel was so ineffective that his constitutional rights were violated.

## II. *PROSECUTORIAL MISCONDUCT*

The petitioner challenges certain conduct of the prosecution at various stages, including pretrial, during the guilt phase, and at the penalty portion of the trial. Characterizing the prosecutor's behavior as flagrant misconduct, Bowling alleges

that it violated his rights under several amendments to the Constitution. The Court examines each contention below.

■ For the prosecutor's misconduct to be found to violate a defendant's constitutional rights, the habeas court must determine that the prosecutor's actions "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Inquiry into the fundamental fairness of a trial can be made only after examining the entire proceedings. *Id.* If prosecutorial misconduct is found, it will be considered harmless error unless it constitutes a "structural defect [ ] in the constitution of the trial mechanism" rather than "an error in the trial process itself." *Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). The Court's standard for conducting the harmless error review was established in *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), *i.e.,* whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 637, 113 S.Ct. 1710.

## A. INVESTIGATION OF THE MURDERS: *BRADY* VIOLATIONS

■ The petitioner's first three allegations of prosecutorial misconduct are that he was denied his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments because of the Commonwealth's failure to disclose exculpatory evidence in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). It was in *Brady* that the Supreme Court declared, "[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment...." *Id.* at 87, 83 S.Ct.

1194. To establish a *Brady* violation, the petitioner must prove that (1) the prosecution suppressed evidence, (2) the evidence would have been favorable to the accused, and (3) the suppressed evidence was material to guilt or to punishment. *Brady*, 373 U.S. at 87, 83 S.Ct. 1194. Later Supreme Court cases have fleshed-out this inquiry.

The petitioner asserting a *Brady* violation has the burden of establishing the three factors. *See Moore v. Illinois*, 408 U.S. 786, 794–95, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972). The inquiry is objective, "irrespective of the good faith or bad faith of the prosecution." *See Brady*, 373 U.S. at 87, 83 S.Ct. 1194. In *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), the Supreme Court summarized the relevant law on *Brady* violations. The Court therein also reaffirmed the rule that " 'a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' " *Id.* at 433 n. 7, 115 S.Ct. 1555 (quoting *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)). Included among the evidence that *Brady* obligates the prosecution to disclose is "evidence affecting credibility." *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The Court in *Kyles* described as "settled" that, under the law, there is no difference between exculpatory and impeachment evidence for *Brady* purposes. *Kyles*, 514 U.S. at 433, 115 S.Ct. 1555.

■ The court has recognized that "*Brady* is concerned only with cases in which the government possesses information which the defendant does not." *See United States v. Mullins*, 22 F.3d 1365, 1371 (6th Cir.1994). There is no *Brady* violation if the defendant knew or should have known the essential facts permitting him to take advantage of the information in question or if the information was available to him from another source. *See Coe v. Bell*, 161 F.3d 320, 344 (6th Cir.), *cert. denied*, 528 U.S. 842, 120 S.Ct. 110, 145 L.Ed.2d 93 (1999); *United States v. Clark*, 928 F.2d 733, 738 (6th Cir.1991).

■ The state need not disgorge every bit of evidence in its possession. Materiality is an essential element of a *Brady* violation. A prosecutor is required "only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial...." *United States v. Bagley*, 473 U.S. 667, 675, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. at 109–10, 96 S.Ct. 2392. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. at 682, 105 S.Ct. 3375; *see also Wood v. Bartholomew*, 516 U.S. 1, 5, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995) (quoting *Bagley* ). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. at 434, 115 S.Ct. 1555. The determination of materiality must be made on the basis of the entire record, considering all the undisclosed evidence collectively. *Id.* at 437, 115 S.Ct. 1555.

### 1. Commonwealth did not disclose exculpatory notes on results of photo lineup.

The petitioner alleges that although a copy of Page One of photo lineup results was provided to them pretrial, Page Two thereof was not provided. According to the petitioner, Page One "displayed only cryptic letters, 'DNS,' or the word, 'no,' beside those individuals that apparently were unable to identify Petitioner from the lineup." It was Page Two which contained the full statements of the results, such as "could not ID" and "did not observe suspect." The petitioner argues that this could have been used to show that there was no witness in the vicinity of the scene who saw the petitioner that morning and, further, of individuals close to the victims, none ever saw the petitioner stalking them. Also, Page Two reveals that the identification of the petitioner by one of the Powell County witnesses, Jack Strange, was based on his having seen the defendant's photograph in the newspaper as the man charged with the crime.

The respondent contends that this claim should be considered defaulted, because it was in the supplemental RCr 11.42 motion which was stricken by the trial court, and the Kentucky Supreme Court affirmed that striking. He also argues that the highest court in Kentucky addressed the claim on the merits nonetheless, rejecting petitioner's charge that his counsel was ineffective for not requesting exculpatory material, because "such claim is refuted by the record." *Bowling II*, 981 S.W.2d at 552. Moreover, the cross-examination of Mr. Strange reveals that defense counsel knew of his newspaper photo identification and was able to effectively reveal it. In his traverse, the petitioner insists that the second page was obviously not known to the defense or defense counsel "could have filed a pretrial motion to suppress this

improper identification" and/or would have been better prepared to cross-examine Strange.

The state record reveals that in an April 16, 1996 Motion for Discovery in the state 11.42 proceedings, the petitioner alleged that he had discovered Page Two pursuant to a January 1996 Open Records request, evidently while preparing the supplement to the RCr 11.42 motion and/or his discovery motion in state court. TR Vol. 5 at 671. However, he made this argument in the context of trial counsel's being ineffective. for not having requested exculpatory evidence regarding a photo lineup, not in the context of the prosecutor's committing misconduct by withholding Page Two. As the respondent has argued, the Kentucky Supreme Court ruled that Bowling's claim that "counsel failed to request exculpatory evidence regarding a photo line-up ... is refuted by the record." *Id.*

This Court considers whether this claim, posited as an ineffective assistance of counsel claim, is considered to have been fairly presented to the state court for its consideration under *Brady* standards. The Court finds that, in this instance, it has been. The standards for *Strickland* prejudice and *Brady* materiality are identical. *See Felder v. Johnson*, 180 F.3d 206, 213–14 (5th Cir.), *cert. denied*, 528 U.S. 1067, 120 S.Ct. 630, 145 L.Ed.2d 520 (1999). Both the *Strickland* prejudice standard and the *Brady* standard for materiality require a conclusion that there is a "reasonable probability" that the result of the proceeding would have been different and the defendant was deprived of a "fair trial." *Strickland*, 466 U.S. at 687–89, 104 S.Ct. 2052; *Bagley*, 473 U.S. at 675–82, 105 S.Ct. 3375. *See Strickler v. Greene*, 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (discussing "reasonable probability" standard). The petitioner has not even demonstrated the minimum, that

this page was suppressed. Even if it was suppressed, was Page Two any more exculpatory than Page One (*i.e.*, is "could not ID" any more exculpatory than "no")? "Exculpatory evidence must create a reasonable doubt that did not otherwise exist." *Augurs*, 427 U.S. at 112, 96 S.Ct. 2392.

██ Moreover, the evidence was already available to the defense. Page One clearly was turned over to the defense, in 1990, even if Page Two was not, and the translation of its "cryptic" letters could have been, and perhaps was, pursued at that time. Alternatively, the contents of the entire report on photo lineup results could have been obtained by merely talking with the listed witnesses, identified not only in Page One but in other police reports, which were turned over as part of the open file discovery. As to the notes about witness Strange, he testified to the circumstances of the television identification on direct examination and was also cross-examined about it. Record No. 58 at 1476. Therefore, with regard to the photo pack's Page Two, the petitioner has failed to preserve or present a *prima facie* case of a *Brady* violation.

### 2. The Commonwealth knew about Tina Earley's affairs and drug use by both Earleys.

The petitioner contends that contemporaneous newspaper articles covering the petitioner's indictment indicate that the police were not truthful in their disclosures about this case. He provides a copy of and quotes from a June 18, 1990 local newspaper article wherein police investigators are described as having ruled out extramarital affairs or drug use as motives for the crime, despite having discovered evidence of both in investigating the murders; the article also reported that police believed the petitioner had mistaken Eddie

Earley for a man named Phiel, of whom he was jealous because Phiel was seeing the petitioner's most recent wife, with whom he was still attempting reconciliation. The petitioner contends that the appearance of the false statements not only indicate perjured testimony before the grand jury, which defense counsel could have used to dismiss the indictment, but also tainted the community's view of the facts with the police "spin." Therefore, the petitioner's rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments, were violated.

The respondent argues that this claim also was defaulted because it was not presented to the Kentucky Supreme Court. Nonetheless, the respondent also argues that the claim is meritless. The Commonwealth gave defendant's counsel a copy of all of the grand jury testimony, and any error in the facts suggested by newspaper articles denying affairs and drug involvement was cured during voir dire. The petitioner insists that the matter is not procedurally defaulted and points out that the respondent does not deny the allegation that perjured testimony was given to the grand jury. The petitioner cites numerous cases condemning the knowing use of perjured testimony.

██ These matters are defaulted because of the petitioner's failure to raise them earlier. Even if they were reviewable, there is no support therefor anywhere in the record. As to the presentation of perjured testimony before the grand jury, the petitioner has not demonstrated (1) that perjured testimony was presented to the grand jury or (2) that transcripts of police testimony before the grand jury were in the possession only of the prosecution and not defense counsel or (3) that the contents of the testimony was unobtainable by the petitioner prior to trial through reasonable diligence.

To the contrary, the petitioner does not deny that during open file discovery prior to trial, he was provided a copy of the grand jury testimony and copies of police reports and recorded interviews suggesting the Earleys' involvement in extramarital or illegal affairs. His counsel could and, according to one defense counsel's notes attached to the 11.42 discovery motion, evidently did interview some of these witnesses.[16] The Kentucky Supreme Court's decision was not based on an unreasonable determination of the facts or contrary to the prejudice standard of *Strickland* or materiality standard of *Brady.*

The petitioner boldly suggests herein, for the first time, that misleading information from newspapers tainted the trial. At this point, it is mere speculation. Even were this Court to consider this claim, a motion for change of venue or voir dire would be the place to reveal such a taint and remove it. The lack of a venue motion and the contents of lengthy, individual voir dire belie any such taint in the case *sub judice.*

### 3. The Commonwealth did not divulge deal with Clay Brackett.

Evidence at trial was that the petitioner bought a .357 magnum from Clay Brackett, who did not have a license but was selling unregistered guns at home and at flea markets. The petitioner complains that the Commonwealth hid a deal it had made to not prosecute Brackett on any gun charges in exchange for his testimony against Bowling. Therefore, cross-examination of Mr. Brackett was ineffective. The petitioner contends that the Common-

wealth's failure to divulge a deal was a violation of *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). He asserts that, because of the withheld evidence, neither the guilt phase of the trial nor the penalty portion resulted "in a verdict worthy of confidence," the petitioner citing to *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). The respondent claims that there is no evidence of a deal with Clay Brackett to be revealed. Additionally, he points to the Kentucky Supreme Court's rejection of this claim.

 Kentucky's highest court stated as follows:

Appellant finally claims that the Commonwealth made a clandestine deal with a witness, Clay Brackett, in exchange for his testimony. Appellant has no basis for such an allegation, and we have no reason to speculate that such an arrangement existed.

Having reviewed each allegation of ineffective assistance of trial counsel, we conclude that Appellant has failed to demonstrate any claims which are not refuted by an analysis and review of the trial record.

*Bowling II,* 981 S.W.2d at 550. Thus, the claim with regard to Brackett was addressed in terms of whether trial counsel was ineffective for failing to ask for the information as part of their preparation, but the Kentucky Supreme Court made a finding of fact based on the record. Bowling has not rebutted the presumption of correctness a federal court must apply to the state court's findings of fact nor shown

---

**16.** As the Sixth Circuit noted recently,

[I]f the reason that the police did not turn over inculpatory evidence about [the other suspect] is that they had substantial exculpatory evidence to conclude that he was not longer a suspect, Brady would not apply.

Brady does not exist to provide fodder for misleading reasonable-doubt defenses.

*Coe v. Bell,* 161 F.3d 320, 345 n. 4 (6th Cir.1998), *cert. denied,* 528 U.S. 842, 120 S.Ct. 110, 145 L.Ed.2d 93 (1999).

that the state court's conclusion was unreasonable in light of the evidence.

The state record shows the petitioner presented to Kentucky's courts no evidence of a deal between Brackett and the Commonwealth. The petitioner has presented to this Court only the affidavit of Brackett's sister, but it does nothing to suggest that there was a deal. This Court has found that, ten years after trial, the petitioner fails to offer even good cause to believe that a deal existed so as to warrant discovery. The petitioner failed to establish a *prima facie* claim under *Brady* because he has failed to demonstrate the existence or concealment of a deal between the prosecution and witness Brackett or that proof of such a deal would be material to the outcome. Accordingly, this Court must defer to these factual findings.

As to the legal standards for either a *Strickland* or a *Brady* claim, there is no reasonable probability that the jury would have returned a different verdict had they been informed that Brackett was testifying in exchange for not being prosecuted on gun charges. Thus, even assuming the existence of an agreement which was not disclosed, and assuming its being favorable to the petitioner for impeachment purposes, this Court fails to find materiality. This Court cannot conclude that there exists a reasonable probability that, had the issue of the non-prosecution of Mr. Brackett been disclosed, the outcome in petitioner's trial would have been different. *See Kyles*, 514 U.S. at 433–34, 115 S.Ct. 1555; *Bagley*, 473 U.S. at 678, 105 S.Ct. 3375; *cf. Agurs*, 427 U.S. at 109, 96 S.Ct. 2392 ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense."); *see also Strickler v. Greene*, 527 U.S. at 291, 119 S.Ct. 1936 (not material if there is only

"a reasonable possibility that either a total, or just a substantial, discount of [a witness's] testimony might have produced a different result").

### Conclusion Regarding Brady Claims

In short, even considering the *Brady* claims collectively, this Court simply cannot conclude that the complained-of undivulged evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435–37, 115 S.Ct. 1555. Although there may be a possibility that any one of the pieces of evidence might have produced a different result, the petitioner has not met his burden of establishing a reasonable probability of a different result. *Strickler v. Greene*, 527 U.S. at 291, 119 S.Ct. 1936.

 The petitioner has recently suggested that audio tapes his counsel desire to study and other information have disappeared in the hands of the State. Even if this is true, the Supreme Court has held that the police are only required to preserve that evidence which is material to the defendant's case. *See California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). Under *Trombetta*, material evidence is evidence which is apparently exculpatory before it is lost and must be "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489, 104 S.Ct. 2528. If the evidence does meet the requirement for materiality but is only potentially useful—possibly exculpatory rather than clearly exculpatory—failure to preserve the evidence will not constitute a denial of due process unless petitioner can demonstrate bad faith on the part of the police or the prosecution. *See Arizona v. Youngblood*, 488 U.S. 51, 55, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988).

■ The Supreme Court rule is dispositive of the issue here. It is merely speculation on petitioner's part that the missing interview tapes would have provided material evidence. Moreover, the same information appears in investigatory summaries and from the witnesses themselves. At best, the missing items are in the category of possibly exculpatory evidence with no showing of bad faith on the part of the police or the prosecution.

Therefore, the result reached by the state court with regard to these purported *Brady* claims was not inimical to the AEDPA standards or contrary to Supreme Court law.

## B. MISCONDUCT AT THE TRIAL

■ On habeas review, the petitioner's burden with a claim of prosecutorial misconduct is a substantial one, and the Court's standard of review is limited to "the narrow one of due process." *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). For relief to be granted, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (quoting *Donnelly v. DeChristoforo,* 416 U.S. at 643, 94 S.Ct. 1868). In examining alleged prosecutorial misconduct on habeas review, the Court must first determine if complained-of comments were improper. *See Boyle v. Million,* 201 F.3d 711, 717 (6th Cir.2000) (quoting *Coleman v. Thompson,* 501 U.S. 722, 735, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)). *See also Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). Even if the prosecutor's conduct was "undesirable or even universally condemned," this Court can only provide relief if the relevant prosecutor statements were so egregious as to render the entire trial fundamentally unfair to a

degree tantamount to a due process violation. *Id.*

■ To make this determination, the habeas court must evaluate the comments within the context of the trial as a whole. *United States v. Young,* 470 U.S. 1, 11–12, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). The "probing analysis" whereby the Court determines if comments were sufficiently flagrant to warrant reversal involves the consideration of four factors: (1) the likelihood that the remarks would mislead the jury or prejudice the accused; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally presented to the jury; and (4) whether other evidence against the defendant was substantial. *See Boyle,* 201 F.3d at 717.

Therefore, this Court proceeds to ascertain whether the state court's actions with regard to the claims of prosecutorial misconduct at trial were reasonable in light of Supreme Court precedent.

1. **Prosecutorial misconduct during both the guilt and penalty phases deprived appellant of a fair and impartial trial and due process of law.**

a. **Voir dire: Prosecution implicitly instructed jurors not to presume innocence.**

During general and individual voir dire, the prosecutor told the jury that at the beginning of a trial, they are in a car with a standard transmission, which is having the car in neutral, ready to go in reverse or forward in their decision as to guilt or innocence. According to the petitioner, this conveyed to the jury the incorrect idea that they should start with no presumption as to guilt or innocence, thus robbing the petitioner of the presumption of innocence.

In addition to the Commonwealth's alleged misstatement of the law, the petitioner complains that defense counsel did not request, nor did the trial court give, an instruction to the jury on the presumption of innocence prior to deliberations. Therefore, the petitioner contends that his Fifth Amendment rights were violated because jurors may fail to understand the full implications of the prosecution's having the burden of proof. *Taylor v. Kentucky*, 436 U.S. 478, 484, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978). The petitioner argues that placing the burden on the plaintiff rather than the prosecution is impermissible and in violation of *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

The respondent first answers that the car analogy is not incorrect and points out that the defense was able to present its own different analogy soon thereafter. Moreover, at the end of the guilt phase, the court gave the proper instruction with regard to the burden of proof. Additionally, the Kentucky Supreme Court rejected this due process claim in *Bowling I*, 873 S.W.2d at 177, 182.

■■■ The petitioner presented this issue on appeal, but the Kentucky Supreme Court does not specifically refer to the car analogy. The opinion begins with the statement that the court had carefully reviewed all of the issues presented by Bowling; that allegations of error considered to be without merit would not be addressed in the opinion; and that Bowling had received a fundamentally fair trial. *Bowling I*, 873 S.W.2d at 177. The court then went on to consider and reject issues I–XXII, including other specific instances of purported prosecutorial misconduct in numbers II–V; and noted therein that in the penalty phase, the prosecution repeatedly reminded the jury that it was they who had the ultimate responsibility for imposing a sentence (*Id.* at 178). Additionally,

in its concluding sentence to the entire opinion, the court repeats that Bowling "received a fundamentally fair trial" (*Id.* at 182). In short, the Kentucky court appears to have found the car analogy claim meritless and clearly found that Bowling's trial was not rendered unfair as a result of prosecutorial misconduct. This Court cannot conclude that the Kentucky court's decision was contrary to or an unreasonable application of federal law.

**b. At closing argument, the prosecutor commented on the petitioner's silence.**

In closing argument, the prosecution stated, regarding potential motive, "We can't tell you what it is because only the man who pulled the trigger knows." Thus, according to the petitioner, the prosecutor impermissibly commented on the petitioner's silence and placed a false burden of proof on a defendant to establish a motive. In *Rachel v. Bordenkircher*, 590 F.2d 200, 202 (6th Cir.1978), when a prosecutor told the jury that they'd never know exactly what happened to the victim because the accused "won't tell us," the Sixth Circuit reversed for "fundamental error" in violation of *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) (reversible error for the prosecution to comment on a defendant's failure to take the stand and testify in his own behalf).

The respondent argues that the prosecution's statement was only in response to defense counsel's opening the door by saying, "We have no confessions here." Still, even if it was an impermissible comment by the prosecution, it should not be reversible error under the standard of *United States v. Moore*, 917 F.2d 215, 225 (6th Cir.), *cert. denied*, 499 U.S. 963, 111 S.Ct. 1590, 113 L.Ed.2d 654 (1991). In the traverse, the petitioner argues not only the standard of *Griffin*, but refers to other

cases, including *Moore,* which, he contends, support his argument that the comment was impermissibly prejudicial and requires reversal.

The Kentucky Supreme Court found that the prosecution's arguments did not deprive the petitioner of a fair trial. With regard to the comment that only the murderer knows the motive, the court concluded as follows:

> There was no direct reference to Bowling. Given the totality of the prosecution's closing argument, this statement, if indeed it was improper, was merely an inadvertent reference. It was not manifestly intended to reflect on the accused silence or of such a character that the jury would naturally and necessarily take it as such. *Byrd v. Commonwealth,* 825 S.W.2d 272 (1992).

*Bowling I,* 873 S.W.2d at 178, II.

▬▬▬ The law is clear that the prosecution is forbidden from commenting on a defendant's decision not to testify at trial. *See Griffin v. California,* 380 U.S. at 613–15, 85 S.Ct. 1229; *Rachel v. Bordenkircher,* 590 F.2d at 200. While direct comments about a decision to remain silent or not to testify are clearly prohibited, indirect comments require a more probing analysis. *See Lent v. Wells,* 861 F.2d 972, 975 (6th Cir.1988). A court should not find manifest intent to comment on a defendant's failure to testify if some other explanation for the prosecutor's remarks is equally plausible; for instance, the comment may be "a fair response to a claim made by defendant or his counsel." *United States v. Robinson,* 485 U.S. 25, 32, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988).

▬▬ Comment on a defendant's failure to testify must be shown to have had a "substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Therefore, prosecutorial comment on a defendant's failure to testify in a trial is not *per se* error requiring automatic reversal. *See Chapman v. California,* 386 U.S. 18, 22, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).[17] Harmless error analysis applies to Fifth Amendment violations. As the Sixth Circuit noted recently, the harmless error standards on direct and collateral review are different:

> The standard for showing harmless error on collateral review, like the standard for demonstrating that a trial error has occurred, is considerably less favorable to the petitioner than the standard applicable on direct review.... Relief may be granted on collateral review only if the trial error "had substantial and injurious effect or influence in determining the jury's verdict. Under this standard, habeas petitioners ... are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).

*McGhee v. Yukins,* 229 F.3d 506, 513 (6th Cir.2000).

▬▬ Having thus reviewed the matter, this Court cannot conclude that the Kentucky Supreme Court's decision that it was not the prosecutor's manifest intent in making the remark to comment on the petitioner's silence, or that the remark was not of such a character that the jury would

---

**17.** The Court recognizes that the harmless error standard from *Chapman,* harmless beyond a reasonable doubt, is no longer applied on collateral review of habeas cases. The holding of *Chapman,* however, which rejects finding *per se* error requiring automatic reversal when a prosecutor comments upon a defendant's failure to testify, remains applicable here.

naturally and necessarily construe it as a comment on his silence, is unreasonable. Even if this argument crossed the line as an improper prosecutorial comment on the defendant's decision to not testify, this Court does not find that the comment was sufficiently prejudicial to violate Bowling's due process rights under the standards of *Estelle v. McGuire*, 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), and *Brecht*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). In conducting the appropriate analysis of this claim, this Court has looked to the occasion of this one comment, the weight of the evidence against the petitioner, and the instruction the jury took to deliberations with them, which provided, "The defendant is not compelled to testify and the fact that he does not testify is not an inference of guilt and shall not prejudice him in any way." TR Vol. 3 at 322. *See Wainwright*, 477 U.S. at 179–81, 106 S.Ct. 2464. Moreover, there was a mountain of circumstantial evidence that the petitioner committed the crime. For a similar district court conclusion, see *Huenefeld v. Maloney*, 62 F.Supp.2d 211 (D.Mass.1999).

The Court concludes that the state court disposition was not contrary to nor did it involve an unreasonable application of "governing legal principles from [the Supreme Court's] decisions." *Williams*, 529 U.S. at 413, 120 S.Ct. 1495.

### c. Improper evidence of sympathy for the victims was presented.

The prosecution also purportedly presented improper and inflammatory evidence in the guilt phase of the petitioner's trial, thus denying him a fair trial in contravention of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Specifically, the prosecution called a tearful pregnant woman who testified about her stopping at the scene upon seeing ambulances and her trying to calm the Earley baby's screaming; and an aunt, who began to weep in the presence of the injured baby's bloodied sleeper. The victims' family can be heard on the trial tape crying while this witness cried; only defense counsel's objection and the court's instruction to the bailiff ended it. The petitioner condemns also the use of a "life photograph" describing Eddie and Tina's morning routine and the current conditions with their baby now being raised by Eddie's parents. Additionally, a paramedic arriving at the crime scene testified in graphic detail about the Earleys' injuries, testimony which was unnecessary and redundant in the face of the pathologist's testimony as to the cause of death. Finally, in the closing argument of the guilt phase, the prosecutor urged the jury to consider the impact of a parent's death in determining guilt, when he said, "The hurt done to Chris that day doesn't have a lot to do with a bullet to his foot."

As to applicable law, the petitioner contends that without specific connection to an element of the crime, victim impact evidence has no place in the guilt phase of a trial, citing to *Sager v. Maass*, 907 F.Supp. 1412, 1420 (D.Or.1995). By deliberately producing emotion in the courtroom during the guilt phase, the prosecution undermined the petitioner's Sixth Amendment right to a fair trial and his Fourteenth Amendment right to due process of law.

The respondent argues that the record reveals no histrionics or inflammatory exhibits.

The Kentucky Supreme Court rejected this argument on appeal. As to the prosecutor's closing argument, the court noted prosecutors are given "wide latitude in closing argument," citing *Williams v. Commonwealth*, 644 S.W.2d 335 (1982), and also noted a prosecutor's statements must be viewed in the context of the entire

trial, the court citing *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). *Bowling I*, 873 S.W.2d at 178, III. Finally, as to the emotional outbursts of several members of the victims' family, "the trial court took proper steps to limit these distractions. The record is void of examples where the impact upon the family of the victims created undue prejudice." *Id.*

█ Again, having considered the record, including only the one incident of an emotional outburst, one picture of the young couple and no pictures of them bloodied and dead, this Court finds that the Kentucky court's decision on this matter does not involve unreasonable determinations of fact or unreasonable applications of relevant Supreme Court law.

### d. Conjecture was the basis of the prosecution argument.

The petitioner first contends that the prosecution's conjecture permeated the entire trial. During the guilt phase, the prosecutor, with no evidentiary support thereof, purportedly suggested to the jury a totally speculative version of the case. This included his conjecture or theory that the petitioner had intentionally rammed his car into the victims' car; that the petitioner had planned the incident with "split second timing"; that he had been stalking the Earleys or staking out the dry cleaners to accomplish this goal; and that he had watched and waited long enough to need the thermos which was found in the car afterwards. Contending that the prosecution "promoted a completely fictional theory of premeditation" with "absolutely no evidence to sustain such a theory," the petitioner contends that it so permeated the entire atmosphere of the trial as to deny him a fundamentally fair trial.

The petitioner also contends that the prosecution's use of conjecture carried over to the penalty phase of the trial, particularly in the cross-examination of the petitioner's mother and sister. For instance, in asking the sister about the time she was met with irritation when she drove from Knoxville at 3:00 a.m., after Bowling's despondent call, "Did you feel the least bit manipulated...? Has it occurred to you that these things that you have described and his various behaviors achieved a possibly desired result of keeping you and the rest of the family steered up and tiptoeing around him and jumping at his beck and call?" (Record No. 61 at 1935–36), the prosecutor suggested that the petitioner was not actually emotionally or mentally disturbed but malingering and/or manipulative so as to upset his family and ensure that its members would respond to his demands. The petitioner asserts that such cross-examination from which improper inferences could be drawn constitutes prejudicial error in a capital case, citing *McClellan v. Commonwealth*, 715 S.W.2d 464 (1986). Additionally, this theory of feigning mental illness in order to manipulate his family carried over to the prosecutor's closing statements.

Finally, the petitioner contends that the conjecture infected the sentencing, where the trial judge characterized the shootings as involving "premeditation, prior planning" and constituting a "cold, calculated, merciless crime," words which show that the court was greatly influenced, almost verbatim, by the prosecution's conjecture.

The respondent argues that the cross-examination was not improper, because there was evidence of what Bowling had said and manipulation could be inferred therefrom. The respondent contends that the Commonwealth's theory of the case was supported by the evidence; and the court was in the best position to take in the whole view of the trial in reaching its own conclusions as to the nature of the

crime. In reply, the petitioner complains (1) that the judge admitted that he had read about the case in the newspaper and (2) that the defense had no opportunity to rebut the conjecture, because, under Kentucky rules, the prosecution speaks last.

This Court examines the Supreme Court of Kentucky's treatment of this claim:

> The prosecution's closing arguments presented its side of the argument to the jury. The conclusions drawn were supported by the evidence. We find no error in a prosecutor presenting an analysis of the facts which tend to show guilt. The jury remained free to determine on its own if that analysis met the burden of proof required for conviction.
>
> . . . . . .
>
> There is no error because the closing arguments by the prosecution were based on the evidence and the reasonable inferences from the evidence. *Cf. Sanders v. Commonwealth,* Ky., 801 S.W.2d 665 (1990). They were within the reasonable latitude permitted during closing argument. *Cf. Lynem v. Commonwealth, Ky.,* 565 S.W.2d 141 (1978)....

*Bowling I,* 873 S.W.2d at 178–179, IV–V.

■■■ As with the other claims of prosecutorial misconduct in the guilt phase, this Court finds that the Kentucky court's decision with regard to the prosecutor's urging his theory of the case is not contrary to nor does it involve an unreasonable application of the aforedescribed applicable federal law.

## C. MISCONDUCT AT THE PENALTY PHASE DENIED PETITIONER A RELIABLE SENTENCE.

The respondent argues that the following claims, except for the prosecution's statement regarding Bowling's lack of remorse, are unpreserved because counsel did not object. Additionally, the respondent relies on the Supreme Court's rejection of all of these claims, citing to *Bowling I,* 873 S.W.2d at 178–79.

### 1. Jury's Responsibility for Death Penalty Diminished

The petitioner contends that the prosecutor's comments encouraged the jury to impose death because the prosecutor thought the petitioner was mean, and his experience qualified him to know this was an appropriate case for such a penalty; because the legislature had deemed it appropriate in devising the death penalty scheme; because the petitioner might be released on parole otherwise; because such penalties were necessary to save civilization from ruin; and because the jurors had a responsibility to the larger community to impose death to demonstrate what kind of actions will not be tolerated.

All of these comments purportedly misled the jury into thinking that they would just be stamping their approval on others' decisions that death was the appropriate punishment. The petitioner contends that the prosecutor's arguments minimized the role of the jury and its responsibility for making the decision to put the petitioner to death, contrary to the constitutional demands of *Caldwell v. Mississippi,* 472 U.S. 320, 328–29, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) ("[I]t is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere."). The petitioner charts the prosecutor's comments in the instant trial beside the same prosecutor's quotes two years earlier in Fayette Circuit Court and notes that after both, in the case of *Clark v. Commonwealth,* 833 S.W.2d 793 (1991), the Supreme Court of Kentucky found the

arguments to be improper and to require reversal of the conviction. The petitioner argues that the instant death sentences, like Clark's, should be reversed on this ground. The petitioner also relies on the dissent in *Bowling I*, Justice Burke finding the remarks in Bowling's case "in substance the same as those criticized in *Clark*...." 873 S.W.2d at 185.

The respondent contends that this claim is refuted by the record. From voir dire to the penalty instructions, jurors were repeatedly told that it was their responsibility to decide guilt and punishment. As to the parallel presentations of the instant prosecutor's comments and the *Clark* case, the respondent contends that the quotes are taken out of context.

The Kentucky Supreme Court's majority in *Bowling I* distinguished *Clark* on the grounds that in Bowling's case the remarks were uttered only after the guilt phase, and, unlike those in Clark's trial, were "far more limited." The court then concluded as to this claim, "During the penalty phase, the prosecution repeatedly reminded the jury that it was they who had the ultimate responsibility for imposing a death sentence. The responsibility of the jury for imposing the death penalty was not improperly minimized." *Bowling I*, 873 S.W.2d at 178, II

■■■ In 1989, the United States Supreme Court clarified its holding in *Caldwell v. Mississippi*, upon which the petitioner relies. In *Dugger v. Adams*, 489 U.S. 401, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989), the Court held that to "establish a Caldwell violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Id.* at 407, 109 S.Ct. 1211. The Kentucky courts found that the jurors' role and responsibility were accurately described to them. This Court finds that the decision of the Kentucky Supreme Court is not an unreasonable application of clearly established federal law, as set down in *Caldwell* and *Adams*.

## 2. Improper "Golden Rule" Victim Impact Argument

In his petition and traverse, the petitioner claims that the prosecution broke the "Golden Rule" by making emotional statements calculated to engender sympathy for the victims and their families. The prosecutor told the jurors to put themselves in the position of the grieving families, begging for the lives of their loved ones to be spared. The petitioner again notes that the same prosecutor made a similar appeal in the *Clark* case and the Kentucky Supreme Court condemned that approach as improper. He characterizes the same court's failure to grant Bowling relief on this issue as inexplicable and a denial of due process and equal protection under the Fifth, Eighth, and Fourteenth Amendments.

The respondent distinguishes *Clark v. Commonwealth* and focuses on other Kentucky law, which upholds a certain amount of background information to be shown to a jury so that the prosecution can show that it was a real person who was victimized, the respondent countering with a citation to *Campbell v. Commonwealth*, Ky., 788 S.W.2d 260, 263–64 (1990). Additionally, the respondent states that no information about the victims was unduly inflammatory; the prosecutor did not actually ask the jurors to put themselves in the shoes of the victims' families. Even if an indirect violation of the "Golden Rule" occurred, case law would support its not being a reversible error. Moreover, the Kentucky Supreme Court rejected this claim.

Kentucky's Supreme Court specifically found that the allegation of a "Golden Rule" violation, like the petitioner's other claims of misconduct, had "no merit.... The closing arguments of the prosecutor during both phases of the trial did not deprive Bowling of a fair and impartial trial." *Bowling I,* 873 S.W.2d at 178, II.

The prosecutor's comments come close to or may cross the line of being violations of the "Golden Rule" in this Courts' opinion. However, the role of this Court is not to grant relief on the basis of its belief. The role of this Court is to determine whether the state court has made a decision based on an unreasonable determination of the facts or a decision contrary to or involving an unreasonable application of guiding Supreme Court pronouncements. Even if this Court were absolutely convinced that the prosecutor's appeals to the jury were improper and actively disapproved of his tactics, the petitioner must still demonstrate that the statements "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo,* 416 U.S. at 643, 94 S.Ct. 1868. Petitioner Bowling has not done so on the instant record.

■ This Court agrees with the state court that the petitioner has failed to meet the standard enunciated by the Supreme Court of the United States. Similar prosecutor comments, "Ask yourself if you had a loved one, or had a relative ... like that ..." in *Simpson v. Jones,* 238 F.3d 399, 409 (6th Cir.2000), were recently found to not be improper. The appellate court in that case found that "even if they were, they were brief and isolated, and this did not rise to the level that would deny [the petitioner's] legal right to due process." *Id.* (also citing to *Donnelly,* 416 U.S. at 643, 94 S.Ct. 1868). Same may be said in the instant case. Therefore, this Court

finds that this claim does not warrant habeas relief under the standards of § 2254(d).

### 3. Improper Misstatements on Finding of Statutory Aggravators

The petitioner argues that the prosecutor told the jury that by having found Bowling guilty of both murders, it had already found the existence of aggravation to support the death penalty and that this argument essentially nullified the jury's view of its true duty to not impose death unless satisfied beyond a reasonable doubt that the aggravating factor was true.

The respondent contends that the finding of two murders has been upheld as a sole aggravating factor for imposing the death penalty in *Sanders v. Commonwealth,* Ky., 801 S.W.2d 665 (1990). In the traverse, the petitioner insists that the state has the burden of proving the existence of an aggravating factor—not merely referencing the guilt phase. The use of the same aggravating factor to impose death is contrary to the rationale of bifurcated trials, which has been to focus on the offense and the penalty separately, not to adopt a finding from the guilt phase. He quotes from *Woodson v. North Carolina,* 428 U.S. 280, 281, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976).

The Kentucky Supreme Court addressed the issue of the permissibility of carrying over a finding from the guilt to the penalty phase in the context of deciding the propriety of the jury instructions. This court will do the same *infra.* For now it is sufficient to quote the state court's conclusion—"Once the jury determined that two of Bowling's acts of killing were intentional and resulted in multiple deaths, the multiple murder aggravating factor applied. *Simmons v. Commonwealth,* 746 S.W.2d 393 (1988)," (*Bowling I,* 873 S.W.2d at 181, XII)—and to note that

it appears the prosecutor was tracking the language of the jury instruction on aggravating factors and pointing out that the jury had, indeed, found multiple/two deaths in the guilt phase.

This Court agrees that neither the prosecutor's argument nor the jury instructions improperly mandated the death penalty, as was condemned in *Woodson v. North Carolina.* This Court finds that the Kentucky Supreme Court's decision is in accord with clearly established federal law.

### 4. Prosecution Attacked Petitioner's Right to Remain Silent

With regard to the comment of the prosecutor regarding motive, "We can't tell you what it is because only the man who pulled the trigger knows," the Court has already addressed this issue elsewhere, *supra*, as a claim of improperly commenting on the accused's silence.[18] Additionally, the petitioner here complains that the prosecutor told the jury to consider the defendant's "lack of seeming remorse" and invited the jury to look at Bowling to see if he appeared remorseful, tactics which have been found to violate the Fifth Amendment and require reversal in several state court opinions cited by the petitioner. Moreover, this statement is contrary to his mother's testimony that her son told her that he prayed nightly for the Earleys and their families; is a violation of the rule against a prosecutor's injecting his personal opinions, his theorizing that Bowling was a mean person who would commit a senseless killing; and constitutes a violation of due process to urge death on the basis of a non-statutory aggravator, as well as a violation of the Eighth Amendment.

The respondent contends that the Kentucky Supreme Court has held that prosecutorial references to a defendant's seeming lack of remorse did not constitute reversible error in the instant case or in other Kentucky cases. *Bowling I*, 873 S.W.2d at 178. He also argues that the prosecutor's comments in the instant case were, at worst, only indirect and isolated references; the evidence of Bowling's guilt was overwhelming; and the jury was instructed at both phases of the trial that the defendant was not compelled to testify and the fact that he does not testify is not to be considered an inference of guilt or to prejudice him in any way.

In his traverse, the petitioner distinguishes the cases relied upon by the respondent; refutes the contention that the remarks were isolated; and vehemently contends that the comments were not in response to any comments made on behalf of the petitioner but were clearly for the express purpose of prejudicing the jury against the petitioner, which they did.

Like the preceding claim, this lack-of-remorse issue is not specifically addressed by the Kentucky Supreme Court. However, that courts' conclusion that the prosecutor's arguing inferences and his theory of the crime did not deprive Bowling of a fair trial is not contrary to nor is it an unreasonable application of federal law clearly established in *Griffin v. California*, 380 U.S. at 609, 85 S.Ct. 1229; *United States v. Young*, 470 U.S. at 1, 105 S.Ct. 1038; and *Brecht v. Abrahamson*, 507 U.S. at 637, 113 S.Ct. 1710.

---

18. This Court quotes from the opinion of the Supreme Court of Kentucky in *Bowling I*, 873 S.W.2d at 178, II, wherein that court noted that there was no direct reference to Bowling and decided that, even if improper, the statement "was not manifestly intended to reflect on the accused's silence or of such a character that the jury would naturally and necessarily take it as such." *Id.*

### 5. Improper Cross–Examination

The petitioner claims that the cross-examination of the petitioner's mother in the penalty phase was improper, because it suggested that the petitioner had a deliberate plan to convince his mother he was mentally ill, although there was no evidentiary basis for the existence of such a plan/mind set. Additionally, in examining her about her more detailed testimony at the penalty phase, the prosecutor wrongly suggested that she was changing her testimony since the guilt phase; and he mischaracterized witness LeMay's testimony.

The respondent contends no error occurred. When asked if she felt manipulated by her son as to his supposed deteriorating mental state, the mother stated she could not answer. As to witness LeMay's testimony, not only did defense counsel make an objection, which was sustained, but any impropriety was cured in the re-asking. The petitioner disagrees about the cure. He maintains that the improper cross-examination, with no evidentiary basis, destroyed the entire mitigation defense because it implied he was not mentally ill but was conniving; that it was prejudicial is revealed in the court's decision that the petitioner not be given any instruction on EED or mental illness and in the jury's verdict.

 The Kentucky Supreme Court wrote:

> There is no error because the closing arguments by the prosecution were based on the evidence and the reasonable inferences from the evidence. *Cf. Sanders v. Commonwealth,* Ky., 801 S.W.2d 665 (1990). They were within the reasonable latitude permitted during closing argument. *Cf. Lynem v. Commonwealth,* Ky., 565 S.W.2d 141 (1978). Bowling had the right to present a defense and request appropriate instructions. The trial judge was duty bound to instruct the jury regarding any relevant defense. Without facts which would tend to support a claimed defense, the trial judge properly refused to issue inappropriate instructions in this case.

*Bowling I,* 873 S.W.2d at 178–179, V. Like the petitioner's earlier complaint about counsel's failure to object to the prosecutor's use of unfounded theories and conjecture, this claim must fail because the Kentucky Supreme Court's above-quoted decision is neither contrary to nor an unreasonable application of clearly established federal law, as stated by the United States Supreme Court. *See Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

### 6. Improper Attempts to Control Defense

The petitioner challenges the prosecutor's handling of evidence of his criminal history and the prosecutor's demand for a ruling on an instruction on EED or mental illness. The petitioner contends that he was entitled to an instruction on the statutory mitigating circumstance of no significant history of a prior criminal record. Despite machinations by the Commonwealth, the court had already decided to give it when the prosecutor, without foundation, objected to the instruction in the presence of the jury in order to prejudice the jury, leaving them wondering whether there was previous criminal history and/or what the mysterious prior history and objection were all about. The petitioner insists that the objection not only served to prejudice the jury, it also implied that the defense was dishonest and caused the jurors to speculate as to Bowling's criminal past. The petitioner also claims that the prosecution coerced the trial court in denying the instruction on mental illness or EED by demanding a ruling prior to resting its case. By attempting to control the

defense in these two ways, the prosecutor committed dishonorable conduct.

The respondent contends that the prosecutor was only doing his job. Additionally, he relies on the state court's decision on this issue.

▪ Kentucky's Supreme Court rejected this claim with regard to the petitioner's prior criminal record and the prosecution's objection:

The defendant had no significant prior criminal history .... The prosecutor made only one objection during the closing argument of defense counsel. The prosecutor did nothing more than object and did not detail in front of the jury the basis for the objection. The trial judge overruled the objection. This objection certainly did not denigrate the specific mitigating circumstances presented by the defense.

*Bowling I*, 873 S.W.2d at 178, IV. As to the prosecution's seeking a ruling on the mental defect/EED instructions, which was not preserved by an objection, there is no allegation, much less a showing, that the petitioner was harmed thereby. Certainly, neither the trial court's rulings when motions or objections are made nor the appellate court's conclusion that Bowling's trial was not thusly rendered unfair by prosecutorial misconduct are contrary to or involve unreasonable applications of clearly established federal law.

**7. Denigration of Mitigation Evidence**

The petitioner argues that the prosecution denigrated the mitigating evidence before the jury in several ways, thus rendering the petitioner's mitigation evidence meaningless in violation of due process and equal protection and also the Sixth, Eighth, and Fourteenth Amendments of the Constitution. The prosecutor purportedly did this in his penalty phase closing argument by referring to "mitigating circumstances that you're instructed to consider if you wish" (emphasis added by petitioner). According to the petitioner, this is an incorrect statement of the law, because a jury is required to consider all mitigating evidence. Blocking consideration of all of the evidence violates the Eighth Amendment, the petitioner citing *Hitchcock v. Dugger*, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987).

The petitioner also characterizes the prosecutor as misstating facts, as well as the law, particularly with regard to the petitioner's mental state, when the prosecutor declared that there was no evidence of the mitigating factors of mental illness or emotional disturbance. The petitioner argues that, to the contrary, it was the prosecutor who had no evidence of Bowling's being merely manipulative; and yet the prosecutor continued to argue his speculation. Additionally, the petitioner submits that the prosecutor's expression of personal belief alone would be reversible error.

The prosecutor purportedly "gutted" the only statutory mitigation instruction by his objection when he objected to the defense's argument that there was no proof of prior criminal history. Characterizing the prosecutor's conduct as egregious, the petitioner contends that his attack on the petitioner's legitimate mitigation evidence produced a jury unable to consider and give effect to that evidence, in violation of the Eighth and Fourteenth Amendments. The petitioner quotes from *Lockett v. Ohio*, 438 U.S. 586, 605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Woodson v. North Carolina*, 428 U.S. 280, 302–03, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 1870, 100 L.Ed.2d 384 (1988); and *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

As to the charge of denigrating the petitioner's mitigation evidence in closing arguments, the respondent contends that both parties are permitted to make comments based upon the evidence and reasonable inferences therefrom, and nothing in his closing argument prevented the jury from considering all relevant mitigating evidence, including alleged mental illness. Moreover, the respondent quotes the court's instructions, which cured any problem because they specifically allowed the jurors to take into account the statutory factor that "the defendant has no significant history of prior criminal activity," and also instructed that they "should consider any other facts and circumstances which you consider to be mitigating or extenuating . . . ." With regard to the objection, the respondent contends that the prosecutor was merely doing his job to preserve the argument for cross-appeal; the petitioner did not ask for an admonition or a mistrial; and the defense went on in closing. Additionally, the Supreme Court of Kentucky rejected these claims of improper objection and argument on appeal.

The Kentucky Supreme Court did specifically address Bowling's claim of "improper and incessant denigration" of his mitigating evidence by the prosecutor. *Bowling I*, 873 S.W.2d at 178, IV. The state court found:

> The trial judge overruled the objection. This objection certainly did not denigrate the specific mitigating circumstances presented by the defense. The prosecution's closing arguments presented its side of the argument to the jury. The conclusions drawn were supported by the evidence. We find no error in a prosecutor presenting an analysis of the facts which tend to show guilt. The jury remained free to determine on its own if that analysis met the burden of proof required for conviction.

*Id.* The court also found that the jury had been properly instructed to consider all mitigating factors and that the instructions fully complied with what is constitutionally required. "There is nothing to suggest that the jury did not consider in their deliberations Bowling's claims of being a model inmate and of being a loving and caring father." *Id.*

 This Court finds the state court's conclusions objectively reasonable.

### Conclusion Regarding Misconduct Claims

On direct appeal, the Kentucky Supreme Court carefully considered the petitioner's multiple alleged instances of prosecutorial misconduct. It specifically found that many of the complained of actions were not improper, and it explained that those issues not mentioned in the opinion were considered to be meritless. Even viewing them cumulatively, the highest state court in the Commonwealth concluded that none warranted post-conviction relief.

 It must be remembered that the Due Process Clause requires a fair trial, not a perfect one. *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). To warrant federal habeas relief, prosecutorial misconduct must be shown to be so egregious as to render the entire proceedings against the defendant fundamentally unfair. *See e.g., Donnelly v. DeChristoforo*, 416 U.S. at 642–48, 94 S.Ct. 1868. Even assuming that some specific instances of alleged misconduct were improper, this Court finds that, based on a careful review of the record of the entire proceedings, none of the prosecutor's comments were of sufficient magnitude to influence the jury's decision. In light of the considerable evidence establishing defendant's guilt and supporting multiple murders as the aggravator, there is no reasonable probability

that the guilt or penalty phase verdicts in this case would have been different without the alleged misconduct. Therefore, the criminal proceedings against the petitioner were not rendered fundamentally unfair by any prosecutorial misconduct.

Accordingly, this Court does not find the state court's rulings on the prosecution's conduct to be an unreasonable application of clearly established federal law as stated by the Supreme Court, and cannot grant relief on this ground.

## III. *TRIAL COURT ERRORS*

The petitioner contends that errors by the trial court denied him due process under the Fourteenth Amendment and diminished the reliability of the appropriateness of the death penalty, in violation of the Eighth Amendment. As with claims of prosecutorial misconduct, a habeas petitioner claiming that a trial error violated his constitutional rights must show not only that the trial court committed error but also that the error was not harmless, i.e., the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. at 637, 113 S.Ct. 1710.

## A. JURY SELECTION

The Supreme Court of the United States has addressed the right of an accused to an impartial jury numerous times. The Court has held that the Sixth and Fourteenth Amendments to the Constitution guarantee a criminal defendant the right to a fair trial by a panel of impartial, "indifferent" jurors; the failure to accord an accused such a tribunal for a fair hearing violates the minimal standards of due process. *In re Oliver,* 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948); *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927). "A fair trial in a fair tribunal is a basic requirement of due pro-

cess." *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955). A juror's verdict must be based upon the evidence developed at the trial. *Cf. Thompson v. City of Louisville,* 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960). The application of these principles to capital cases has consumed much of the jurisprudence of the Supreme Court of the United States. *See Morgan v. Illinois,* 504 U.S. 719, 727–28, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992).

On Bowling's direct appeal, Kentucky's highest court did not refer to specific case law of the United States Supreme Court, but clearly measured the petitioner's claims against the relevant law, beginning its discussion on this topic as follows:

> The method by which Bowling's jury was chosen complied with Kentucky law and due process. He received a fundamentally fair trial by a Jury whose members were qualified to consider the case on the basis of the evidence presented to them.... The jury that sentenced Bowling to death was fair and impartial.

*Id.* at 177, I. The Kentucky court went on to address each of the following specific complaints of the instant petitioner regarding different aspects of jury selection.

> 1. **The trial court's decision to eliminate three qualified potential jurors, two of whom disfavored the death penalty, did not comply with the rules and statutes governing jury selection or due process.**

This claim is based upon the trial court's deviation from its initial plan to death-qualify a pool of forty-four potential jurors, from which, after the petitioner's eighteen peremptory strikes and the Commonwealth's twelve, fourteen jurors, including two alternates, would be left to hear the case. Approaching the end of voir dire, however, the court decided to and did qualify four more to assure an adequate

pool, considering the possibility of illness. The court later decided that these four extra jurors were not necessary after all and would be dismissed. On the morning that trial began, the petitioner objected to their summary exclusion, because two seemed to disfavor the death penalty. The court granted the petitioner's motion to exclude one for cause, but then went on with its plan to excuse the last three who were qualified, jurors numbered 45–47, including the two favored by the petitioner. The petitioner states that the procedure should have been for counsel to make the decision as to who should sit, including jurors 4547 in the pool of those being considered.

The petitioner argues that the net effect of the trial court's method of reducing the number back down to forty-four was to grant the Commonwealth two free challenges and to violate both Kentucky law and the federal Constitution, the Sixth, Eighth, and Fourteenth Amendments, by eliminating randomness in the selection of jurors. Additionally, the petitioner complains that the trial court further justified excusing one of the last three, Dumas, on the basis that it would have struck him for cause because of a mental condition, but it did not strike a juror named Bushong, who also admitted to current depression but had no reservations about the death penalty.

The respondent contends that if the trial court erred, it was on the side of caution in its granting the defense extra peremptory challenges; providing for qualification of an adequate pool with two alternates; and adding another four jurors to the process as further protection for the process, if needed by the time of trial. All of these were procedures to which Bowling lodged no objection until jurors he preferred were among the last chosen and then dismissed. Additionally, the respondent points out that Mr. Dumas had a doctor's letter,

while juror Bushong did not, thus explaining that difference. In sum, the respondent contends, all members of the potential pool of qualified jurors were randomly selected, and any mischief which may have resulted from adding to the initial pool of forty-four was cured by the deletion of the extra jurors.

The petitioner counters that he was under no obligation to object to the qualification of four extra jurors until the court announced its decision to strike those last four, thus failing to preserve the issue of random jury selection as guaranteed the petitioner in both the Kentucky and United States constitutions.

Kentucky's Supreme Court examined in detail the trial court's original plan, the parties' voir dire, and elimination of the last four jurors, one for cause and the other three as unnecessary, and found as follows:

There was no substantial or prejudicial deviation from the principle of random selection in the procedures taken by the trial court. It was not reversible error for the trial judge, in an abundance of caution, to qualify an additional four jurors. All members of the potential jury pool were randomly selected.

*Bowling I,* 873 S.W.2d at 177, I.

 This Court agrees with the Kentucky court's decision that there was no error in the trial court's reverting to its original 44–juror plan and its conclusion that all jurors in that pool were randomly selected. There was no unreasonable application of clearly established federal law.

2. **Petitioner was denied his constitutional rights to an impartial jury and due process by the court's refusal to strike jurors who could not consider the entire range of penalties and were clearly biased.**

The petitioner specifically complains of four jurors who were clearly biased and

should have been struck for cause. He identifies Charles Livingston, Juror # 650, as one who should have been excluded for cause as an "automatic death penalty" juror under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). Because the court would not strike him for cause, despite his assertion that "intentional killings deserve the death penalty" and because the petitioner exhausted his 18 peremptory strikes, this man actually served on the jury, thus rendering its verdict unreliable. Additionally, the petitioner had to "waste" peremptories on Millie Scarber, Juror # 544; David Middlebrook, Juror # 689; and Lynn Buckles, Juror # 595, when the trial court refused to strike for cause. The petitioner contends that the trial court's process of death qualification of jurors and removal of those with feelings against capital punishment purportedly violates the Sixth, Eighth, and Fourteenth Amendments.

The respondent notes that only one of the jurors Bowling unsuccessfully moved to strike for cause actually sat on the final jury. That person was Charles Livingston, and even defense counsel Baldani conceded in his motion to strike that there was equivocation in his testimony, because Mr. Livingston also testified that he would make his decision based on the evidence; that he did not feel the death penalty was necessarily the only appropriate penalty; and he would consider all other options and facts. Because excusing jurors for cause is discretionary with the court and the state court's decision is to be reviewed under the presumption of correctness, there was clearly not an erroneous abuse of that discretion, the respondent citing, *inter alia*, to *McQueen v. Scroggy*, 99 F.3d 1302, 1320–21 (6th Cir.1996). The petitioner, in his traverse, relies on the case of *Morgan v. Illinois*, 504 U.S. at 719, 112

S.Ct. 2222; his contention that Livingston was unequivocal in his belief that a person who committed a multiple intentional murder deserved to be sentenced to death; and the fact that this juror was not asked directly about multiple murders before the court ruled. In short, the petitioner argues, Livingston's rehabilitation did not go to the steadfastness of his belief that the death penalty is the only appropriate penalty for intentional murder.

The trial transcripts, at Volumes 2–8, contain the lengthy voir dire of potential jurors about the death penalty. Record Nos. 50–56. On appeal, the Kentucky Supreme Court first noted that a trial court has discretion when deciding whether to excuse a juror for cause. The court then analyzed the jurors' responses and stated, as to the jurors the trial court refused to excuse for cause, as follows:

> Bowling was not denied his constitutional right to an impartial jury because the trial judge refused to strike for cause certain jurors who were allegedly biased.... After a careful review of the record and considering the totality of the circumstances, this Court cannot find an abuse of discretion in the trial court's decision to allow these potential jurors to serve. During voir dire, each was able to express an attitude that they were able to consider the full range of penalties from the minimum to the maximum. The fact that some potential jurors expressed a tendency toward the most severe penalty when presented with specific situations does not automatically preclude their service.

*Bowling I*, 873 S.W.2d at 177, I. Finally, citing Kentucky case law, the court found no error with regard to the most complained-of juror, Charles Livingston, Juror # 650, "who indicated that he could consider the entire range of penalties." *Id.*

A challenge for cause is designed to remove a juror who is partial to one side or who has formed an opinion prior to hearing the evidence. The Supreme Court has explained that the party seeking exclusion must show that the "potential juror lacks impartiality." *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). The Court held that "the proper standard for determining when a prospective juror may be excused for cause because of his or her views on capital punishment ... is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Id.* at 424, 105 S.Ct. 844 (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)). In judging whether the trial court erred in failing to exclude a juror on grounds of claimed bias, "deference must be paid to the trial judge who sees and hears the juror." *Id.* at 425–26, 105 S.Ct. 844. This is because the trial judge's "predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record." *Id.* at 429, 105 S.Ct. 844. The finding of the trial court on the question of a juror's impartiality "ought not be set aside by a reviewing court, unless the error is manifest." *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) (quoting *Reynolds v. United States*, 98 U.S. 145, 156, 8 Otto 145, 25 L.Ed. 244 (1878)).

A helpful tool was provided by the Supreme Court in *Patton v. Yount*, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984), setting out the standard to be applied to a federal habeas corpus case in which the partiality of an individual juror is placed in issue:

> That question is not one of law and fact. Rather, it is plainly one of historical fact: did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed?

*Patton*, 467 U.S. at 1036, 104 S.Ct. 2885. As such, "the determination is essentially one of credibility, and therefore largely one of demeanor." *Id.* at 1038, 104 S.Ct. 2885. The Supreme Court further stated that "[i]t is here that the federal court's deference must operate, for while the cold record aroused some concern, only the trial judge could tell which of these answers was said with the greatest comprehension and certainty." *Id.* at 1040, 104 S.Ct. 2885. Therefore, "the trial court's resolution of such questions is entitled, even on direct appeal, to 'special deference' ... [t]he respect paid such findings in a habeas proceeding certainly should be no less." *Id.* at 1038, 104 S.Ct. 2885 (footnotes and citations omitted).

As is apparent therefrom, even before the advent of the AEDPA's stricter standard, a court's finding with regard to juror impartiality was presumed correct unless the plaintiff could carry his burden of rebutting the presumption of correctness by convincing evidence. *See* the predecessor to the AEDPA's 28 U.S.C. § 2254(e)(1), 28 U.S.C. § 2254(d); *Patton v. Yount*, 467 U.S. at 1036, 104 S.Ct. 2885 (ambiguity and juror testimony insufficient to overcome presumption of correctness as to the trial court's finding of impartiality).

■■■ The issue then is not whether this Court or another trial judge would have decided differently. Instead, the issue is whether the trial court's conclusion that Mr. Livingston would be impartial is "fairly supported" by the record. *Witt*, 469 U.S. at 433, 105 S.Ct. 844 (quoting *Adams v. Texas*, 448 U.S. at 45, 100 S.Ct. 2521). Clearly it is. The record reveals that although Livingston did initially give an affirmative answer as to the appropriateness

of the death penalty automatically for multiple murders, upon questioning by the defense and the court, he later said he could consider all of the circumstances and all of the options, including the minimum penalty. Record No. 51 at 443–44. The petitioner has not rebutted the presumption of correctness of this decision. He has certainly not carried his burden of demonstrating that the trial court's factual determination with regard to Livingston's impartiality is unreasonable in light of the evidence before it or that the Kentucky appellate court's legal conclusions about him and the jury as a whole involved an unreasonable application of clearly established federal law as determined by the Supreme Court. This Court finds no violation of federal law and is satisfied that the Kentucky courts' conclusions about the petitioner's jury comport with *Patton, Wainwright,* and the standard expressed in *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986):

> [T]he Constitution presupposes that a jury selected from a fair cross section of the community is impartial, regardless of the mix of individual viewpoints actually represented on the jury, so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case.

*Id.* at 184, 106 S.Ct. 1758.

As to the petitioner's theory that he was being forced to waste peremptories on Scarber, Middlebrook, and Buckler, it was in *Ross v. Oklahoma,* 487 U.S. 81, 83–85, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), that the Supreme Court of the United States addressed the issue of whether the trial court's error in refusing to exclude a potential juror for cause required reversal, because the defendant had to exercise a peremptory challenge to exclude this juror after the court refused to remove the juror

for cause. The defendant argued that if the court had properly excluded the juror, the resulting jury panel may have been different. *Id.* at 87, 108 S.Ct. 2273. The Court held that this possibility did not mandate reversal. "[P]eremptory challenges are not of constitutional dimension. They are a means to achieve an impartial jury. So long as the jury that sits is impartial, the fact that the defendant has to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." *Id.* at 88, 108 S.Ct. 2273.

The Supreme Court also recently held that when a defendant objects to a trial court's denial of his for-cause challenge, the defendant may choose to either remove the challenged juror peremptorily and forgo a later Sixth Amendment challenge or allow the juror to sit, preserving the Sixth Amendment claim for appeal. *United States v. Martinez–Salazar,* 528 U.S. 304, 120 S.Ct. 774, 781, 145 L.Ed.2d 792 (2000). "[A] defendant's exercise of peremptory challenges ... is not denied or impaired when the defendant chooses to use a peremptory challenge to remove a juror who should have been excused for cause." *Id.* at 782. When a potential juror should have been excused for cause but is not, the defendant has not been deprived "of any rule-based or constitutional right [if he] elects to cure [the] error by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat." *Id.* at 777.

Similarly, when Bowling was confronted with the three potential jurors who were not excused for cause and who, in defense counsel's opinion, should have been removed from the jury, the jurors were removed. In the words of the Sixth Circuit, when faced with a similar claim, "[t]he system worked precisely as intended. *See, e.g., Martinez–Salazar,* 120 S.Ct.

at 777...." *United States v. Quinn*, 230 F.3d 862 (6th Cir.2000). This Court finds in Bowling's trial and appellate courts' conclusions no unreasonable applications of Supreme Court jurisprudence.

### 3. Petitioner was denied a fair impartial jury and due process because he was forced to exhaust his peremptories and consequently was unable to strike biased jurors.

The petitioner identifies two more jurors, in addition to Livingston, who were "superficially qualified to serve" but whom he did not want, whom he could not strike because the defense had run out of peremptonies, and who ended up serving on the jury. These are Terry Kindred, # 581, and June Lacy, # 591. Relying on *Marsch v. Commonwealth*, Ky., 743 S.W.2d 830 (1987), *Montgomery v. Commonwealth*, Ky., 819 S.W.2d 713 (1991), and *Morgan v. Illinois*, 504 U.S. at 719, 112 S.Ct. 2222, the petitioner argues that these jurors were biased; therefore, the jury's make-up indicates that it was not fair and impartial; the verdict is not reliable; and reversible error occurred because of this contravention of the requirements of the Sixth, Eighth, and Fourteenth Amendments.

The respondent emphasizes the fact that Bowling was granted eighteen peremptory challenges, which was ten more than he was entitled to under Kentucky rules. Even after using them to eliminate the four jurors he would have had removed for cause, he would have had fourteen left to remove these two jurors. Also, there is no authority for the proposition that a loss of a peremptory challenge constitutes a violation of constitutional law. The case of *Marsch* is distinguishable on the numbers alone, as that defendant was left with no peremptories after using them to strike jurors whom the court would not excuse for cause.

In addition to the portions of *Bowling I* quoted above, the Kentucky Supreme Court also wrote therein:

Bowling was not denied a fair and impartial jury. The trial court provided Bowling more than twice the number of peremptory challenges which are normally granted. RCr 9.40. The claim that the trial judge's refusal to excuse jurors for cause unfairly exhausted his peremptory challenges is without foundation.

*Bowling I*, 873 S.W.2d at 177, I.

██ The trial record shows that the petitioner did not move to have jurors Kindred and Lacy removed for cause, and, with the peremptories left to him, he could have stricken them. That he chose to remove others and not Kindred or Lacy was his decision to make. The petitioner in this case has not demonstrated that the jury selected was biased. Finding that the state court's determination that an impartial jury was empaneled is not unreasonable, the Court denies the request for relief on this claim.

### B. FAILURE TO INSTRUCT

██ The Supreme Court has held that the Due Process Clause protects an accused in a criminal case against conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). In determining whether the instruction has caused a constitutional violation, a reviewing court seeks to determine how a reasonable juror could have interpreted the instruction. *See Sandstrom v. Montana*, 442 U.S. 510, 514, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). Review of a claimed deficient jury instruction requires that the instruction be viewed in the context of the overall charge. *See Cupp v. Naughten*,

414 U.S. 141, 146–47, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973).

 The complained-of instructions must not simply be erroneous; rather, like other trial court errors, to warrant habeas relief they must "so infect[ ] the entire trial that the resulting conviction violates due process." *Henderson v. Kibbe,* 431 U.S. 145, 154, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977). The Supreme Court has specifically held that jury instructions involving alleged state law error may not serve as the basis for habeas relief, unless the instructions have "so infused the trial with unfairness as to deny due process of law." *Estelle v. McGuire,* 502 U.S. 62, 75, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). The Sixth Circuit has noted that this burden on collateral attack is even greater than that required to demonstrate plain error on direct appeal. *Scott v. Mitchell,* 209 F.3d 854, 882 (6th Cir.2000) (*citing, inter alia, Henderson,* 431 U.S. at 154, 97 S.Ct. 1730). The Court now takes up the petitioner's individual complaints of errors in the instructions.

**1. Guilt Phase**

Kentucky's murder statute provides, in pertinent part, as follows:

(1) A person is guilty of murder when:

 (a) With intent to cause the death of another person, he causes the death of such person or of a third person; except that in any prosecution a person shall not be guilty under this subsection if he acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be. However, nothing contained in this section shall constitute a defense to a prosecution for or preclude a conviction of manslaughter in the first degree or any other crime, or

 (b) Including, but not limited to, the operation of a motor vehicle under circumstances manifesting extreme indifference to human life, he wantonly engages in conduct which creates a grave risk of death to another person and thereby causes the death of another person.

(2) Murder is a capital offense.

KRS 507.020.

Bowling's jury found him guilty of the murder of Ernestine Lynn Earley under the following instruction of the court:

You will find the defendant, Thomas Clyde Bowling, Jr., guilty under this instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

 (a) That in this county on or about April 9, 1990, he shot Ernestine Lynn Earley with a gun, resulting in an injury to her that caused her death;

 AND

 (b) That in so doing he intended to cause Ernestine Lynn Earley's death.

TR Vol. 3 at 323. The instruction on the death of Eddie Earley was identical, except for the name of the victim. *Id.* at 324.

The trial court rejected the defense team's tendered instructions, which phrased (b) as follows: "That in so doing ... [h]e caused the death of [victim's name] intentionally and not while acting under the influence of extreme emotional disturbance...." TR Vol. 3 at 300–01. The petitioner states that an instruction on extreme emotional disturbance was warranted by the evidence and that the court's failure to instruct unconstitutionally deprived petitioner of his only defense, enti-

tling him to reversal, citing *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980).

The petitioner quotes liberally from the dissent in *Bowling I*, 873 S.W.2d at 182–85, wherein Justice Leibson concluded that from the evidence the jury could reasonably have concluded that Bowling was suffering from some significant degree of mental illness, diagnosed as severe depression and paranoia, and that he killed two strangers whom he happened upon by chance. The Justice pointed to evidence of "bizarre behavior, suicidal comments, and depression … leading up to the killings" and "evidence that these mental problems had been exacerbated by drugs and alcohol." *Bowling I*, 873 S.W.2d at 183 (J. Leibson, dissenting). The petitioner contends that, with an EED instruction, the jury could have reasonably doubted his guilt for intentional murder and yet found him guilty of manslaughter. Without it, he had no defense; and, without the instruction but with the prosecutor's conjectures as to the petitioner's mental state, he was actually penalized for exercising his right not to testify.

According to the petitioner, an EED instruction could have ameliorated not only the guilty verdict but the punishment later handed down, because, without it, he was also precluded from arguing his evidence in mitigation during the penalty stage. The petitioner distinguishes *Buchanan v. Angelone*, 522 U.S. 269, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998), relied upon by the respondent, on the grounds that it is a Virginia case, wherein instructions on mitigating factors are not mandated as they are in Kentucky law. The trial court's refusal to give the statutory mitigation instructions denied him due process of law, and his convictions were obtained in violation of the Sixth, Eighth and Fourteenth Amendments.

In response, the Commonwealth contends that the giving of an EED instruction not only is not mandated by Kentucky law defining EED, but it is also not mandated by the facts in this case. In this case, the instruction would require the jury to speculate upon evidence not in the record. There was no evidence that Bowling's judgment was overcome or that he acted uncontrollably as a result of any incident on the morning of April 9, 1990. The respondent points to the Kentucky Supreme Court's findings on this issue, both in *Bowling I*, 873 S.W.2d at 178–79, and *Bowling II*, 981 S.W.2d at 550, and stresses that the Kentucky Supreme Court's interpretation of state law and its implicit finding in this matter is binding on the federal court. Additionally, the United States Supreme Court has rejected the argument that a defendant's right to not testify operates to excuse him from presenting evidence on which he has the burden of production, citing *United States v. Rylander*, 460 U.S. 752, 757–60, 103 S.Ct. 1548, 75 L.Ed.2d 521 (1983), and *United States v. Dunnigan*, 507 U.S. 87, 96, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993).

The petitioner also complains of the trial court's refusal to give the Commonwealth's proffered instruction on transferred intent. Since Dr. Hunsaker testified that Tina Earley's fatal wounds could have come through or been intended for Eddie, and since the jury asked to rehear the doctor's testimony during their deliberations, the jurors were obviously concerned with whether her murder was intentional. Without the transferred intent instruction, the jury was left with no guidance. The respondent points out that Bowling objected at trial to the Commonwealth's request to have this instruction; therefore, he has no basis for a claim now. Failing to object to the non-giving of the instruction, he has defaulted such a claim; and he clearly

suffered no prejudice from the trial court's sustaining his objection to giving the transferred intent instruction.

The Kentucky Supreme Court addressed the merits of both of these claims on the petitioner's direct appeal. As to the failure to instruct on EED, the majority of the court summarized Bowling's position as claiming "that his allegedly bizarre behavior the weekend before the incident, together with the fact that he struck the victims' vehicle with his car before he opened fire, could have caused him to act uncontrollably." *Bowling I,* 873 S.W.2d at 179, VI. The court went on as follows:

> We find this argument to be without merit because it would require the jury to speculate on evidence which is not in this record. This Court has repeatedly indicated that a defendant is not entitled to an extreme emotional disturbance instruction merely because he exhibits behavior akin to mental illness or the effects of substance abuse. *McClellan v. Commonwealth,* Ky. 715 S.W.2d 464 (1986).
>
> Here, there was no evidence that Bowling's judgment was overcome on the morning of the killings, nor any evidence that he acted uncontrollably or as a result of anything other than an evil or malicious purpose. There was no excuse for his actions other than that he may have acted strange the preceding weekend and he may have suffered from alcohol abuse. There was no evidence presented from which the jury could ascertain the viewpoint of a person in Bowling's situation under the circumstances as Bowling seemed to believe them to be simply because there was no evidence of what Bowling believed the circumstances were. There was no evidence of any reckless driving before his automobile collided with the Earley vehicle on the fatal morning. There was no evidence of any reckless driving record introduced at trial.
>
> There was also no evidence that he suffered any physical trauma when he rammed his vehicle into the victims' car that could lead a jury to suspect he was suffering from extreme emotional disturbance. All that is presented is a series of facts that simply do not amount to competent probative evidence which would require an instruction.

*Id.* As to the trial court's decision to sustain defense objections to the transferred intent instruction, the court stated that the jury was presented with ample evidence from which it could conclude that Bowling, in fact, intended to cause Tina's death; Bowling was not prejudiced by the instruction given; and there was no prejudice in the judge's sustaining defense objections to the transferred intent instructions offered by the Commonwealth. *Id.* at 179, VII.

The Kentucky Supreme Court again analyzed the EED instruction issue in accordance with Kentucky law on appeal of the post-conviction proceedings. Regarding Bowling's 11.42 claim that counsel failed to properly investigate an EED defense, the court concluded that its use as a defense was unlikely and the evidence presented at trial "was even not sufficient to warrant an instruction on EED as a mitigating factor" in the penalty phase. *Bowling II,* 981 S.W.2d at 549.

This court has examined both of the Kentucky Supreme Court's opinions carefully. Even the dissent in *Bowling I,* while severely criticizing Kentucky's law with regard to EED and contending that the Kentucky Supreme Court's earlier *McClellan* decision "unduly limited the effect of EED as evidence of diminished mental capacity at the guilt phase," found no violation of federal law. 873 S.W.2d at 183 (citing *McClellan v. Commonwealth,*

Ky., 715 S.W.2d 464 (1986), *cert. denied,* 479 U.S. 1057, 107 S.Ct. 935, 93 L.Ed.2d 986 (1987)). Justice Liebson and a special justice also urged that, under Kentucky law, even if the EED instruction was not warranted in the guilt phase, it should have been given as a mitigating circumstance, pursuant to KRS 532.025(2)(b)(2).

 However, neither a violation of state law nor a state court's decision applying purely state law may be reviewed by a federal habeas corpus court since any such errors in that regard are not of a constitutional magnitude. *See Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *Watters v. Hubbard,* 725 F.2d 381, 383 (6th Cir.1984). Thus, when the evidence presented at trial does not support a particular jury instruction, based upon a state court's interpretation and application of state law, an alleged error predicated upon that particular jury instruction is not cognizable in federal habeas corpus review unless the failure amounted to a fundamental miscarriage of justice. *See Bagby v. Sowders,* 894 F.2d 792, 795 (6th Cir.) (en banc) (discussing *Beck v. Alabama*), *cert. denied,* 496 U.S. 929, 110 S.Ct. 2626, 110 L.Ed.2d 646 (1990). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle,* 502 U.S. at 67–68, 112 S.Ct. 475.

 In *Beck v. Alabama,* upon which the petitioner relies, the Supreme Court held that state defendants in capital cases are entitled to instructions on lesser included offenses "when the evidence would have supported such a verdict." 447 U.S. at 627, 100 S.Ct. 2382. In the circumstances before the Court in *Beck,* the instructions gave essentially only a choice between the extremes of an acquittal and an automatic death penalty. *Id.* at 637, 100 S.Ct. 2382. The circumstances in the instant case did not contain such a limited choice. In Bowling's case, the Kentucky Supreme Court had his *Beck v. Alabama* federal claim before it, but found the EED instruction not supported by the evidence under Kentucky law. In light thereof and of the discussion in the next section, this Court finds that the state court's decision is based on state law but it is also not contrary to federal law.

## 2. Penalty Phase

The Kentucky statute regarding instructions on both aggravating and mitigating circumstances in a death penalty case is KRS 532.025(2), and it is subsection (b) thereof which lists specific mitigating circumstances. The portion of the statute pertinent to the petitioner's claims reads as follows:

(2) In all cases of offenses for which the death penalty may be authorized, the judge shall consider, or he shall include in his instructions to the jury for it to consider, any mitigating circumstances or aggravating circumstances otherwise authorized by law and any of the following statutory aggravating or mitigating circumstances which may be supported by the evidence:

. . . . .

(b) Mitigating circumstances:

1. The defendant has no significant history of prior criminal activity;

2. The capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance even though the influence of extreme mental or emotional disturbance is not sufficient to constitute a defense to the crime;

. . . . .

7. At the time of the capital offense, the capacity of the defendant to appreciate the criminality of his conduct to the

requirements of law was impaired as a result of mental illness or retardation or intoxication even though the impairment of the capacity of the defendant to appreciate the criminality of his conduct or to conform the conduct to the requirements of law is insufficient to constitute a defense to the crime; ....

KRS 532.025(2) (West 1989).

The defense had offered a mitigation instruction which listed these statutory factors and other numerous circumstances in mitigation,[19] but the trial court rejected it. The court's instruction included only one of the three statutory mitigating factors Bowling requested and a catch-all sentence for the other mitigating evidence. It read as follows:

## INSTRUCTION NO. 14 MITIGATING CIRCUMSTANCES

In fixing a punishment for the defendant for the murder of Ernestine Lynn Earley and Edward Lee Earley you shall consider such mitigating or extenuating facts and circumstances as have been presented to you in the evidence, including but not limited to such of the following as you may believe from the evidence:

(a) That the defendant has no significant history of prior criminal activity.

---

19. The defendant's instruction read as follows:

> INSTRUCTION NO. 2 MITIGATING CIRCUMSTANCES
>
> In fixing a sentence for Thomas Clyde Bowling, Jr., you shall consider such mitigating or extenuating facts and circumstances you believe to be true by a preponderance of the evidence, including but not limited to the following:
>
> a. That Thomas Clyde Bowling, Jr. has no significant history of prior criminal activity.
>
> b. That Thomas Clyde Bowling, Jr. was acting under the influence of extreme mental or emotional disturbance.
>
> c. That Thomas Clyde Bowling, Jr.'s capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect.
>
> d. That Thomas Clyde Bowling, Jr.'s capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of intoxication from alcohol.
>
> e. That any lingering doubt you have as to Thomas Clyde Bowling Jr.'s guilt should weigh against the imposition of the death penalty because the death penalty is irreversible and a possibly innocent man should not be executed.
>
> f. That Thomas Clyde Bowling, Jr. has no history of criminal convictions for violent offenses.
>
> g. That Thomas Clyde Bowling, Jr. is mentally ill.
>
> h. That Thomas Clyde Bowling, Jr.'s capacity to commit the offense of murder was lessened by mental difficulties and/or the intake of alcohol and that this ability to maturely and meaningful [sic] deliberate, reflect and intend the death of Edward and Tina Earley was lessened by these mental problems and/or the effects of alcohol.
>
> i. That Thomas Clyde Bowling, Jr. did not flee or run away and offered no resistance to the police upon his arrest.
>
> j. That Thomas Clyde Bowling, Jr. is a good and caring father of 13 year old Jason Bowling.
>
> k. That Thomas Clyde Bowling, Jr. has been a model inmate who has received no disciplinary reports.
>
> Mitigating circumstances are unlimited. You must consider any other fact or circumstance which you consider mitigating even if it is not listed above. The mitigating circumstances listed in the instructions are merely examples of some of the factors the jury can take into account in deciding not to impose a death sentence. Any mitigating circumstance that you find to be true by a preponderance of the evidence, you must designate in writing by checking the appropriate verdict form, signed by the foreperson.
>
> TR Vol. 3 at 310.

You shall consider any other facts and circumstances which you consider to be mitigating or extenuating even though they are not listed in this Instruction. TR Vol. 3 at 328.

The petitioner charges that the trial court violated the first sentence of KRS 532.025(2), which mandates that the judge "shall include" in his instructions to the jury any of the enumerated statutory circumstances supported by the evidence. The petitioner specifically contends that evidence was presented at trial which supported instructions on the two additional statutory mitigating factors, an instruction on extreme emotional disturbance under KRS 532.025(2)(b)(2) and on mental disease or defect and on impaired capacity based upon intoxication, because the petitioner had drunk all weekend and empty bottles of wine coolers were found on the Powell County property, mitigating factors provided in KRS 532.025(2)(b)(7).

The petitioner asserts that the trial court's failure to give these instructions was in disregard of the statute and specific Kentucky case law, and the failure violated his Fourteenth Amendment rights to due process and equal protection of the law. Also, without the EED instruction, the defense could not properly refute the characterization of the defendant as a mean person by explaining the internal workings of EED. The petitioner argues that this is particularly harmful because the issues of EED and mental illness are so complicated as to be beyond the realm of the laymen who are jurors; therefore, jurors need the instruction in order to consider the mental issues in mitigation.

The petitioner also complains that besides not giving instructions based on the above-cited statutory mitigating factors, the trial court also erroneously failed to include other non-statutory mitigating circumstances, which were necessary to guide the jurors to fully consider all of the evidence in mitigation. In addition, the trial court erred when it failed to instruct that any finding of a mitigating factor need not be unanimous. The petitioner argues that without such specific instructions, the jury's sentence is not a reliable sentence. The jury not having the mitigating evidence sufficiently within reach to consider and give effect to that evidence, the petitioner claims that he is entitled to relief from the sentence. He cites to *Penry v. Lynaugh,* 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), *Boyde v. California,* 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), and *Johnson v. Texas,* 509 U.S. 350, 113 S.Ct. 2658, 125 L.Ed.2d 290, 305 (1993).

The Commonwealth responds that the trial court in the instant case did give the jury a general mitigating circumstances instruction; and defense counsel took advantage of the instruction to argue various mitigating circumstances, including EED. As the jury instructions complied with both the Constitution and Kentucky law, the penalty phase instructions were proper. Additionally, the Kentucky Supreme Court found that the trial court's instruction was constitutionally adequate; and the U.S. Supreme Court has, in *Buchanan v. Angelone,* 522 U.S. 269, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998), rejected the claim that a failure to instruct on a statutory mitigating circumstance is an automatic federal violation. The respondent states that Bowling has the burden of establishing constitutional error injury instructions (*citing Kordenbrock v. Scroggy,* 680 F.Supp. 867, 892–93 (E.D.Ky.1988), *affirmed in part on this issue and reversed in part on other grounds,* 919 F.2d 1091, 1120–22 (6th Cir.1990)) (*en banc*) and, even if the federal court finds error, the harmless error analysis must be applied (*citing Coe v. Bell,* 161 F.3d 320, 333–40 (6th Cir.1998)).

On Bowling's direct appeal, Kentucky's Supreme Court noted that Bowling had been allowed to introduce a vast amount of evidence in mitigation and that he was not complaining of the exclusion of any that he wished to present. The court then found that the trial court's failure to provide requested instructions on the additional statutory mitigating factors was based on the court's "finding that no reasonable juror could have so determined with the evidence presented." *Bowling I*, 873 S.W.2d at 180, IX. As to the list of non-statutory mitigators requested, the court also found this claim of error to be "without merit." *Id.* Kentucky's highest court concluded as follows:

> The jury was instructed to consider any and all mitigating factors which they found relevant. There is no requirement to enumerate each such nonstatutory factor in detail. There is nothing to suggest that the jury did not consider in their deliberations Bowling's claims of being a model inmate and of being a loving and caring father.
>
> The jurors were properly instructed on their ability to consider mitigating evidence. The jury instructions provided for mitigating circumstances and instructed the jury to consider any other facts or circumstances which they considered mitigating or extenuating, even though they were not listed in the instructions. The jury instructions fully complied with what is constitutionally required. *Smith v. Commonwealth*, Ky., 599 S.W.2d 900 (1980). The requirement of individualized sentencing in all capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence. *Boyde v. California*, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990).

*Id.* Thus, the court found no constitutional violations. The petitioner contends to this Court that the Supreme Court of Kentucky failed to give proper consideration to the United States Supreme Court's other applicable rulings by relying solely on *Boyde v. California*, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), which held that the catch-all instruction on mitigation therein was all that was needed to pass constitutional muster. According to the petitioner, the *Boyde* case dealt with non-statutory mitigating circumstances, while the instant case also deals with the failure to give instructions on statutory mitigating factors.

With regard to an instruction explaining that unanimity is not required for findings of mitigating circumstances, Kentucky's highest court stated that such an instruction is not required under Kentucky law. The court also specifically addressed the issue with regard to federal law, distinguishing the case of *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), in that the wording of the Bowling court's instructions is "totally different" and there is no Kentucky statute requiring that the jurors unanimously reach a conclusion regarding the application of any mitigating factor. The Kentucky Supreme Court concluded:

> Each individual juror was free to examine and react to any mitigating factor when determining the appropriate sentence. The instructions are in conformity with *Mills*, because any juror who found any mitigating factor of sufficient relevance could individually use that fact to prevent the jury from reaching a unanimous sentence of death. Bowling's argument is without merit.

*Bowling I*, 873 S.W.2d at 180, X.

■ The Supreme Court of the United States has held that federal law, the Eighth and Fourteenth Amendments to the United States Constitution, dictates that the sentencer in a capital case may not be precluded from considering any relevant circumstance as a mitigating factor.

*See Mills v. Maryland,* 486 U.S. at 371, 108 S.Ct. 1860. "The Constitution requires States to allow consideration of mitigating evidence in capital cases. Any barrier to such consideration must therefore fall." *McKoy v. North Carolina,* 494 U.S. 433, 442, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990). Since the Kentucky Supreme Court ruled that the requirements of *Boyde* were satisfied, that jurors were not precluded from considering all the defendant's evidence in mitigation and that *Mills* was not violated, the question for this Court is whether these rulings were contrary to or an unreasonable application of federal law, as stated by the United States Supreme Court.

This Court has studied Bowling's trial court instruction No. 2 on mitigation, aforequoted, and the remainder of the penalty phase instructions (TR Vol. 3 at 330–342), which included instructions on the requirement of presuming the defendant innocent of an aggravating circumstance unless the jury believed from the evidence alone and beyond a reasonable doubt that an aggravating circumstance exists; explanations of the four authorized sentences; and guidance as to the relative weights to be given aggravating and mitigating circumstances.[20] Additionally, the instant petitioner's jury form did not require findings

regarding mitigation and, therefore, did not contain the "yes" and "no" questions on mitigation found to be misleading in *Mills v. Maryland* and *McKoy v. North Carolina,* 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990). After the court's earlier instruction to the jury to consider "any other facts and circumstances which you consider to be mitigating," there were no questions requiring a finding on mitigating factors. Rather, Bowling's instructions had only one finding required of the jury, to be filled out on a form which was designed follows:

### INSTRUCTION NO. 15

#### Unanimous Verdict

The verdict of the jury must be unanimous and signed by one of you as Foreman. You may use the forms below in writing your verdict.

A. FINDING OF FACT CONCERNING AGGRAVATING CIRCUMSTANCE

We the jury, by unanimous vote, find that the evidence (circle one)—HAS—HAS NOT—proven beyond a reasonable doubt the existence of the aggravating circumstance listed under Instruction No. 13.

TR Vol. 3 at 339. Thus, the jury was required to answer unanimously only the

---

**20.** Instruction Nos. 11 and 12 ended with the following paragraphs:

Even though you may find the aggravating circumstance exists, you do not have to fix the defendant's punishment at either the death penalty or imprisonment for life without benefit of probation or parole until the defendant has served a minimum of 25 years of his sentence.

Even though you may find one or more mitigating circumstances exist, you may nevertheless fix the defendant's punishment at death, or imprisonment for life without benefit of probation or parole until the defendant has served a minimum of 25 years of his sentence, if you find beyond a reasonable doubt the existence of the aggravating

circumstance, but you shall not fix the death penalty, or imprisonment for life without benefit of probation or parole until the defendant has served a minimum of 25 years of his sentence, unless you believe the weight of the aggravating circumstance, if it exists, exceeds the weight of the mitigating circumstance or circumstances, if any.

Even though you may believe the weight of the aggravating circumstance or circumstances exceeds the weight of the mitigating circumstances, you do not have to fix the death penalty or life without benefit of probation or parole until the defendant has served a minimum of 25 years of his sentence, but you may fix a lesser sentence. TR Vol. 3 at 333–336.

one question on the aggravating circumstance, a finding which is required by statute before a death sentence could be imposed. The form concluded with Instruction No. 15's section B, which had only two additional places for the jury's responses: the foreman had to mark one of the four available penalties and affix his signature.

■ This Court finds that the instructions given in the instant case are most similar to those which passed constitutional muster in *Boyde v. California.* Boyde's instructions listed the statutory mitigation factors and concluded with a similar "catch-all" portion on other mitigating circumstances, contained a weighing instruction,[21] and did not contain the troublesome "yes" or "no" questions about mitigation in *Mills* or *McKoy.* After examining the instructions in *Boyde,* the Supreme Court of the United States concluded that "there is not a reasonable likelihood that the jurors in petitioner's case understood the challenged instructions to preclude consideration of relevant mitigating evidence offered by the petitioner." 494 U.S. at 386, 110 S.Ct. 1190. The Kentucky Supreme Court's application of *Boyde* in similar circumstances is clearly not an unreasonable application of federal law as stated therein and in other decisions.

## C. FAILURE TO HOLD A HEARING REGARDING PETITIONER'S DISSATISFACTION WITH SUMMERS' AND BALDANI'S REPRESENTATION

The petitioner has earlier presented his claim that trial counsel rendered ineffective assistance based upon allegations Bowling made at the in-chambers colloquy between him and the trial judge, and this Court set forth a portion of the exchange, *supra,* in dealing with this claim.[22] He also now complains of the trial court's merely questioning him with all counsel present, contending that the Sixth, Eighth, and Fourteenth Amendments demand that the trial judge inquire of the defense team as to the truthfulness of the petitioner's allegations regarding his dissatisfaction with them.

The petitioner contends that his complaints at that time showed that his representatives (1) had not adequately prepared; (2) nor taken time to discuss the case with him; (3) nor presented a reasonably competent defense. Rather than holding a hearing, defined in Black's Dictionary as including the presentation of witnesses and evidence, the trial court erred in conducting what the petitioner characterizes as a "conversation" with an uneducated defendant trying to describe the serious allegations. When the trial court denied his requests of new counsel or a mistrial or a continuance, the petitioner states that he was forced to accept continued representation by the men with whom there had been a complete breakdown in the attorney-client relationship. He contends that a hearing would have been more appropriate and more thorough; it could have gotten at the factual bases upon which the petitioner was basing his complaints; and, if held *ex parte,* the petitioner could have developed the

---

**21.** The state court in *Boyde* had instructed as follows:

> If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose

a sentence of confinement in the state prison for life without the possibility of parole. *Boyde,* 494 U.S. at 374, 110 S.Ct. 1190.

**22.** The entire colloquy between the petitioner and the trial court is in the record at Record No. 60 at 1805–30.

facts underlying his allegations, such as identifying witnesses about whom he contended he had told his counsel but whom counsel did not call on his behalf. As it was, the petitioner argues, he made a competent showing of serious allegations, which were unrebutted and required further probing. He emphasizes again that, to date, he has not yet had a hearing on his serious allegations of ineffective assistance of counsel.

The respondent points out that the petitioner did not complain of any aspect of trial counsel's assistance until the jury returned a verdict of guilty and, even at that time, he never fully set forth the basis for his dissatisfaction. Nor did he complain then of the kind of hearing which the trial court gave him. The respondent insists that the court repeatedly gave Bowling opportunities to state who was not called or what he requested that the attorneys failed to do, but his responses were so evasive that a motion for a hearing on the matter might even have been dismissed for failure to state sufficient facts giving a basis for the request. According to the respondent, the trial court made appropriate findings in the record regarding Bowling's attorneys' competence and their strategy. The respondent also points out that the Kentucky Supreme Court rejected this claim in *Bowling I* and maintains that its resolution of the issue is correct.

On Bowling's direct appeal, the Supreme Court of Kentucky wrote as follows:

The trial judge acted within his sound discretion when he refused to declare a mistrial or to appoint new counsel. Bowling did not complain of his trial counsel's performance until after the jury returned a guilty verdict. Bowling himself made neither timely nor specific objection to the defense provided by his three attorneys. No objection was made to the conduct of an immediate hearing by the trial judge which afforded the defendant an opportunity to express his dissatisfaction with the performance of his defense team. In addition, the trial judge permitted Bowling an opportunity to fully set forth the basis for his alleged dissatisfaction.

The trial judge properly ruled that Bowling failed to show any sufficient cause for discharging his attorneys. The trial judge determined that the trial strategy used by Bowling's counsel had a better chance of success than any of which the trial judge could think in light of the strong evidence of guilt presented by the prosecution.

*Bowling I*, 873 S.W.2d at 179–180, VIII.

The cases cited by the petitioner simply do not support his contention herein that due process or any other portion of federal law required a more formal hearing in the circumstances of this case. Rather, the petitioner's cases concern defendants who were so dissatisfied with counsel that they decided to proceed to trial *pro se* and focus on the issues of whether the defendant's decision for self-representation was voluntary and/or whether his waiver of his right to counsel was knowingly and intelligently made. *See e.g., Sanchez v. Mondragon*, 858 F.2d 1462, 1467 (10th Cir.1988); *see also United States v. Padilla*, 819 F.2d 952, 957–58 (10th Cir.1987). Reversals were mandated by several appellate courts upon finding that the lower court failed to inform the defendant adequately of the consequences of proceeding *pro se*. *See United States v. Welty*, 674 F.2d 185 (3rd Cir.1982); *United States v. Williams*, 594 F.2d 1258 (9th Cir.1979) (per curiam). In most of the cases, the appellate court was clearly concerned with summary denials when a defendant complains of counsel at the eleventh hour. *Williams*, 594 F.2d at 1260; *see also McMahon v. Fulcomer*, 821 F.2d 934 (3rd Cir.1987). Yet none held

that a separate full hearing, rather than an immediate colloquy, was required.

Although both the petitioner and respondent contend that the Supreme Court's decision in *United States v. Cronic*, 466 U.S. 648, 658, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), is supportive of their respective positions, this Court finds that *Cronic*, a sister case of *Strickland v. Washington*, decided on the same date, cautions against just what the petitioner urges herein, *i.e.*, that the reviewing court infer or presume ineffective assistance without examining counsel's conduct and finding a break-down in the adversarial process.

In the instant case, the error, if any, is not that of the trial court, but is that of the petitioner, who obtained the attorneys of his choice and allowed them to represent him for six months, through several pretrial hearings before the court, a dozen defense motions pretrial, and a full week of trial, before he raised any dissatisfaction with trial counsel. At that point he was given an opportunity to be heard. The court not only listened to him, but actually did probe further, as the colloquy demonstrates; there was no indication at the time that the defendant desired a hearing or had anything more to produce. *See United States v. Iles*, 906 F.2d 1122, 1131 (6th Cir.1990).

■ The Kentucky Supreme Court held that the trial court did not commit constitutional error in not convening a hearing and calling counsel to testify, *sua sponte*, after six months of representation and minutes before the penalty phase of the trial was to begin. The possibility that a hearing with trial counsel called as testifying witnesses could have produced more information is not the issue before the Court. The issue is whether the state Supreme Court's decision finding no constitutional error was contrary to or an unreasonable application of the United States Supreme Court's statement of federal law. This Court believes not. There was an inquiry as to the reasons for the petitioner's dissatisfaction and as to his options, before the court denied his motion. The defendant then proceeded to the next stage of trial, with the full representation of his retained counsel. The Kentucky Supreme Court's rejection of this claim was not based on an unreasonable determination of the facts in light of the evidence; nor was it contrary to established federal law.

## D. FAILURE TO SEQUESTER JURY BETWEEN GUILT AND PENALTY PHASE

Between the end of the guilt phase of the trial and the beginning of the penalty phase, *i.e.*, from Friday afternoon until Monday morning, the jurors were not sequestered. The petitioner argues that sequestration in a felony case is mandatory "after the case is submitted [to the jury] for their verdict." RCr 9.66. The reason for this state rule is to safeguard the defendant's right to a fundamentally fair trial by an impartial jury, as the Sixth, Eighth, and Fourteenth Amendments require. The petitioner argues that because death is different, there is a corresponding increased importance in making sure that every safeguard is observed, citing *Gregg v. Georgia*, 428 U.S. 153, 187, 96 S,Ct. 2909, 49 L.Ed.2d 859 (1976), and making sure that the determination that death is the appropriate punishment is reliable, citing *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976).

The respondent's position is that, in conformity with the Kentucky rule, the jury was sequestered after the case was submitted for their verdict on the question of guilt, and they were sequestered again at the conclusion of the penalty phase. RCr 9.66 contains no requirement that jurors

be sequestered between the guilt and penalty phases of trial. In fact, under Kentucky law, entirely different juries may be used to assess penalty and guilt, thus implying that the two phases are separate and distinct proceedings. Moreover, after the court advised counsel that it would only admonish the jury about their duty over the weekend, and after the court did, in fact, admonish the jury, counsel for Bowling made no objection thereto, thus waiving the issue. The decision of sequestration is discretionary, except when mandated during jury deliberation by RCr 9.66, and the respondent urges there was no abuse of that discretion. Finally, he points out that the Kentucky Supreme Court rejected this claim.

The Supreme Court of Kentucky stated that, under Kentucky law, sequestration is necessary only in a felony case from the time the case is submitted for a verdict on the question of guilt until such time as the jury reaches a verdict; and, in the instant case, the jury was sequestered during that deliberation. *Bowling I*, 873 S.W.2d at 182, XIX. RCr 9.66 does not require jurors to be sequestered after having found guilt and before beginning the penalty phase of the trial. Therefore, the decision to not sequester the jury at that time was within the discretion of the trial judge, and there was no abuse of that discretion. Additionally, the court found that Bowling had failed to demonstrate how he suffered any prejudice thereby. *Id.*

■■■ The requirement that a jury be sequestered during deliberations in the guilt phase of a felony trial is a matter of state law upon which the Kentucky Supreme Court has ruled, finding the state law not violated. State law violations are not cognizable on habeas review. *See Smith v. Phillips*, 455 U.S. 209, 221–22, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). To the extent that the petitioner urges a violation of federal law, the petitioner points to no authority for his contention. Nor does he state any factual basis for believing that the failure to sequester between phases somehow tainted the proceedings in some manner, such as permitting the inclusion of extraneous information,[23] thereby violating his constitutionally guaranteed rights. Therefore, this claim must also fail as a basis for relief.

## IV. *DEATH SENTENCE UNCONSTITUTIONAL*

To pass constitutional muster, a capital sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 877, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).

Under Kentucky law and the capital sentencing laws of most states, the jury is required during the sentencing phase to find at least one aggravating circumstance before it may impose death. *See Gregg v. Georgia*, 428 U.S. 153, 162–164, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (reviewing and approving Georgia sentencing scheme); *Proffitt v. Florida*, 428 U.S. 242, 247–250, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (reviewing and approving Florida sentencing scheme). "[S]tatutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty." *Zant*, 462 U.S. at 878, 103 S.Ct. 2733. The Supreme Court has also stated, "[T]he channeling and limiting of the sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action." *May-*

---

**23.** *See e.g. Gall v. Parker*, 231 F.3d 265, 332– 35 (6th Cir.2000).

*nard v. Cartwright,* 486 U.S. 356, 362, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988).

In *Lowenfield v. Phelps,* 484 U.S. 231, 245–46, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), the Supreme Court upheld the Texas death penalty scheme, in which the narrowing function was performed by the legislature when it circumscribed the range of offenses eligible for the death penalty. *Id.* at 245–46, 108 S.Ct. 546. "The fact that the sentencing jury is also required to find the existence of an aggravating circumstance in addition is no part of the constitutionally required narrowing process, and so the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm." *Id.* at 246, 108 S.Ct. 546. As the Court explained, the use of "aggravating circumstances" is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion. The Supreme Court stated that there was no reason why this narrowing function may not be performed by jury findings at either the sentencing phase of the trial or the guilt phase. *Id.* at 244–45, 108 S.Ct. 546.

**A. DEATH SENTENCE IS CONSTITUTIONALLY INFIRM AND VIOLATIVE OF THE EIGHTH AND THIRTEENTH AMENDMENTS AS WELL AS DUE PROCESS AND EQUAL PROTECTION OF THE FOURTEENTH AMENDMENT.**

1. **The use of the same two murders in the guilt phase as the sole aggravating factor to impose a death for both murders fails to narrow the class of person eligible for the death penalty, violating the constitutional prohibition against cruel and unusual punishment.**

The petitioner contends that using a finding from the guilt phase as the sole aggravating factor fails to provide any real narrowing in the penalty phase as the Constitution requires. Rather, there is only a "meaningless reaffirming" of their finding in the guilt phase.

The respondent's position is that the Kentucky Supreme Court has rejected this argument in the instant case and in the two other Kentucky death penalty cases in which the fact of multiple murders was the sole aggravating circumstance; Kentucky's highest court and the United States Supreme Court have repeatedly held that only one aggravating circumstance need be shown beyond a reasonable doubt to sustain a death sentence; and the sentence of death is not disproportionate in the present case.

When the petitioner brought this argument on direct review, the Supreme Court of Kentucky specifically found that *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), applies and supports the decision in the instant case. *Bowling I,* 873 S.W.2d at 181, XIV. "Only one aggravating factor need be shown beyond a reasonable doubt to sustain a death sentence. . . . Here the death sentence is not disproportionate and it is not cruel and unusual punishment for the commission of double murders." *Id.*

 This Court finds that the Kentucky Supreme Court's decision on this issue was not an unreasonable application of *Lowenfield* or other applicable federal law clearly established by the United States Supreme Court. The aggravating factor of intentional killing resulting in multiple deaths sufficiently narrows the class of death-eligible persons to pass constitutional muster. *See also Arave v. Creech,* 507 U.S. 463, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993); *Lowenfield v. Phelps,* 484 U.S. at 244, 108 S.Ct. 546; *Zant v. Stephens,* 462 U.S. at 874, 103 S.Ct. 2733. In fact, the Supreme Court has expressly

held that a trier of fact may sentence a defendant to death after finding an aggravating circumstance "at either the guilt or penalty phase." *Tuilaepa v. California,* 512 U.S. 967, 971–72, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994).

2. **The submission of a single instruction permitting the jury to make a single finding of an aggravating circumstance to support the imposition of two death sentences impermissibly narrowed responsibility of jury and renders the sentences invalid.**

The petitioner contends that failure to give two separate instructions informing the jury of the necessity of an aggravating factor to support each death sentence is the " 'kind of open-ended discretion which was held invalid in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 ... (1972).' *Maynard v. Cartwright,* [108 S.Ct.] at 1858."

The Kentucky Supreme Court rejected this argument, pointing out that Kentucky's statutory system in a capital case was modeled after the one which the Supreme Court upheld in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). *Bowling I,* 873 S.W.2d at 181, XV. The aggravating factor of multiple murder was an essential part of the circumstances of the crimes before the jury in the penalty phase; once the jury determined the defendant's two acts of killing were intentional and resulted in multiple deaths, the multiple aggravating factor applied to each of those killings. *Id.*

■■■ Again, the state Supreme Court's ruling was not an unreasonable application of clearly established federal law as stated in *Gregg* and *Lowenfield.*[24]

3. **Petitioner's sentence of death must be set aside as being excessive and disproportionate to the penalty imposed in other cases.**

The petitioner argues that at the time of his trial, he was the only person in the Commonwealth who received a death sentence solely for the aggravating circumstance of killing two people. The petitioner goes on to chart a list of people convicted of double murder in Kentucky, with no other aggravating factors except that of multiple deaths. In the years from 1977, when the state Department of Public Advocacy began collecting data on potential capital cases, to 1991, when the petitioner's death sentence was imposed, all were spared the death penalty, except the petitioner. Therefore, the petitioner argues that his receiving the death penalty is excessive and disproportionate on its face.

The Commonwealth points out that the petitioner is no longer the only person to receive the death penalty for committing multiple deaths. In the ten years since the petitioner's convictions, the Supreme Court of Kentucky has upheld the capital penalty in two cases in which the sole aggravating factor, like the petitioner's, was multiple deaths: *Tamme v. Commonwealth,* Ky., 973 S.W.2d 13 (1998); and *Foley v. Commonwealth,* Ky., 942 S.W.2d 876 (1996).

The Supreme Court of Kentucky, in Bowling's direct appeal in 1994, stated that it had reviewed the instant record; conducted a proportionality review of other cases in which the death sentence was imposed, as required by KRS 543.075(3)(c); and specifically found as follows:

---

**24.** In *McQueen v. Scroggy,* 99 F.3d 1302, 1333 (6th Cir.1996), the United States Court of Appeals for the Sixth Circuit rejected that petitioner's same challenge to the Kentucky statute; the court also noted the consistency with which the Georgia statutory scheme had been upheld by the Supreme Court of the United States.

The sentences imposed on Bowling were not inappropriate, arbitrary, discriminatory, unusual, cruel or disproportionate. The sentences were imposed because of the individual factors of the crimes of which he was found guilty as charged. Pursuant to K.R.S. 532.075, this Court has carefully reviewed the record and has determined that the death sentence was not imposed under the influence of passion, prejudice or any other arbitrary factor. The death sentences were not excessive or disproportionate to the penalty imposed in similar sentences since 1970 considering both the crime and the defendant.... We have conducted an independent review of all the circumstances and conclude that they exceed any minimum threshold justifying capital punishment.

*Bowling I,* 873 S.W.2d at 181–82, XVI.

■ The death penalty is required by the Constitution to be an individualized sanction based on both the nature of the crime and the criminal. In *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), which reinstated the death penalty, the Supreme Court discussed the importance of a case-by-case determination at the sentencing hearing. "We have long recognized that '[f]or the determination of sentences, justice generally requires ... that there be taken into account the circumstances of the offense together with the character and propensities of the offender.'" *Id.* at 189 (quoting *Pennsylvania ex rel. Sullivan v. Ashe,* 302 U.S. 51, 55, 58 S.Ct. 59, 82 L.Ed. 43 (1937)). Since *Gregg,* the Court has reaffirmed that sentencing determinations must be made based upon an examination of the particular characteristics of the defendant. *See Penry v. Lynaugh,* 492 U.S. 302, 317, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) ("[T]he Eighth Amendment mandates an individualized assessment of the appropriateness of the death penalty."); *Zant v. Stephens,* 462 U.S. at 879, 103 S.Ct. 2733 (requiring that once the defendant is put in the category of persons eligible for the death penalty, the jury must make an individualized determination "on the basis of the character of the individual and the circumstances of the crime").

There is no federal constitutional requirement that a state appellate court conduct a comparative proportionality review, but the Kentucky Supreme Court conducted such a review and found that Bowling's death sentences were not disproportionate to the crimes committed. The petitioner apparently misapprehends the issue. It is not simply whether other people have or have not received the death penalty for crimes similar to his; it is also whether *his* death sentence is disproportionate, based on *his* crimes.

■ The Kentucky Supreme Court's conclusion that his penalties were "not inappropriate, arbitrary, discriminatory, unusual, cruel or disproportionate" did not involve an unreasonable application of Supreme Court law.

**B. SENTENCE VIOLATES DOUBLE JEOPARDY**

1. **Petitioner's two death sentences based on the same aggravating factor violate double jeopardy and due process, rendering both sentences invalid.**

2. **In a double murder in which the only aggravating circumstance is intentional multiple murder, imposition of the death penalty for either killing violates the constitutional guarantees against double jeopardy and denies due process of law.**

The petitioner argues that the doctrine of "mutually supporting aggravating cir-

cumstances" precludes simultaneous use of the murder of one victim to support the death penalty for murder of the second victim, and use of the murder of the second to support the death penalty for the murder of the first, citing *McMichen v. State*, 265 Ga. 598, 458 S.E.2d 833, 840 (1995). The petitioner argues there was only one incident of multiple deaths; therefore, only one aggravating circumstance served as the basis for two death sentences, in violation of double jeopardy. Accordingly, he is being punished twice for the same murder; one death sentence must be vacated; and he is entitled to a whole new sentencing proceeding, based upon *Cosby v. Commonwealth*, Ky., 776 S.W.2d 367, 372 (1989), *Boulder v. Commonwealth*, Ky., 610 S.W.2d 615 (1980), and decisions in other state courts.

The Commonwealth characterizes the petitioner's argument as ignoring the fact that his sentence was based on his killing two different victims. Additionally, the state strongly urges that the rationale of *Lowenfield v. Phelps*, 484 U.S. at 245–46, 108 S.Ct. 546, is applicable to the petitioner's Eighth Amendment claim because it held that the fact that the aggravating circumstance duplicates one of the elements of the crime does not make the sentence constitutionally infirm. *Id.* The state also quotes a Kentucky case which stated, "The Double Jeopardy Clause is to prevent multiple prosecutions for one act, *U.S. v. DiFrancesco*, 449 U.S. 117, 129, 101 S.Ct. 426, 66 L.Ed.2d 328 ... (1980), not to prevent the state from separately punishing the killing of two or more people." *Smith v. Commonwealth*, Ky., 734 S.W.2d 437, 447 (1987).

On review of these claims, the Kentucky Supreme Court held, "Once the jury determined that two of Bowling's acts of killing were intentional and resulted in multiple deaths, the multiple murder aggravating factor applied. *Simmons v. Commonwealth*, Ky., 746 S.W.2d 393 (1988)." *Bowling I*, 873 S.W.2d at 181, XII. Later, "Bowling's sentence was based on the murder of two different victims.... Here there are two convictions and two sentences.... The aggravating circumstances only determine whether the crime of murder shall carry the death penalty." *Id.* at 181, XIII (citing to *Lowenfield v. Phelps*, 484 U.S. at 231, 108 S.Ct. 546).

■ Again, the Kentucky Supreme Court's decisions are neither contrary to nor unreasonable applications of *Lowenfield* and other clearly established federal law.

## C. COMMONWEALTH'S DECISION TO SEEK DEATH WAS UNDULY BASED ON RACE OF VICTIMS AND DEATH SENTENCE WAS UNDULY BASED ON RACE OF VICTIMS.

The petitioner contends that his sentence of death is violative of the Due Process and Equal Protection Clauses of the Fourteenth Amendment, as well as the Eighth and Thirteenth Amendments, because it was influenced by race: the victims' being white. He refers to numerous studies supporting the proposition that the killing of white victims is more likely to draw a penalty of death than convictions involving non-white victims. Under this claim, even the Commonwealth's decision to seek the death penalty was based only on the racial identity of the victims, and so it was unconstitutional.

The Commonwealth contends that the petitioner did not raise this issue before the state courts. Therefore, it should not be considered on the merits. Even if it were, however, the Commonwealth argues there is no evidence of discriminatory purpose in his case, citing the Supreme

Court's language in *McCleskey v. Kemp*, 481 U.S. 279, 294, 298, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). The respondent also notes the rejection of this argument in other Kentucky capital cases, particularly *McQueen v. Scroggy*, Ky., 99 F.3d 1302, 1333 (1996), *cert. denied*, 520 U.S. 1257, 117 S.Ct. 2422, 138 L.Ed.2d 185 (white male accused of murdering a white female), and *Bussell v. Commonwealth*, Ky., 882 S.W.2d 111, 115 (1994), *cert. denied*, 513 U.S. 1174, 115 S.Ct. 1154, 130 L.Ed.2d 1111 (1995) (black perpetrator and white victim). Additionally, the Commonwealth argues that Bowling's argument should not be entertained because it requires a new rule of federal constitutional law barred by *Teague* and that Bowling actually lacks standing to assert violations of the constitutional rights of others.

 This Court has already addressed the racial challenge, *supra*, when the petitioner argued that counsel were ineffective for not attacking the death penalty on this basis. The petitioner never briefed the claim to Kentucky's highest court and presented to this Court no cause to excuse the default. The Court notes, however, that when raised by another white Kentucky petitioner, it has previously been found to be meritless by this Court in *McQueen v. Scroggy*, Lexington Civil Action No. 87–192, *aff'd*, 99 F.3d at 1333. And, like the black criminal defendant in *McCleskey v. Kemp*, the instant petitioner offered "no evidence specific to his own case that would support an inference that racial consideration played a part in his sentence" (481 U.S. at 292, 107 S.Ct. 1756) nor any evidence of such a consideration in the instant prosecutor's decision to seek the death penalty (*Id.* at 296–97, 107 S.Ct. 1756). Accordingly, this Court finds no basis for habeas relief.

**D. FAILURE OF KENTUCKY SUPREME COURT TO CLEARLY ELUCIDATE STANDARD FOR THEIR PROPORTIONALITY REVIEW VIOLATES DUE PROCESS.**

**1. Petitioner's state and federal constitutional rights will be denied by the manner in which proportionality review was conducted by the Kentucky Supreme Court.**

By statute, the Supreme Court of Kentucky must conduct a proportionality review process whenever the death penalty is imposed for a capital offense. *See* KRS 532.075(3). The petitioner challenges the constitutionality of Kentucky's proportionality review as violative of due process because its review is limited solely to the cases in which the death penalty was imposed and ignores similar cases in which the same aggravating factor of two intentional murders was present but the death sentence was not imposed. The petitioner cites to other states whose highest courts have held that the latter group of cases, non-capital penalties for double murders, must be considered in a proportionality review. He contends that due process demands that the Kentucky court "expand its universe" to include all similar cases.

The respondent notes that because proportionality review is not constitutionally required, it is a matter of state law to be conducted as the state sees fit. The manner in which the state Supreme Court conducts its proportionality review is, therefore, a matter of state law, the respondent citing to, *inter alia, McQueen v. Scroggy*, 99 F.3d at 1333–34. Also, the Kentucky Supreme Court rejected this claim on direct appeal in *Bowling I*, 873 S.W.2d at 181–82, XVI and XVII.

This Court notes that on Bowling's direct appeal, the Supreme Court of Kentucky described its statutory proportionality review, which includes study of the

accumulated records of all felonies in which the death penalty was imposed after January 1, 1970. *Bowling I,* 873 S.W.2d at 182, XVII. Kentucky's highest court also referred to cases in which the petitioner could find all of the comparable cases listed if he desired to make a comparison of his own and then concluded that Bowling's sentences "were not excessive or disproportionate to the penalty imposed in similar sentences since 1970 considering both the crime and the defendant." *Id.* at 181–82, XVI.

■■■ This claim arises under state, rather than federal, law. The Supreme Court of the United States has held that there is no constitutional requirement that states conduct a proportionality review:

> There is thus no basis in our cases for holding that comparative proportionality review by an appellate court is required in every case in which the death penalty is imposed and the defendant requests it.... We are not persuaded that the Eighth Amendment requires us to take that course.

*Pulley v. Harris,* 465 U.S. 37, 50–51, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). In conducting habeas review, a federal court is limited to deciding whether the conviction violated the Constitution, laws or treaties of the United States. *Estelle v. McGuire,* 502 U.S. 62, 67, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *Lewis v. Jeffers,* 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990); *Pulley,* 465 U.S. at 41, 104 S.Ct. 871. Federal habeas relief is not available for review of questions of state law. *See Gryger v. Burke,* 334 U.S. 728, 731, 68 S.Ct. 1256, 92 L.Ed. 1683 (1948). *Hebert v. Louisiana,* 272 U.S. 312, 316, 47 S.Ct. 103, 71 L.Ed. 270 (1926).

■■■ Having found no claim involving federal law, the Court denies this claim for relief.

### 2. Petitioner's inability to obtain access to KRS 532.075(6) data deprives him of effective assistance of counsel, rational sentencing, due process, and equal protection.

The petitioner states that he needs access to the KRS 532.075(6) data compiled by the Supreme Court, in order to strengthen his argument that Kentucky's death penalty is disproportionately applied. Without it, the petitioner is purportedly deprived of effective assistance of counsel and support for his arguments that the death penalty scheme is unconstitutional, as applied to him. The Commonwealth characterizes this as "a hollow argument" which the Kentucky Supreme Court has consistently rejected.

In the instant case, the Supreme Court of Kentucky addressed this argument in its entirety as follows:

> Bowling claims that his inability to obtain access to KRS 532.075(6) data deprives him of effective assistance of counsel. There is no merit to this frequently used argument.

*Bowling I,* at 182, XVIII.

■■■ In *Harper v. Commonwealth,* Ky., 694 S.W.2d 665 (1985), Kentucky's highest court gave a more complete response, including the following:

> For some reason, obscure to us, the Public Advocate keeps insisting on access to the data collected by this court under the provisions of KRS 532.075(6). We had thought the *Ex Parte Farley,* Ky., 570 S.W.2d 617 (1978), settled this question. There is no articulated reason why the Public Advocate cannot assemble this data for use in capital cases.... The Public Advocate has the curious idea that we consider all previous cases which were tried or could have been tried as capital cases. This is a mistaken belief. KRS 532.075(6) refers to rec-

ords of all felony offenses in which the *death penalty was imposed* after January 1, 1970, or such earlier date as the court may deem appropriate. We have used such cases commencing in 1972. The Public Advocate can study these cases, as well as we have done.

*Harper,* 694 S.W.2d at 670–71. Like the preceding claim, the petitioner's claim is a matter of state, not federal, law. He has not demonstrated that his constitutional rights have been violated because the Supreme Court of Kentucky did not hand him the data which he could obtain for himself from the same source. Nor has he demonstrated that the state's resolution of this claim is contrary to clearly established Supreme Court jurisprudence.

### CONCLUSION

For the reasons discussed above, this Court concludes that Bowling has not established any instance where the state proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2). Moreover, petitioner presents no other grounds upon which habeas relief is warranted. Accordingly, the Court being advised, IT IS ORDERED, as follows:

(1) The petition of Thomas Clyde Bowling, Jr., for writ of habeas corpus [Record No. 17] is DENIED;

(2) The stay of execution entered herein on October 1, 1999 [Record No. 27] is hereby VACATED;

(3) The instant action is DISMISSED; and

(4) Judgment will be entered contemporaneously with this opinion and order in favor of the respondent.

In accordance with the Memorandum Opinion and Order entered contemporaneously with this Judgment, the Court hereby ORDERS AND ADJUDGES that

(1) the petition for a writ of habeas corpus is DISMISSED WITH PREJUDICE and judgment is entered in favor of the respondent;

(2) the Court, in an abundance of caution, finds that the petitioner has arguably made a substantial showing of the denial of his constitutional rights with regard to the issues raised herein and hereby ISSUES a certificate of appealability on all of the petitioner's claims (28 U.S.C. § 2253(c); Fed.R.App.P. 22(b));

(3) an appeal from this Judgment would be taken in good faith;

(4) this Judgment is FINAL; and

(5) this matter is STRICKEN from the active docket.